# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JUAN VILLA RAMIREZ,
Defendant and Appellant.

S099844

Kern County Superior Court
SC076259A

August 25, 2022

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Kruger, Groban, Jenkins, and Guerrero concurred.

Justice Groban filed a concurring opinion, in which Justice Liu concurred.

PEOPLE v. RAMIREZ

S099844

Opinion of the Court by Corrigan, J.

Juan Villa Ramirez[1] was convicted of a variety of crimes on three separate occasions. Those sets of convictions were as follows: 1. Robbery of Leonel Paredes, kidnapping during the commission of carjacking and for purposes of ransom, during which Paredes was exposed to a substantial likelihood of death, and three enhancements for personal firearm use;[2] 2. Robbery and kidnapping during the commission of carjacking of Juan Carlos Ramirez;[3] 3. Carjacking, kidnapping with intent to commit robbery, and first degree murder of Chad Yarbrough, with special circumstances for killing during kidnapping and carjacking, and three personal firearm use enhancements.[4]

---

[1] We adopt defendant's name as it appears in the trial court below and in defendant's briefing before us. We note, however, that defendant's name appears as Juan de Dios Ramírez Villa in litigation before the International Court of Justice. (*Case Concerning Avena and Other Mexican Nationals* (Mexico v. U.S.) 2004 Judgment, I.C.J. 12, 25 (Mar. 31) [litigant #20].) We mean no disrespect by adopting the name used in his briefing.

[2] Penal Code sections 212.5, subdivision (c), 209.5, 209, subdivision (a), and 12022.5, subdivision (a). All statutory references are to the Penal Code unless otherwise stated.

[3] Sections 212.5, subdivision (c) and 209.5. Defendant was acquitted of a separate count of carjacking. (§ 215, subd. (a).)

[4] Sections 215, subdivision (a), 209, subdivision (b)(1), 187, subdivision (a), 190.2, subdivision (a)(17)(B) and (L), 12022.5, subdivision (a).

1

In addition to these offenses, separate counts charging methamphetamine possession and possession of a firearm under the influence of that drug[5] were bifurcated. Following the capital trial a separate jury convicted defendant of the drug offenses, but acquitted him on the weapons allegation. The jury returned a verdict of death for the murder and that sentence was imposed. In addition, the court imposed consecutive sentences of life without the possibility of parole for the Paredes kidnapping for ransom; two terms of life with the possibility of parole for the kidnappings of Ramirez and Yarbrough; and a total consecutive determinate term of 21 years. Additional determinate terms and orders were imposed and are not challenged in this appeal. Sentences on all counts except the murder were stayed pending appeal.

We affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. Crimes Against Paredes

Late on October 4, 1997, Paredes parked his car near his apartment in Lamont and was approached by three men. Defendant placed a shotgun on his chest, Efrain Garza pointed a revolver, and the third man held a knife below his ear. Defendant demanded Paredes's car keys, saying he would be hurt if he did not cooperate. Duct tape was placed over his eyes and mouth, and used to secure his hands and feet. Garza took

---

[5] Health and Safety Code sections 11370.1, subdivision (a), 11550, subdivision (e).

his keys and wallet.[6] Paredes was ordered to lie in the back seat of his car and was held at knifepoint as the car drove off. Paredes could tell from the voices around him that defendant was the driver.

After driving for about 15 minutes, Paredes was moved to the trunk. After another 10 or 15 minutes, the car was parked in a garage. Paredes remained locked in the trunk for four to five hours while the men tried to negotiate a $500 ransom from Paredes's cousin and uncle. During that time, the trunk was occasionally opened. Paredes was hit in the face, held with a shotgun to his neck, and forced to talk to his uncle on the phone. At some point, the abductors drove to another location with Paredes still in the trunk. The abductors left in a second car, warning Paredes not to call the police or his family would be harmed. Paredes managed to remove the tape, open the trunk, call his uncle, and report the incident to police.[7] One latent fingerprint was lifted from the trunk lid of Paredes's car. It did not match defendant.

### b. Crimes Against Juan Carlos Ramirez

On October 14, 1997, defendant was at Efrain Garza's house in Lamont, along with Garza, Hector Valenzuela, Freddy De La Rosa, Daniel Quintana, and defendant's cousin, Carlos Rosales. Juan Carlos[8] arrived at the house next door to

---

[6] Garza was initially a codefendant, but his case was severed from that of the defendant.

[7] Evidence concerning Paredes's identification of defendant is discussed in further detail *post* at part II.B.5.

[8] Defendant and the victim Ramirez are, apparently, not related but share the same last name. To avoid confusion, we refer to the victim by his given name.

purchase drugs from someone named "Shannon." Valenzuela and De La Rosa approached him and Valenzuela demanded a ride at gunpoint. Valenzuela got into the cab of Juan Carlos's truck while De La Rosa got in the back. Juan Carlos drove about a half mile to a field, where Valenzuela and De La Rosa took personal belongings, including his watch, necklace, and a charm with "Juan" engraved on it.

The three men got back in the truck and De La Rosa drove. Near Shannon's house, De La Rosa hit a parked car and told Juan Carlos to drive. The other four individuals who had been at Garza's house were walking down the street, and De La Rosa called out to them to get in the truck. Those men were defendant, Garza, Quintana, and Rosales.

Valenzuela pointed a pistol at Juan Carlos and told him to drive to an orchard. Upon arrival Valenzuela then ordered Juan Carlos out of the truck. Defendant, Valenzuela, De La Rosa, and Garza got out also. They demanded money, but Juan Carlos denied having any. When a search of his wallet proved otherwise, the men beat him. Defendant asked for the gun so he could kill him. Defendant said he was the devil, and that if Juan Carlos said anything, defendant would cut off parts of his body and shove them in his mouth. Defendant took the victim's belt and struck him on the back with it. The beating continued, after which defendant bound the victim with rope. After the men left in his truck, Juan Carlos untied himself, walked to a friend's house, and called the police.

Rosales was called by the prosecution and corroborated much of the victim's testimony. He admitted that he and the others got into the truck at De La Rosa's invitation. Valenzuela

had a gun.[9]  At the orchard, Rosales stayed in the truck with Quintana, while the others got out.  Garza pulled out a pistol-grip 12-gauge firearm.  Valenzuela took some money, a belt, and jewelry.  Valenzuela was angry because Juan Carlos had lied about having no money.  Valenzuela and Garza both hit Juan Carlos with their guns, and defendant, along with De La Rosa and Garza, beat him.  Juan Carlos was then dragged toward the orchard and tied up.  At the time of trial Rosales's memory for detail was unclear.  He had testified at the preliminary hearing that defendant beat Juan Carolos with a belt and later bound the victim with rope defendant took from the truck.

Quintana also testified for the prosecution.  He said that everyone who got out of the truck at the orchard beat Juan Carlos.  Although Quintana had said in an interview that defendant was the first to hit the victim, his recollection at trial was that they all assaulted him at the same time.  After the beating, defendant got a rope from the truck and bound the victim.  Quintana believed that defendant was the oldest of the six perpetrators, and that he and Garza were the leaders of the group.

The attackers left Juan Carlos in the orchard then drove to a park where Valenzuela divided the stolen money.  Each man received about $10.  Valenzuela kept the necklace, but gave the charm with "Juan" engraved on it to defendant.

After dividing up Juan Carlos's property, the group stopped at a food truck.  Afterward, defendant, along with Rosales and Quintana, went first to Rosales's house then on to

---

[9]    On cross-examination, Rosales testified that the first time he saw the gun in Valenzuela's hand was when Valenzuela got out of the truck at the orchard.

Quintana's, where Garza and Willie Santiago met them. Defendant had been using methamphetamine all day and began drinking at Quintana's.

### c. *Murder of Chad Yarbrough*[10]

The murder occurred on the same day as the Juan Carlos crimes. It arose against the backdrop of conflict between groups who lived in two communities outside Bakersfield: the city of Arvin and unincorporated Lamont. While defendant and his associates were at Quintana's, defendant cleaned a Tec-9 handgun, loaded it, and wrapped it in a shirt.[11] About two hours later, Garza said he saw Chad's truck. As described more fully below, there had been animosity between defendant's family and Chad. Defendant and Garza went outside and approached the truck. Rosales testified he heard the sound of a gun cocking and saw Chad's younger brother get out of the truck. After Garza got in on the passenger side and defendant got behind the wheel, the truck drove off.

In October 1997, Chad and Brent went to Arvin High School. Chad was a senior and Brent a freshman. Chad would drive them to and from school in his white truck. On October 14, the brothers went to football practice, and visited Chad's girlfriend, Carolina Castro. Brent described what transpired as Chad drove away from Castro's home. Two Hispanic men confronted them in the middle of the road. When they waived Chad down he stopped and rolled down his window. The men

---

[10] Chad and his younger brother, Brent, share a last name. To avoid confusion, we will refer to them by their given names.

[11] Rosales had seen defendant with the gun before and had seen Garza shoot it. When he fired it once or twice, the gun jammed.

talked like they knew each other, but Brent did not hear what they said.

Defendant said his name was Loco. The other man pulled out a gun and ordered both brothers to get out of the truck, but defendant told Chad to stay put. Chad said, "I'm Cool," or words to the effect that everything was okay. The other man told Brent to sit on the curb. Both men got in the truck with Chad between them. Defendant was driving. A large man approached and told Brent to stay on the curb and say nothing. A second man stood nearby. Brent sat on the curb for 30 to 45 minutes, until the men left. He then ran to Castro's house and told her to call the police because his brother had been kidnapped.

The same evening, the Yarbrough family searched for Chad. At around 1:30 a.m., his uncle found Chad's body in a field. He wore only his underwear. Black electrical tape covered his eyes and part of his nose; shoelaces bound his hands behind his back. Autopsy surgeon Donna Brown discovered three fatal gunshot wounds to the head. Dr. Brown opined that if the weapon had been fully automatic, the entry wounds would have been closer together and all on the same side of the head. The absence of stippling meant the weapon was at least two feet away when it was fired. Chad's body had scratches and irritation on his knees, chest, right arm, and lower leg. One of his fingers was swollen. The imprint of gravel indicated he had collapsed to his knees at some point.

Investigators found three spent bullets, three cartridge casings, and three live rounds at the crime scene. The casings and the spent bullets had been fired from the same gun, and the three live rounds had been ejected from that gun as well. Based on the location of the spent bullets and casings, criminalist

Gregory Laskowski opined that (1) the shooter was moving while firing, and (2) the shooting was inconsistent with fire from a fully automatic weapon.

Evidence about defendant's activities before and after the murder was presented. Rosales recounted how defendant and Garza approached the truck, ordered Brent out, and drove off with Chad sitting between them. Defendant's cousin, Isabel Garcia, initially told police that she saw defendant and Gabriel Flores in Chad's truck that night. Her attention was drawn to the truck because defendant waved and yelled to her from the passenger seat. She drew investigators a diagram to show where the encounter happened. At trial, she disavowed her statement. Thirteen-year-old Joamy Garza was staying at a house of someone called Chepa, where runaway girls stayed and young men visited. At trial, she recalled that two people she knew as Baby and Loco came to the house in a white truck. She told police that she went cruising with the two men. She subsequently identified defendant in a photographic lineup, but would not sign it.

Chad's truck was found in a Bakersfield garage. It appeared the stereo had been removed, and the truck bore red primer paint. Salvador Saldivar, who pleaded guilty to receiving a stolen truck, testified that he went to Chepa's house late on October 14 or early on October 15, 1997, to pick up a white truck. He drove to a garage where he painted the truck red. He did not recall talking to young men about the truck, and did not recall identifying anyone. Deputy Moore testified that Saldivar admitted to him that he saw a man named Baby with the truck, and that Baby said the truck was stolen. Baby was with another man named Loco. Saldivar identified defendant as Loco when shown a photographic lineup.

Ten months later on July 19, 1998, Kern County Sheriff's Sergeants Rosemary Wahl and Glenn Johnson interviewed defendant in El Paso, Texas. Defendant claimed no involvement in the abduction and murder and denied using drugs in October 1997. He admitted he joined a Lamont gang as a young teen, but left the gang around 1995.

On July 24, 1998, defendant was interviewed again in Bakersfield. He told Wahl and Johnson that when he was partying at Quintana's house, he was not waiting for Chad to come by. He was planning to leave because he was "already on the run for jumping bail." He said he was using methamphetamine and hashish at Quintana's. He admitted stopping Chad and asking if he knew who defendant was. Chad repeatedly said he did not and finally started to get out of his truck, but defendant pushed him back in. He and Garza made Brent get out and defendant drove away. He first stopped near a gas station where he "slapped the bitch." Asked why he did so, defendant said, "I was telling him it wasn't a game to be playing around with gangbangers . . . ."

Then they drove to the field and got out of the truck. Garza told Chad to remove his shoes and bound his hands with black tape. Planning to leave Chad in the field and take his truck, they promised him he would not be harmed. They made him disrobe, to embarrass him and force him to walk home in that condition.

Defendant had the unloaded gun with him; Garza went to the truck to get the clip. Defendant's intent was to scare Chad because of an incident involving defendant's cousin, Rosales,

and because Chad "was banging for Arvin."[12] Chad was sitting on the ground as defendant inserted the clip. Defendant did not know there was a round in the chamber, and as he was trying to put the clip in, he pressed the trigger and discharged the weapon. Because it was dark, he did not know where Chad had been hit.

He and Garza drove off, throwing Chad's clothes out the window on the way. They gave the truck to "some guys" who were at "some pad." They partied there for two or three hours, hitchhiked to Santa Clarita, and threw the gun away near Pyramid Lake. They parted ways in Santa Clarita, and defendant fled to Mexico. He did not learn that Chad had died until five or six months later.

The officers also asked defendant about the crimes against Juan Carlos. He said that "they had jumped me like a couple [of] days before that." He recounted, "we were at Baby's [Garza's] house" when Juan Carlos parked across the street. "He was in the pickup saying some shit I guess that's what the neighbors told us and then we took the truck from him and took off and we dumped him out in the fields and left him."

Deputy Sheriff Robert Contreras, a liaison officer with the Gang Suppression Unit, identified two local street gangs: Lamont 13 and Weedpatch 13. The Mexican Mafia uses the number 13, which stands for the letter M, and is also associated

---

[12] As described below, the defense presented evidence of a conflict involving Carlos Rosales and an incident during which brothers Jose and Freddy Gomez, along with Chad, threw sandbags and other items at Rosales's house and car. After defendant said in his interview that Chad was "banging for Arvin," he described the incident and referred to the Gomez brothers as "Arvin [B]oys."

with the southern part of California. Lamont 13 has two subsets: Varrio Chico Lamont (VCL) and Lamont Familia Sureños (LFS). He testified that defendant, De La Rosa, Quintana, Garza, Valenzuela, Rosales, and Flores belong to LFS and that Santiago belonged to VCL. He identified photographs of defendant's tattoos, including "LFS," "13," "Lamont," and "Sur." He testified that LFS initiated new gang members at Myrtle Avenue School. Contreras had seen defendant and others at the school. Garza had apparently just been initiated. The court instructed the jury this gang evidence was admitted solely for purposes of identification, motive, or intent.

### 2. *Defense Evidence*

Defendant offered an alibi for the evening Paredes was kidnapped. In October 1997, Ashley Medina was dating defendant's cousin, Rosales. Medina testified that on October 4, 1997, the evening of the Paredes kidnapping, she had been at the Kern County Fair, arriving home around 8:30 p.m. Around 9:00 p.m., Rosales and defendant came over. They talked and watched movies, then defendant fell asleep. Medina and Rosales retired about 2:00 a.m.; Rosales and defendant left her house between 12:30 p.m. and 1:00 p.m. the next day. To Medina's knowledge, defendant did not leave the house before that time. Rosales also testified that defendant spent the night at Medina's.

Defendant challenged Paredes's identification of his assailants. Efrain Garza's brother, Jesus, testified about a conversation with Paredes's cousin, Rosalio. Rosalio related that Paredes said he was unsure of Garza's identification.

Dr. Scott Fraser, an eyewitness identification expert, testified about factors that can affect identification accuracy. He

explained that if there was a light source behind an approaching assailant, as occurred in the kidnapping of Paredes, the accuracy of the victim's identification could be reduced. The greater the number of individuals involved, the less accurate the recognition of a single person. The presence of a weapon reduces accuracy because it distracts the witness and causes stress.

As to Chad's murder, the defense presented evidence of an incident in September 1997. Chad and brothers Jose and Freddy Gomez were friends. One day, as Jose was driving down a road in Lamont, a car in which Carlos Rosales was riding pulled up. Jose was told to pull over. When he did so the other car blocked him in. Gabriel Flores (Gooney) ran up and swung a knife at Jose. Around midnight that night, Chad drove Jose and Freddy to Carlos Rosales's house in Lamont. Chad and Jose each picked up a sandbag and threw it at a car in the driveway. Rosales's mother, Maria Villa, came outside and Jose asked in a respectful voice whether Rosales was there. Told he was not, Jose asked her to tell Rosales that Jose had stopped by. Jose denied doing or saying anything else before leaving, but his brother Freddy testified that Jose told Ms. Villa to inform Rosales that he was "going to kick his ass."

Maria Villa is Rosales's mother and defendant's aunt. She awoke to the noise of the men hitting her car with sandbags. She did not know any of them, but subsequently learned Chad's name from television reports. One of them said Rosales had fought with him and cut his arm. Chad said he was looking for Rosales and was told he was not at home. Chad shouted for Rosales to come outside. He tried to push Villa, but she stepped back. During these events, Villa's nieces, ages 11 and 12, and her infant grandson, were in the house, and the girls were frightened. Villa wrote down part of the license plate, which

included "CYA."  Chad's truck had a personalized license plate: CYARBRO.

Defendant was in jail at the time of the Rosales incident, but was released a week or two before Chad was killed.  Maria Villa's son, Alejandro Saenz, told him about the incident, including the attempt to shove Ms. Villa.  Saenz also told defendant about the license plate and asked him to find out who had come to the house that night.  Saenz further testified, "All of us were raised together"; defendant "got really upset" when he was told about the incident.  Before October 14, defendant told Saenz he knew whose truck had come to Villa's house, and defendant "said that it was taken care of."

Defendant testified.  He denied any part of the Paredes kidnapping, admitted he assaulted Juan Carlos, and admitted he shot Chad but did so by accident.

Defendant lived in Lamont until 1995, and attended Arvin High School for about a year and a half.  While there, Arvinas gang members would jump him, making him fear for his safety.  In late 1994, someone shot at his house while his mother was there, and someone threw a Molotov cocktail at the home.  He thought the Arvin Boys were responsible.[13]

After leaving Lamont, defendant lived in Phoenix for two years with his fiancée and their two children.  He attended a design school and junior college.  In May or June 1997, his fiancée left him and he lost his job as a forklift operator.  In

---

[13]  Quintana, who was 16 years old in 1997, lived in Lamont and was bused to Arvin High School.  He and others who were bused to Arvin had trouble there just because they were from Lamont.

addition, tumors on his tongue and neck caused severe headaches, unrelieved by over-the-counter medications.[14]

In June 1997, defendant purchased a Tec-9 firearm altered to be fully automatic. After a three- or four-round burst, the gun would jam, and a shell would have to be ejected. When he returned to Lamont in August 1997, he left the gun in Arizona. Sometime later, an ex-roommate brought the gun to Visalia.

Defendant was arrested in August 1997 for possession of methamphetamine and spent 30 days in jail. After his release on bail, his cousin, Alex Saenz, told him that people in a white truck had gone to his aunt's house creating the disturbance described above. Defendant told Saenz something had to be done about the attack and retrieved the Tec-9 gun.

Defendant was experiencing pain from his tumors and was depressed because he had lost his fiancée, home, children, and job. He took drugs and was high most of the time, staying awake for two or three days using methamphetamine. He came to believe that Chad and the Gomez brothers attacked his aunt's house. He testified that the three ran around with the Arvin Boys. Based on his experience, he thought if nothing was done about their attack, his aunt might be harmed.

Defendant denied abducting Leonel Paredes. On October 4, he went with his cousin, Carlos Rosales, to the home of Ashley Medina, arriving between 8:30 and 9:00 p.m., and staying there until 1:00 or 2:00 p.m. on October 5.

---

[14] As described below, defendant had vascular tumors on his tongue and neck.

As to the attack on Juan Carlos, defendant testified he was at Garza's house with Garza, Rosales, Quintana, De La Rosa, and Valenzuela. Over the preceding two days he had been consuming methamphetamine, phencyclidine (PCP), and alcohol. That morning he consumed marijuana, methamphetamine, and two 40-ounce bottles of Cobra malt liquor. A truck drove up to Shannon Brown's house next door. Valenzuela and De La Rosa got in the truck, which drove away. Fifteen or 20 minutes later, the truck returned and hit a car in front of the neighbor's house. De La Rosa told Juan Carlos to settle the damage by telling Shannon to keep the money he owed Juan Carlos for drugs. Then they told defendant, Quintana, Rosales, and Garza to get in the back of the truck. Defendant did not know where they were going or that Valenzuela and De La Rosa had abducted Juan Carlos. He thought he was "[g]etting a ride somewhere."

In the truck, defendant told De La Rosa that Rosales wanted to be dropped off. De La Rosa told him they were going to take care of "something" and did not respond when asked what the something was. They stopped on a canal bank and defendant tried to find out what they were doing. De La Rosa said that Juan Carlos had beaten up his sister. Angered by this revelation, defendant hit Juan Carlos two or three times. He and Valenzuela bound Juan Carlos, but did nothing else to him. After they drove back to town, Valenzuela gave him $20 and a medallion with "Juan" etched on it, and told him to give $10 to Rosales.

Defendant went to Quintana's house later in the afternoon and ingested alcohol and narcotics. He had his Tec-9 with him. People in the house played with the gun, inserting and ejecting the clip. At some point, someone said: "There's that guy." He

did not know what they meant, but walked outside and saw a truck drive by. He and Garza, who had the Tec-9, approached the truck. Defendant spoke to Chad who said he did not know defendant. Chad opened the door and defendant got into the driver's seat. At Garza's direction, Brent got out of the truck and Garza entered it. Defendant wanted to scare and embarrass Chad, get him to admit what he had done, and protect his aunt. He did not intend to hurt Chad. Defendant was drunk and high, slurring his words, and unable to think straight.

While they drove around, Garza told Chad to take his clothes off. Defendant had heard that the Gomez brothers were Arvin Boys, and told Chad he should not be hanging around with gangbangers. Chad admitted trying to run down Rosales, but denied being part of the incident at his aunt's house. His demeanor upset defendant, who said they would not hurt Chad and would leave his truck where he could find it.

Defendant was still drunk and high, and had difficulty thinking. At some point they stopped in a field. Garza secured Chad's hands, while defendant paced, trying to decide what to do. He tried to scare Chad with the gun but Chad would not admit the confrontation with his aunt. Defendant asked Garza to get the clip from the truck.

Still intending to frighten Chad, he began to load the clip into the weapon. In the process the gun fired. He was not aiming the gun, and did not know there was a round in the chamber. Chad fell to the ground and did not move. Defendant was confused, unsure what to do, and did not think there was anything he could do for Chad. He drove the truck to Bakersfield and walked to his aunt's house, as Garza left in the truck. Defendant denied driving around with Joamy Garza. He

stayed at his aunt's house until morning, sitting by a window and smoking "dope." He was panicked and hallucinating, seeing officers everywhere. He and Garza hitchhiked to Los Angeles, and defendant threw the gun away en route.

Pathologist Barry Silverman opined that Chad's wounds were inflicted instantaneously by automatic gunfire. Considering where the spent casings and spent bullets were found, Dr. Silverman concluded that Chad's head could not have been on the ground when he was hit.

Criminalist Ronald Helson, testified that a Tec-9 may be modified to be fully automatic. He thought Chad's wounds were consistent with automatic weapons fire. The shooter would have to have been an expert marksman to have fired single shots causing equidistant head wounds. A semi-automatic weapon modified to be automatic no longer functions as designed. The magazine spring may not have sufficient tension to load rounds in the chamber as quickly as rounds are fired, which could cause the gun to jam.

Dr. Stephen Estner diagnosed defendant with multiple hemangiomas, or "vascular tumors that grow from and feed into arteries and veins in certain parts of the body." Defendant had a tumor on his tongue and a mass in his right neck. Dr. Estner expressed concern that jugular vein pressure would cause deoxygenated blood to back up in the right brain, causing pain and affecting brain function. In addition, tumors in his throat pressed on both the internal jugular vein and carotid artery.

Dr. David Bearman testified that defendant's hemangioma caused pain and decreased blood flow to the brain. Dr. Bearman also opined that defendant suffered from depression; sleep deprivation; polysubstance abuse; and acute

17

stress disorder along with posttraumatic stress. The combined impact of drug use and sleep deprivation would affect judgment, coordination, and perception.

Clinical psychologist Francisco Gomez met with defendant three times over seven hours. He also interviewed defendant's mother and older brother, and reviewed school records along with other documents. Based on cognitive and intelligence tests, he diagnosed defendant with low level chronic depression and polysubstance abuse, which he employed to cope with his depression. Defendant experienced multiple stressors from June to November 1997, including a drug arrest, and the loss of his fiancée, job, and apartment. These factors exacerbated his depression, increasing his drug use. The drugs compromised his decision making.

Professor Jose Lopez testified about criminal street gangs. He identified Arvina gang graffiti five blocks from defendant's mother's house, which was in Lamont gang territory. Conflict between the Arvin and Lamont communities dated back to 1958, when a high school was established in Arvin and students from Lamont were bused there. There were active gang members in Arvin and Lamont in 1997, but Dr. Lopez opined that defendant was not among them. He based his conclusion on the fact that LFS was defunct as of 1994 or 1995, and defendant, who was 21 years old in 1997, was associating with 15-year-olds. Lopez concluded that Chad's killing was not gang related. In his view, machismo culture would put pressure on a man to avenge an attack in the middle of the night by a rival group.

### 3. *Prosecution Rebuttal*

Neuroradiologist Matthew Lotysch described the highly redundant system of arteries and veins that carry blood to and

from the brain. He disagreed with Dr. Estner's opinions that the hemangiomas would affect vessels in defendant's neck and impede blood drainage from the brain. He also testified that defendant's hemangiomas did not in any way compromise his ability to breathe. He saw no physical evidence in this case or in his experience that such masses impair blood supply to the brain when a person's blood pressure is elevated due to stress or drug use. The withdrawal phase from methamphetamine is itself accompanied by chronic headaches. He agreed, however, hemangiomas could put pressure on nerves, causing discomfort.

Criminalist Gregory Laskowski reviewed Dr. Silverman's testimony and concluded that Silverman lacked knowledge of ballistics. He testified that the pattern in which the bullet casings dispersed suggested the shooter moved while firing. He asserted that Mr. Helson's testimony did not consider where the bullet slugs were found, and without that information, no valid opinion could be given as to whether the shots were fired by an automatic or semiautomatic weapon.

Sergeant Rosemary Wahl interviewed Maria Villa on October 30, 1997. Wahl asked whether the men who came to her house had threatened her or tried to harm her. Villa responded that they did not.

*B. Penalty Phase*

*1. Prosecution Evidence*

Defendant was arrested on August 22, 1997, in a Bakersfield apartment. He was found in a bedroom with methamphetamine and a loaded handgun nearby. He admitted the drugs and weapon were his.

Evidence was also presented about the murder of Javier Ibarra in March 1995. Alma Mosqueda testified she was at

home with Ibarra and Christina Ramirez. Defendant's brother, Cipriano Ramirez, called her to ask if he could come over and "take care of business." Because Cipriano and Ibarra had fought about Christina in the past, Mosqueda suspected something bad was going to happen. Five or ten minutes later, as Mosqueda was walking the couple through the parking lot, Cipriano, Gabriel Flores, and defendant arrived and blocked Ibarra's car. At Cipriano's direction the women went back inside. Mosqueda looked back and saw Ibarra spread his hands out like he was calling somebody out to fight. She could not see the parking lot from her apartment, but heard four or five shots, a pause, and then one final shot. She ran out to find Ibarra face down on the grass with a fatal gunshot wound in the back of his head. The car in which the three men arrived was leaving.

Testimony varied as to defendant's attire the night Ibarra was killed. Jesse Ibarra, the victim's brother, testified that when he visited Mosqueda the next morning, she said defendant had been wearing a white hat.[15] Mosqueda testified, however, that she did not remember that conversation. She also testified that Gabriel Flores was wearing a white hat when the three men confronted Ibarra. About two days after the killing Sheriff's Deputy Daniel Fuqua arrested defendant wearing a white baseball cap. Gerardo Soto, defendant's uncle, testified that the evening Ibarra was killed, defendant was wearing a cap but it was not white. He told Deputy Contreras the night of the shooting that defendant was wearing a dark Pendleton shirt and a blue baseball cap.

---

[15] As noted below, the defense presented evidence that the shooter was wearing a white cap.

Chad's girlfriend, brother and mother gave victim impact testimony. Almost daily Chad and Castro discussed their hopes for the future. Chad wanted to play college football, then become a physical education teacher and coach. The couple had planned to marry and picked names for their future children.

Brent did not return to school for many weeks after the murder and his grades dropped. He had trouble sleeping and still experienced nightmares. He went nowhere alone for fear that something would happen to him. He blamed himself, in part, for his brother's death, feeling he should have done something to prevent it.

Chad's mother, Cheryl Yarbrough, had three children: Melissa, Chad, and Brent. The family had been quite close, doing everything together. After Chad died, the family seldom dined together and gave up family trips. Melissa moved from the house and everyone kept to themselves. They all attended counseling. Ms. Yarbrough described her son as caring, compassionate, and fun-loving. He loved to joke with his mother.

### 2. *Defense Evidence*

Defendant also presented evidence about the Ibarra killing. Ysela Nunez saw the crime from her second-story window. A car drove up and three men approached a group of two "girls" and a man. The girls walked away, and the men fought briefly. Two of the attackers jumped back, and the third man shot the man who had been with the girls. The shooter wore a white hat; black pants; and a Pendleton shirt, checkered in black, white, and grey. The second man wore coveralls, and the third man wore blue jeans and a blue shirt. Nunez did not recognize defendant in court.

Defendant's mother and grandmother described his childhood. He was born in Guadalupe, Chihuahua, Mexico, where his parents worked in the fields. The family was very poor, and sometimes went without food. His father was an alcoholic who was violent toward his wife and children. After the parents separated, Angelita moved with her five children to Bakersfield. Defendant was about one year old at that time, sickly and thin. They lived in a three-bedroom house with about 15 to 20 others. They moved to Lamont after an uncle was killed in the house. Defendant's mother worked in the fields eight to nine hours a day, six days a week, for 11 years to support her children. Lorenzo, the oldest son, was rough with the younger children and would beat them. When defendant was a child, he had a tumor on his tongue that grew larger over time. When defendant was nine years old, he worked cleaning yards and delivering newspapers, giving his earnings to his mother.

In high school, students called defendant "stupid from Lamont." His mother intervened but school staff were not helpful. Items, including a Molotov cocktail, were occasionally thrown through their windows. Defendant began using drugs at about age 14.

Other relatives testified about the scarcity of food and the older brother's abuse. His uncle would sometimes hit defendant in the head, then say how tough he was. Relatives testified the defendant loved his two daughters and wrote letters to them.

The parties stipulated that if Chad's girlfriend were called as a witness, she would testify that she and Chad once drove by Carlos Rosales's home. Chad said he and the Gomez brothers had once gone to the house where Chad and "Luis" dented

Carlos's car.[16] She saw the car but did not see any damage. Chad told her they tried unsuccessfully to break a window with a rock.

Dr. Stephen Estner returned in the penalty phase and testified that defendant's hemangiomas pressed on more nerves in the neck than Dr. Lotysch recognized. In addition to cranial nerves described by Dr. Lotysch, the vagus nerve travels from the brain to the gastrointestinal system and also branches off to the heart, controlling its rate and rhythm. Pressure in the area could affect the respiratory system and mental function. The pressure would vary with the size of the mass. While he generally agreed with Dr. Lotysch's testimony, he thought headaches, lightheadedness, and facial swelling were caused by obstruction of some vascular structures. Methamphetamine use, along with fear and anger, could cause enlargement of the mass by raising defendant's blood pressure. The enlargement also causes difficulty speaking, and when a person has difficulty speaking, he might take action rather than use words. Other physiological effects can also occur due to the obstruction of blood flowing in and out of the brain.

Dr. Francisco Gomez, Jr., who previously testified that defendant suffered from chronic depression, testified about risk factors for depression in an impoverished Hispanic community. These include physical abuse and "severe neglect, poverty, low socioeconomic status, [and] culturative stress." Clinical depression affects "social functioning — how you see the world, how you act, how you behave, how you perceive things." Exposure to violence is a high-risk factor for depression. Very

---

[16] Jose Gomez's middle name was Luis.

young children can be affected by these environmental factors. Stimulants like methamphetamine provide some relief from depressed feelings.

Dr. Jose Lopez also returned to testify about gang culture. When parents are absent, children may be "subjected to street socialization," which functions like a "surrogate parent." In the Latino family, there is emphasis on the male image. Older siblings do not have the authority of a parent, and may use violence to discipline younger children. Respect is very important in Latino and gang culture. No value attaches to walking away from a fight. If a female relative is treated discourteously, a manly reaction involving aggression is required.

The parties stipulated that the defendant received no drug or gang counseling when out of custody and had not joined a prison gang following his arrest.

*C. Bifurcated Trial on Counts 10 and 11*

A new jury was empaneled to hear evidence on count 10, unlawful possession of methamphetamine while armed with a loaded gun (Health & Saf. Code, § 11370.1, subd. (a)); and count 11, possession of a loaded gun while under the influence of that drug (Health & Saf. Code, § 11550, subd. (e)). The testimony was substantially similar to that introduced at the penalty phase, recounting defendant's arrest in an apartment with methamphetamine and a loaded handgun. When arrested, defendant admitted both items were his. He showed signs of drug use which was confirmed by urine test.

## II.  DISCUSSION

### A. *Pretrial Issues*

#### 1. *Motion To Disqualify the Prosecutor's Office*

Defendant moved to disqualify the Kern County District Attorney's Office on two grounds:  (1) prosecutors had adopted inconsistent theories about who was the shooter in the Javier Ibarra murder; and (2) Chad's aunt, Diana Yarbrough, was a supervising clerk for the Kern County Municipal Court, with a close relationship to the District Attorney's Office.  The motion was denied and defendant urges the ruling was an abuse of discretion.  No error appears.

Under section 1424, subdivision (a)(1), a motion to disqualify the district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." This court has interpreted that standard to mean " 'the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner,' " making it unlikely the defendant will receive fair treatment " 'during all portions of the criminal proceedings.' " (*People v. Eubanks* (1996) 14 Cal.4th 580, 592 (*Eubanks*), quoting *People v. Conner* (1983) 34 Cal.3d 141, 148 (*Conner*).)  Defendant bears the burden of demonstrating a conflict of that nature.  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 709.)  We review the superior court's factual findings for substantial evidence, then determine whether those facts demonstrate the court abused its discretion in denying the motion.  (*Id.* at pp. 711–712.)  An erroneous denial is state law error reviewed for prejudice under the *Watson* standard.  (*People*

*v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Vasquez* (2006) 39 Cal.4th 47, 66–70 (*Vasquez*).)

Defendant's motion was litigated based on declarations and exhibits. Transcripts showed that, in the separate trials of Gabriel Flores and Cipriano Ramirez, the Kern County District Attorney's Office argued Flores personally shot Ibarra and that Cipriano was an aider and abettor.

Each man was convicted of murder. Significantly, Flores's jury rejected an allegation that he personally used a firearm.

In support of the motion to disqualify, defense counsel declared his belief that, in the penalty phase, the prosecutor would argue defendant shot Ibarra, relying on testimony of Cipriano Ramirez to that effect, which the prosecutor in the Cipriano trial had disavowed as false. Defendant argued that these circumstances demonstrated a conflict of interests because the prosecutor in this case (1) was motivated by personal and emotional bias against defendant; (2) was representing conflicting interests; and (3) had adopted a strategy that would require the defense to call several members of the district attorney's office as witnesses to rebut the allegation that defendant was the shooter.

As for the victim's aunt, Diana Yarbrough, defense counsel declared that she "is a supervising clerk in the [Kern County] Municipal Court" with an office in the same building as the district attorney's. Counsel alleged "upon information and belief" that the close working relationship between the two offices "has compromised the impartiality of the Office of the District Attorney in this matter."

In opposition, the People stated their intent, during the penalty phase, to present evidence of defendant's involvement

in the Ibarra murder for which his brother Cipriano, and friend, Gabriel Flores, had both been convicted. The People acknowledged that defendant's "degree of actual involvement differs depending on which witnesses statements (including his own brother) one chooses to believe. He clearly has culpability as a co-principal in that crime by all accounts. [¶] The People intend to present all of the evidence of defendant's involvement, and let the jury decide what to believe as to his degree of culpability." The People relied upon *People v. Watts* (1999) 76 Cal.App.4th 1250 to urge that they could permissibly "argue inconsistent and even mutually exclusive theories in separate trials of co-defendants so long as the evidence was subject to different interpretations or had changed." They argued that the former prosecutors were not appropriate witnesses because "their subjective personal theories of their respective cases are irrelevant and inadmissible." They represented that, in the event a conflict arose from presenting inconsistent theories, "we won't put on Cipriano's testimony [from his own trial]. We will just go with the theory on aiding and abetting, which certainly is not inconsistent with either of the theories of those prior prosecutions."

As to Diana Yarbrough, the People declared that she "has never worked for the District Attorney's Office. She has no closer relationship to the District Attorney's Office than any other court employee. [¶] Her office is not within the District Attorneys' Office nor even on the same floor of the building. As a 'supervising' clerk she does not even have daily contact with deputy district attorneys in the courtroom. [¶] Her only interaction on this case has been as a member of the victim's family and not as a court employee."

The trial court did not abuse its discretion in finding that the defense failed to carry its burden.

Defendant's allegation of inconsistent theories did not establish a conflict of interests sufficient to warrant recusal of the district attorney's office. The prosecutor relied on legal authority to urge that he could argue defendant shot Ibarra so long as the evidence was subject to different interpretations. The argument did not demonstrate a lack of integrity or impartiality warranting recusal. The remedy for the prosecutor's misapprehension, if any, was to restrict the People to arguing, as they had in previous trials, that defendant was an aider and abettor, making him equally guilty. We discuss in detail below defendant's separate claim that the prosecutor deprived him of a fair penalty phase verdict by presenting inconsistent theories of guilt in separate trials. (Pt. II.C.1., *post*.) Here, it suffices to note that the prosecutor did not ultimately introduce Cipriano's prior testimony identifying defendant as the shooter. Defense counsel conceded below that the prosecutor's agreement not to present such evidence would alleviate the alleged conflict. This record fails to establish that the prosecutor acted in such an uneven manner as to make it unlikely that defendant would receive a fair trial. (*Eubanks*, *supra*, 14 Cal.4th at p. 592.)

The court's ruling as to Diana Yarbrough was, likewise, well within its discretion. A personal relationship between the victim or a defendant and the district attorney's office may require disqualification, particularly where there is evidence that the relationship has influenced the prosecutor's discretionary decisions. (See, e.g. *Vasquez*, *supra*, 39 Cal.4th at pp. 52, 57; *Conner*, *supra*, 34 Cal.3d at pp. 148–149.) Here, however, Ms. Yarbrough did not work for the district attorney's

office, did not share space with that office, and did not have daily contact with deputy district attorneys in the courtroom. The fact that the victim's aunt was a county court employee, without more, did not warrant the "serious step" of recusing the entire district attorney's office. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1156.)

## 2. *Change of Venue*

Defendant contends that conducting his trial in Kern County violated his statutory right to a change of venue (§ 1033, subd. (a)) and his constitutional right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. He argues that pervasive media coverage of the crimes, false rumors, and the victim's popularity in the community raised a reasonable likelihood that 12 impartial jurors could not be impaneled. He fails to persuade.

### a. *Governing Principles*

On a defendant's motion, the court must order a change of venue when a reasonable likelihood appears "that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21.) This requirement was adopted in response to a series of Supreme Court cases in the 1960's recognizing that media publicity about a criminal trial could, in some circumstances, deprive the defendant of due process. (*People v. Peterson* (2020) 10 Cal.5th 409, 438 (*Peterson*).) Courts must weigh five factors in evaluating this claim: "the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim." (*People v. Harris* (1981) 28 Cal.3d 935, 948; accord, *Peterson*, at p. 439.)

On appeal, a defendant "must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial." (*People v. Rountree* (2013) 56 Cal.4th 823, 837 (*Rountree*).) "[I]n rare and 'exceptional cases,' a defendant may show circumstances so ' "extraordinary" ' that a court may assume no fair trial could be had." (*Peterson, supra,* 10 Cal.5th at p. 439, quoting *People v. Prince* (2007) 40 Cal.4th 1179, 1216 (*Prince*).) The United States Supreme Court has occasionally found such a showing adequate in cases where media coverage "manifestly tainted a criminal prosecution" and resulted in " 'kangaroo court proceedings.' " (*Skilling v. United States* (2010) 561 U.S. 358, 379 (*Skilling*).) But the high court has made clear that the assumption "attends only the extreme case." (*Id.* at p. 381.)

"[W]e accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county." (*Rountree, supra,* 56 Cal.4th at p. 837.)

### b. *Proceedings Below*

Defendant moved for a change of venue in May 2000, two and a half years after the crimes occurred. Materials provided in support included transcripts of television broadcasts and excerpts from newspaper coverage. In addition, Dr. Edward Bronson, a professor of political science at California State University, Chico, testified about the media coverage and a survey conducted in January 2000 to assess coverage impact. Defendant and Garza were originally charged together, but the cases were ultimately severed. Dr. Bronson's analysis included

potential jurors' views of both defendants. He did not always disaggregate the information as to views about each defendant when calculating his statistics. Based on his research, training, and experience, Dr. Bronson opined there was a reasonable likelihood that the jury panel would be affected by pretrial publicity and that no remedy other than a change of venue would be adequate.

Dr. Bronson testified that 225 articles were published about the case in the Bakersfield Californian, the Lamont Reporter, and the Arvin Tiller. Of those articles, 133 were from 1997, 72 from 1998, 19 from 1999 and one from 2000. There were 97 articles on the front page of the paper; 30 more were on the front page of an interior section. Coverage included 24 letters to the editor and three editorials. Dr. Bronson characterized this level of media coverage as "very high."

Dr. Bronson described several kinds of prejudice. Inflammatory publicity is of the greatest concern, followed by inadmissible or inaccurate reporting, and coverage reflecting a presumption of guilt. He noted approximately 20 references to an execution-style slaying, emphasizing the brutality of shooting a kneeling victim in the head. References to torture were later discounted. Other details included Chad's fear, being forced to disrobe, having tape over his eyes, and being on his knees. Defendant reportedly admitted intending to humiliate the victim in retaliation for an act of disrespect against a relative. The media also made numerous references to carjackings and gang activities. Dr. Bronson could not determine whether the reporting was inadmissible or inaccurate. As to a presumption of guilt, reports noted that defendant had confessed and fled to Mexico, and that codefendant Garza, whose case had not yet been severed, had

refused to take a lie detector test. Reports related that defendant said the gun discharged accidentally and that he did not intend to kill the victim. But these statements would be followed by an observation that Chad was shot three times.

Bronson considered a change of venue was warranted because of the gravity of the crime and the pursuit of a death penalty. Letter writers expressed the view that even more extreme penalties should be imposed. One writer opined that defendant's arms should be cut off so he could never pull a trigger again. Dr. Bronson found no mitigating content in the media he reviewed.

Some coverage described defendant and Garza as Hispanic. Some stories discussed a theory that Chad was killed because he was dating a Hispanic classmate. Others addressed contentions that the case received greater resources because the victim was White. Most of the stories, however, did not include a racial slant. Other negative details included references to gangs, defendant's criminal history, and his being armed and dangerous. Bronson listed as a positive factor that defendant and Garza were not described as outsiders to the community.

As to victim status, Chad was the high school football captain. His jersey number appeared in thousands of places, including the football fields at Arvin and Bakersfield High Schools, armbands, cheerleaders' uniforms, and plaques. There was a shrine and multiple memorials, including one attended by 4,200 people. A candlelight vigil was conducted on his 18th birthday. He was honored at his high school's homecoming and numerous fundraisers were held to raise money for scholarships in his name. Many contributed to a reward fund that grew to $15,000.

Dr. Bronson testified that Kern County was the 14th most populous of California's 58 counties, with a population of 648,400. News coverage reflected that Chad's death shocked, saddened, and galvanized people throughout the county. Dr. Bronson opined that the response was similar to that common in a small community.

Dr. Bronson also discussed electronic media, although he gave it less emphasis because it is harder to track and tends to have a lesser impact than print media. He observed generally that "there was a massive amount of coverage. There were far more broadcasts than there were news articles; that the material largely tracked what was in the newspapers; that . . . the coverage was — as with the newspapers, . . . heavier in the earlier period and then dwindled later on."

A survey of Kern County residents conducted in January 2000, about a year before jury selection began, revealed the following: approximately 82 percent of the 403 jury-eligible respondents recognized the case; 53.6 percent of eligible participants thought the two defendants were definitely or probably guilty; 52.9 percent favored the death penalty after conviction; 41.9 percent had heard the defendants were gang members; 14.9 percent had heard that a defendant had confessed to the murder; 61.2 percent did not know whether it was defendant or Garza who had confessed; 52.3 percent had heard that Chad was tortured; 32.8 percent had heard that both defendants had criminal records that included carjacking and murder charges. Finally, focusing on the details of gang membership, torture, confession, and criminal record, almost 75 percent had heard one or more of those facts, 44 percent knew two or more, 21.6 percent knew three or more, and 5 percent knew all four. Of those who were aware of all four specifics, 100

percent thought the defendants were guilty and 81 percent thought they deserved the death penalty. Lesser degrees of awareness gave rise to less belief in guilt and favor for the death penalty, but the numbers remained high.[17] The survey did not ask if participants could put aside their knowledge of the case and beliefs about guilt and punishment to decide the case solely on the evidence introduced in court.

The court denied the motion. It found that defendant had not met his burden to show a reasonable likelihood that an impartial jury could not be empaneled. In particular, it expressed concern that Dr. Bronson's survey did not reflect whether those surveyed had fixed opinions that could not be set aside. The court added that the motion could be renewed, presumably at the end of jury selection. Defendant's petition for writ of mandate was denied by the Fifth District Court of Appeal.

Four hundred and fifty jury panelists were called; 199 were dismissed for hardship and 166 were excused for cause, leaving 85 panelists from which to select the jurors and alternates.[18]

---

[17] Of those who recognized three specifics, 83.6 percent thought they were guilty and 71 percent thought they deserved the death penalty. Of those who recognized two specifics, 74.7 percent thought they were guilty and 56 percent thought they deserved the death penalty. Of those who recognized one specific, 64.8 percent thought they were guilty and 45 percent thought they deserved the death penalty.

[18] In some of our own jury selection cases, and those of the United States Supreme Court, the terminology used can potentially cause confusion. Those called to a courtroom for jury

Defendant renewed his motion for a change of venue on January 5, 2001, at the completion of the for-cause excusals. The renewed motion was based on publicity since the previous motion and on an analysis of the juror questionnaires. Dr. Bronson was recalled. He identified 19 new articles since the last change of venue motion. They contained references to the victim having been bound and killed "execution style" with three shots to the head. The articles stated that defendant was the decisionmaker and fired the fatal shots. They mentioned defendant's inculpatory and exculpatory statements. There was discussion of defendant's gang involvement and his flight to Mexico. The articles also reported that defendant faced charges for two other carjackings.

Some articles mentioned that football players touched Chad's memorial plaque before taking the field; a Sheriff's bicycle patrol had been established from a memorial fund; and a quote from one citizen that "Chad will never be forgotten."

Jury questionnaires revealed that 79 percent of panelists recognized the case, and 11 percent knew the victim or his family; 16 percent had attended the victim's funeral or a memorial, or knew someone who had done so; only 2 percent knew the defendant or his family; 18 percent said they could not be fair and impartial if street gangs were involved in the case; 14 percent believed they could not be fair due to the nature of

---

selection are prospective jurors, or members of a jury panel. However, some jury panel members are occasionally referred to as "jurors," once they are called forward for voir dire, even if they are never sworn in as trial jurors. To avoid confusion we refer to prospective jurors as panelists and use the term "juror" only to describe someone actually sworn to serve in that capacity.

the charges; 19 percent had formed an opinion on guilt that they could not set aside.

Dr. Bronson reviewed the voir dire of the first 75 of the 251 panelists who remained after hardship excusals. He considered the sample representative. He did not know the age, race or residence of those questioned. Nor did he focus attention specifically on the 85 panelists who remained after challenges for cause. Dr. Bronson opined that panelists are not always completely forthcoming about bias in voir dire, although he acknowledged that this was less of a concern during individual, or *Hovey,* voir dire,[19] that was used in this case. In his view the court's questioning was not always thorough enough. He cited examples of leading questions asking whether a panelist would "do your duty" and "follow the law" that suggested the panelists should respond favorably. In addition, 31 of the 75 panelists were not asked about their familiarity with the case. Of the remaining 44 people who were asked, 41 (93 percent) were aware of some facts; 15 percent of the group were excused based on their representations that they could not be fair and impartial.

Dr. Bronson acknowledged that of the 85 panelists remaining after challenges for cause, approximately one quarter had heard nothing about the case. He also agreed that all of the 39 panelists who stated that they could not be fair because of pretrial publicity were excused for cause. Nonetheless, he continued to maintain that the selection process did not remedy

---

[19]    In a *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1) each prospective juror is questioned outside the presence of any others.

the effect of pretrial publicity, and that defendant could not receive a fair trial in Kern County.

The trial court again denied the motion. Relying on its firsthand observation of the panelists and their demeanor, the court concluded that defendant had failed to demonstrate a reasonable likelihood that the panelists had such fixed opinions that a fair and impartial trial could not be conducted.

During jury selection defendant used all of his peremptory challenges allotted to the selection of the panel and alternates. His request for additional peremptory challenges was denied and he expressed dissatisfaction with the jury empaneled to try the case.

### c. *Pretrial Motions*

Defendant has failed to demonstrate error in the denial of his motions to change venue.

As to the nature of the offense, " 'every capital case presents a serious charge. This factor adds weight to a motion for change of venue, but is not dispositive.' " (*People v. Smith* (2015) 61 Cal.4th 18, 40.) This case was not particularly aggravated in comparison to other capital murders; it did not involve multiple murders or violent sex acts, for example. That the victim was bound and shot in the head at close range are gruesome facts, but do not approach the sensational nature of other cases in which we have upheld the denial of venue motions. (See, e.g., *Smith*, at pp. 23–24, 40 [defendant and accomplices hit victim multiple times with blunt objects, forced the victim to cut her own wrist with a razor, forced her to hold her wrists over a fire pit, poured whiskey on her wounds, wrapped a garbage bag around her head, and then bludgeoned her to death with a metal bar]; *People v. Zambrano* (2007) 41

Cal.4th 1082, 1096–1097, 1125 (*Zambrano*) [defendant shot the victim then decapitated and dismembered the body with an ax and saw].)

Defendant places great emphasis on the pretrial publicity factor. There were 244 articles in the three local papers over a five-year period. Articles reported that the victim was bound and killed execution style, and that defendant admitted the shooting but claimed it was accidental. The newspapers mentioned carjacking and gang activities. But media coverage " 'is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case.' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1048.) The use of descriptions like " 'execution-style murders,' ' "brutal," "cold-blooded," "evil," "horrible," or "horrific" ' [are] not by themselves necessarily prejudicial when they appear[] in generally factual and noninflammatory reporting." (*People v. Scully* (2021) 11 Cal.5th 542, 570 (*Scully*).) The coverage here was similar to that in *Scully* where we upheld the denial of a change of venue motion. There newspapers discussed a " 'cold-blooded' " or " 'execution-style' " murder and described the defendant as "a parolee, violent felon, career criminal, or reputed member of the Aryan Brotherhood." (*Id.* at p. 569.) Nonetheless, those articles also referred to the defendant as " 'suspected' " or " 'accused' " of " 'allegedly' " shooting the victim, and were "generally factual, fair, and not inflammatory." (*Ibid.*) Similarly, the reporting in this case was "essentially factual, not sensationalized" (*Zambrano*, *supra*, 41 Cal.4th at p. 1126), and presented defendant's assertion that the shooting was accidental.

Moreover, the impact of pretrial publicity may be mitigated as time elapses between coverage and jury selection. (*People v. Proctor* (1992) 4 Cal.4th 499, 525 (*Proctor*); see, e.g.,

*Scully*, *supra*, 11 Cal.5th at pp. 568, 570–571 [publicity largely abated two weeks after the killing]; *People v. Jennings* (1991) 53 Cal.3d 334, 361 [publicity 11 months before trial]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1130 [lapse of five months]; *People v. Welch* (1972) 8 Cal.3d 106, 113–114 [news reports ending about a month before trial].)  Here, 205 articles were published between 1997 and 1998, over two years before defendant's trial.  Only 19 articles were published in 1999, with 20 articles published in 2000 and 2001.  The press coverage here had abated in the months preceding jury selection, and the trial was held in Bakersfield, a larger community approximately 20 miles away from Arvin, where the victim lived.  (See *Proctor*, at p. 525.)  These circumstances greatly mitigated the effect of pretrial publicity.

Defendant relies on the results of the 2000 survey of Kern County residents to argue that recollection of the case remained high despite the passage of time.  Approximately 82 percent (329 of 403) of jury-eligible respondents recognized the case; 53.6 percent thought the two defendants were definitely or probably guilty; 41.9 percent had heard the defendants were gang members; 14.9 percent had heard that a defendant had admitted the killing; and 32.8 percent had heard that both defendants had prior criminal records that included carjacking and murder charges.  But the fact that many jurors recall a case does not equate to the type of extreme press coverage that manifestly taints a criminal prosecution.  The degree of exposure was comparable to that in *Proctor*, where 80 percent of those surveyed had heard of the case and 31 percent had formed an opinion as to the defendant's guilt.  There, based on the passage of time and the location of the trial in a larger community, we held that a change of venue due to pretrial publicity was not

strongly indicated. (*Proctor*, *supra*, 4 Cal.4th at pp. 524−526, and cases cited; accord *Scully*, *supra*, 11 Cal.5th at pp. 570–571, and cases cited.) "Almost inevitably even those qualified for potential service by a court may have had some prior exposure to the case, but '[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance.*'" (*Peterson*, *supra*, 10 Cal.5th at p. 441, quoting *Skilling, supra*, 561 U.S. at p. 381.) The answer is to "rigorously vet potential jurors to screen out those tainted and irrevocably biased by pretrial publicity, to find 12, plus alternates, who can decide only on the evidence admitted at trial." (*Peterson*, at p. 441.)

As for community size, at the time of defendant's trial Kern County was the 14th largest in California, with a population of 648,400. The trial was held in Bakersfield, the county seat and the largest city in the county. (California State Association of Counties, Kern County <https://www.counties.org/county-profile/kern-county> [as of Aug. 22, 2022]; Statistical Atlas, Population of Kern County, California <https://statisticalatlas.com/county/California/Kern-County/Population> [as of Aug. 25, 2022]. All Internet citations in this opinion are archived by year, docket number and case number at <http://www.courts.ca.gov/38324.htm>.) In a populous urban area, a major crime is less likely to remain imbedded in the public consciousness. (*People v. Coleman* (1989) 48 Cal.3d 112, 134; *People v. Balderas* (1985) 41 Cal.3d 144, 178 (*Balderas*).) We have upheld the denial of motions for change of venue in Kern County and other, smaller counties. (See, e.g., *Scully*, *supra*, 11 Cal.5th at p. 574 [Sonoma County, population approximately 421,500]; *People v. Vieira* (2005) 35 Cal.4th 264, 280–283 [Stanislaus County, population approximately

370,000]; *People v. Weaver* (2001) 26 Cal.4th 876, 905 [Kern County].) The size of this community militates against a venue change.

As to defendant's community status, he was not an outsider. Although born in Mexico, he moved to Kern County as an infant and lived there most of his life. According to Bronson, several articles described defendant as Hispanic without any contextual relevance, which he deemed to be "unprofessional." However, he did not note any overtly inflammatory terms designed to spark ethnic prejudice. (See *Prince, supra*, 40 Cal.4th at p. 1214.) Defendant emphasizes that media reports portrayed him as a gang member. But evidence of that involvement would be part of the trial evidence, including defendant's own admissions to law enforcement. Any prejudice stemming from defendant's status as a gang member would be a potential factor wherever the case was tried. (*Scully, supra,* 11 Cal.5th at p. 575; *Prince*, at p. 1214.) Chad's death did spark local action. Law enforcement announced plans to crack down on gang activity. A "Call to Action" meeting and various fundraisers were held to combat gang violence, and a reward was offered for information leading to the arrest and conviction of the suspect at large. A few letters to the editor described the suspects as "evil," and "self-centered gang members." But we cannot say that these circumstances reflected " ' "*unusual local hostility* . . . such that a change of venue would likely produce a less biased panel." ' " (*Scully*, at p. 575, original italics, quoting *People v. Panah* (2005) 35 Cal.4th 395, 449 (*Panah*); see also *Balderas, supra*, 41 Cal.3d at p. 179.)

As for the victim's prominence, Chad was well-known and well-liked in his hometown, particularly among his peers. Memorial attendance and the ongoing local tributes were

significant.    But he did not appear to have particular prominence outside of this small town and the local football community.  Certainly jurors from anywhere might sympathize with the fact that a popular and successful young man met an untimely death.  In *Proctor*, we did not find a change of venue indicated where the victim was a well-known and well-liked member of the small community who worked in the school system for 20 years and had " 'taught everyone's kids.' " (*Proctor*, *supra*, 4 Cal.4th at p. 526.)  And in *People v. Rices* (2017) 4 Cal.5th 49, we upheld the denial of a change of venue where the victims "were members of the close-knit Chaldean community" and "that community, understandably, grieved heavily over its loss," but the community "constituted only a small portion of the large overall population in the East County district" from which the jurors were chosen.  (*Id.* at pp. 72–73.)

The above factors do not weigh strongly in favor of a change of venue for a trial that was conducted in a larger city with jurors drawn countywide.

Most significantly, a review of the voir dire demonstrates no reasonable likelihood that defendant did not, in fact, receive a fair trial from the jurors actually seated.  The profile of 10 of the 12 seated jurors is discussed in greater detail below in connection with defendant's challenge to the court's ruling on challenges for cause. (See pt. II.A.4., *post*.)  In brief, 11 of the 12 had been exposed to some pretrial publicity.  However, that fact, standing alone, "does not necessarily require a change of venue. [Citation.]  ' "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." ' " (*Panah*, *supra*, 35 Cal.4th at p. 448.)  In *Prince*, we affirmed the denial of a venue change even though "a high percentage of the [panelists] and 12 of the 13

jurors who actually served at trial . . . had been exposed to the publicity . . . ." (*Prince, supra,* 40 Cal.4th at p. 1215.) We noted the responses to the questionnaires and voir dire "did not disclose any prejudgment or emotional bias" and "displayed only a vague recollection of past news coverage." (*Ibid.*) The panelists asserted that "the publicity would not prevent them from serving as unbiased jurors." (*Ibid.*)

Likewise, here most of the jurors had heard only the basic facts that would be presented at trial, and many remembered very little due to the passage of time. (See pt. II.A.4., *post.*)[20] And all of the seated jurors stated that their exposure to pretrial publicity would not affect their ability to be fair and impartial. While a "juror's assurances that he [or she] is equal to this task cannot be dispositive of the accused's rights" (*Murphy v. Florida* (1975) 421 U.S. 794, 800), defendant here "offers no sound basis to believe the jurors' assurances in this case were insincere" (*Peterson, supra,* 10 Cal.5th at p. 442).

As discussed below, the court and the parties carefully vetted the seated jurors and the court made specific findings based on the jurors' answers and demeanor. We have repeatedly declined to find prejudice under similar circumstances. (See *Scully, supra,* 11 Cal.5th at pp. 573–574; *Proctor, supra,* 4 Cal.4th at p. 527, and cases cited.) "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and

---

[20] Seated Juror No. 7's purported emotional reaction to the fact that Brent stood in for his late brother as homecoming king is discussed in further detail below. (Pt. II.A.4.f., *post.*)

extent of news stories that might influence a juror' [Citation.] . . . [¶] Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a [panelist's] impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the [panelist's] inflection, sincerity, demeanor, candor, body language, and apprehension of duty. [Citation.] In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." (*Skilling, supra,* 561 U.S. at pp. 386–387.) That the jury acquitted on one count of carjacking is another indication that the jurors were not unduly swayed by emotion, and considered each allegation separately. (See *id.* at pp. 394–396; *People v. Harris* (2013) 57 Cal.4th 804, 831.) The record demonstrates that defendant was tried by 12 impartial jurors.

We further reject defendant's claim that the pretrial publicity in this case was so pervasive and damaging that prejudice must be presumed rather than shown. (See generally *Mu'Min v. Virginia* (1991) 500 U.S. 415, 429; *People v. Avila* (2014) 59 Cal.4th 496, 509–513 (*Avila*); *Prince, supra,* 40 Cal.4th at pp. 1216–1218.) Such a presumption "attends only the extreme case." (*Skilling, supra,* 561 U.S. at p. 381 [pervasive publicity from the Enron scandal did not require that prejudice be presumed].) The examples cited in *Skilling* are illustrative:

*Rideau v. Louisiana* (1963) 373 U.S. 723 involved a murder trial in a small community. Three times shortly before trial, a local television station broadcasted a video of the defendant "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping,

and murder, in response to leading questions by the sheriff." (*Id.* at p. 725.) Over a third of the community had watched at least one of the televised confessions, as had three of the actual jurors. (*Id.* at pp. 724–725.) In finding a presumption of prejudice, the court observed that the trial amounted to "kangaroo court proceedings" in which "the people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute." (*Id.* at pp. 726–727.)

The *Skilling* court also discussed *Estes v. Texas* (1965) 381 U.S. 532, which it described as follows: "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Billie Sol Estes] was entitled.' " (*Skilling, supra,* 561 U.S. at pp. 379−380.)

Finally, the *Skilling* court looked to *Sheppard v. Maxwell* (1966) 384 U.S. 333. There the defendant "was accused of bludgeoning his pregnant wife to death. '[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.' [Citation.] Pretrial media coverage, which [the court] characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process . . . . [Citation.] But Sheppard's case involved more than heated reporting pretrial: [The court] upset the murder conviction because a 'carnival atmosphere' pervaded the trial [citation]." (*Skilling, supra,* 561 U.S. at p. 380.)

This was not such an "extreme case." (*Skilling*, *supra*, 561 U.S. at p. 381.) There was no media circus surrounding the trial and no broadcast of a videotaped confession. Although the press reported that defendant had admitted shooting Chad, it also reported his exculpatory statement that the gun discharged accidentally. Of course, these same facts were admitted at trial. The volume of pretrial publicity alone did not give rise to a presumption of prejudice. " '[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' " (*Id.* at p. 384.) This is particularly true given the passage of three years between the crime and the beginning of trial. (See *Avila*, *supra*, 59 Cal.4th at p. 510.) The high court has "rightly set a high bar for allegations of juror prejudice due to pretrial publicity. [Citations.] News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." (*Skilling*, at p. 399, fn. 34.) Here there was a three-year gap between the crimes and trial, and the facts are substantially different from the cases to which the defense points. No presumption of prejudice is warranted on these facts.

### d. Renewed Motions

Defendant claims the trial court erred in denying several motions for a change of venue prompted by developments during jury selection and the trial itself. He fails to persuade.

### i. Panelist M.D.

On January 17, 2001, during the selection of alternates, Panelist M.D. reported that she had just learned her brother worked with the victim's sister. M.D.'s brother had commented

that he had to rearrange the sister's schedule so that she could attend the trial. M.D. told her brother that she could not talk about the case. She was not acquainted with Chad's sister or even aware of her name. She stated that this brief conversation with her brother would not affect her ability to be fair and impartial. Defendant challenged the panelist for cause, moved for a mistrial, and renewed the motion for change of venue. He argued that it was "absolutely unfair and prejudicial . . . to be put through . . . this type of a jury pool, with jurors that we know have close connections with this family, are one person away from this family, going to affect them for the rest of their lives." Defendant objected that "[w]e have to waste a peremptory on people like this, when, if we were in the situation where we had a jury that could be fair and impartial, and didn't prejudge guilt, we can — there would be totally different considerations, in exercising challenges." The court found, based on the panelist's answers and demeanor, that she could perform her duties, and denied defendant's motions.

The voir dire of M.D. does not bear out defendant's argument that the panel was "saturated" with people closely associated with the Yarbrough family. M.D. did not personally know the victim or his sister. The panelist's brother worked at the same chain store as Chad's sister, but the record did not establish a close relationship. The panelist conscientiously avoided any discussion of the case with her brother and the trial court found that she could be fair and impartial.

### ii.  Circus Atmosphere

On January 31, 2001, defendant objected that the presence of family members in the courtroom was creating a "circus atmosphere." He described that 20 to 25 members of the

47

Yarbrough family had broken into "loud and raucous laughter" when Brad testified about his underpants. Several members of the jury followed suit. He also commented that, twice that day during breaks in the trial, the family members were "gathered outside the courtroom . . . visiting in loud voices and seemingly very happy about the progress of affairs, with jurors sitting a few feet away . . . ." Defendant suggested there had been favoritism shown towards the victim's family, citing as examples a sign on the courtroom door saying, "Yarbrough case," and a uniformed bailiff having commiserated with the Yarbrough family in the hallway. The bailiff was questioned and said that he had asked the family how they were holding up during the trial. The interaction lasted about five minutes. The trial court denied defendant's motion for mistrial. It observed: "I don't find there's been a circus atmosphere. I deny that there's been any inappropriate behavior by the jurors or people in the audience section. [¶] I don't agree with that characterization . . . that people were laughing in a loud and raucous manner. Certainly, I could hear laughter. But I don't feel it was inappropriate." The court admonished the bailiff not to speak with the family members.

This record does not bear out defendant's assertion that a circus atmosphere permeated the case. Family members have a right to attend a public trial and may well have done so regardless of the venue. The family's audible laughter over a discrete aspect of testimony did not undermine courtroom decorum. The court specifically found that the laughter was not disruptive and saw no need to admonish the audience at the time. The bailiff's interaction with the family in the hallway was an isolated incident for which he was admonished. A sign identifying the trial by the victim's last name, rather than

defendant's, is somewhat unusual. But as the prosecutor observed below, this was likely done for practical reasons to assist witnesses and court-watchers, rather than as an overt act of favoritism. These circumstances are a far cry from *Sheppard v. Maxwell*, *supra*, 384 U.S. 333, where "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," causing "frequent confusion and disruption" (*id*. at p. 355) and thrusting jurors "into the role of celebrities" (*id*. at p. 353).

### iii.  Juror No. 11

On February 5, 2001, Juror No. 11 had lunch with her father. He asked her if she was getting bored with the case. When she said no, he replied, "[W]hat's taking them so long? They know he did it." She responded that she could not discuss the case. After the juror reported the incident, defendant moved for a mistrial and renewed his change of venue motion. The court questioned Juror No. 11 and several other jurors who were also aware of the incident. The court declined to dismiss Juror No. 11, grant a mistrial, or revisit its venue ruling.

Defendant contends that Juror No. 11 was "subject to improper influence by her father who expressed a forceful opinion, in public, about the guilt of the defendant," and "appeared hostile" to defense counsel when questioned about the incident. These arguments are more properly addressed to defendant's claim of juror misconduct. That claim, and a fuller discussion of the relevant record, appears *post* at part II.B.1. Here, it is enough to note that this isolated incident between the juror and her father does not evidence a pervasive and damaging bias held by the seated jurors that would warrant a change of venue.

### iv. Diana Yarbrough

On February 9, 2001, defense counsel reported that the previous day he had encountered the victim's aunt, Diana Yarbrough, when appearing before a different judge, in another courtroom, in connection with defendant's funding requests. Ms. Yarbrough, a supervising clerk in the municipal court, had regularly attended defendant's trial. Defense counsel argued it was "inappropriate" for Ms. Yarbrough to be supervising the clerk in a department that handled matters related to this case and moved for a change of venue, a mistrial, and dismissal. Ms. Yarbrough testified about the incident. She generally supervised the clerk in the other courtroom, but had made arrangements for another supervisor to oversee issues arising from defendant's proceedings there. She entered that department during a recess and spoke for about one minute with the clerk about an unrelated juvenile matter. She heard nothing about defendant's case and reviewed no records related to it. The trial court denied defendant's motions. The court noted that Ms. Yarbrough did not supervise the clerk assigned to the trial courtroom, and found no evidence that she had seen or discussed any information regarding the case.

Ms. Yarbrough's status as an employee of the Kern County Superior Court did not warrant a change of venue. She was effectively walled off from defendant's trial and had no confidential information about it. Her brief presence on an unrelated juvenile case in a different department did not undermine confidence in the fairness of these proceedings.

### 3. Correctional Officers in Jury Pool

Defendant contends the denial of his motion to dismiss all correctional officers from the jury pool violated his right to an

impartial jury. He argues that "[I]t was clear from the testimony of the numerous correctional officers called as prospective jurors that the local correctional facilities were centers of interest and concern about this case; that it was a major topic of discussion during the process of jury selection; and that many correctional officers held opinions or expressed notions that were premature, unfounded, and false." The claim fails.

Panelist S.L. was a correctional officer and gang investigator for the Department of Corrections and Rehabilitation. Defendant challenged him for cause arguing that he had special knowledge about gangs and had heard a rumor at work that the victim's penis was severed and placed in his mouth. Counsel argued: "This is a CDC officer. He's not one of the defendant's peers. There's a potential here that he will substitute his expertise for the evidence in this case. He indicated that. [¶] The problem with this case and having this case in Kern County keeps resurfacing, because the burden keeps shifting to the defendant to disprove rumors. We don't know all the rumors that these people have heard. [¶] This [juror] heard some of the more horrendous rumors, which now we are going to have to disprove and possibly show autopsy pictures we have agreed to stipulate to keep out, and now I have to show the fact this victim's genitals are intact. [¶] The juror himself is in an adversarial position with gangs automatically because of his job. He would be in an adversarial position to potential defense witnesses and to this defendant if he was a juror."

The court denied the challenge for cause against correctional officers as a group and against panelist S.L. in

particular.[21]  As for the blanket challenge, the court observed that "the Legislature, in their wisdom, had not excluded correctional officers from the prospective jury pool.  It's the legislative intent that correctional officers be allowed to be on criminal juries."  Defendant renewed his blanket challenge during the subsequent voir dire of another correctional officer, Panelist S.W.  The renewed motion was denied.

Defendant argues that, under the unique facts of this case, all correctional officers in the jury pool were unfit to serve because the case was "a chief subject of concern and speculation in the numerous correctional institutions of Kern County, and . . . falsities, presumptions of guilt, and poisonous rumors were part of daily talk in public areas of these institutions."  The court acted within its discretion.  We addressed a similar claim in *People v. Ledesma* (2006) 39 Cal.4th 641 (*Ledesma*).)  There, the defendant argued that the panelist's "employment as a corrections officer in the county jail system where defendant was housed constituted 'implied bias' — a presumption of bias that could not be overcome by a finding that he could be fair and impartial."  (*Id.* at pp. 669–670.)  We noted that, under California law, "a juror may be excused for 'implied bias' only for one of the reasons listed in Code of Civil Procedure section 229, 'and for no other.'"  (*Id.* at p. 670.)[22]  If the facts do not establish

---

[21]  The court's ruling with respect to the attributes of this particular panelist is discussed *post* at part II.A.5.a.iv.

[22]  Code of Civil Procedure section 229 provides for dismissal of a panelist or seated juror because of:  (1) consanguinity or affinity to a party, witness or victim; (2) certain family, confidential, or business relationships; (3) participation in another action or trial involving the same parties or cause of

one of the grounds for implied bias listed in that statute, a panelist may be excused for "[a]ctual bias" if the court finds that the panelist harbors a state of mind that would prevent impartiality. (Code Civ. Proc. § 225, subd. (b)(1)(C); *Ledesma,* at p. 670.) We rejected Ledesma's claim, concluding: "None of the statutory grounds for a finding of implied bias is present in this case, and the trial court concluded that [the panelist] was not actually biased." (*Ledesma,* at p. 670.) The same is true here.

Defendant's assertion about panelists' exposure to case information among correctional officers was explored on a case-by-case basis. Three of the panelists defendant identifies: S.L., S.W., and M.T., did not serve on the jury. Those people could not possibly have affected the fairness of defendant's trial. (*People v. Black* (2014) 58 Cal.4th 912, 921 (*Black*); *People v. Yeoman* (2013) 31 Cal.4th 93, 114 (*Yeoman*).)

The challenges against Seated Juror Nos. 6, 8, and 12 are discussed in further detail below. As to the venue claim, we note that these jurors had some general knowledge about the case from the news media. None of the information they recounted was inaccurate, and none was acquired from their employment in the prison system. This voir dire record disproves defendant's expansive claim that "falsities, presumptions of guilt, and

___

action or being a party to the action pending before the court; (4) an interest in the outcome of the action; (5) an unqualified opinion on the merits of the action founded on knowledge of its material facts; (6) a state of mind evincing enmity against, or bias towards, either party; or (7) in a capital case, a conscientious opinion that would preclude the juror from finding the defendant guilty. Correctional officers, as a class, do not automatically fall under any of these categories.

poisonous rumors" about the case were so prevalent in the correctional institutions of Kern County that anyone who worked there was *automatically* disqualified from service. The defense presented no independent proof on this broad assertion. The trial court properly denied defendant's blanket challenge.

### 4. Biased Jury

Defendant contends the trial court repeatedly and erroneously denied for cause challenges, resulting in a biased jury. Of the 48 panelists he identifies, 26 were removed by defense peremptory challenges. After the defense exhausted its peremptories, 10 panelists whom defendant unsuccessfully challenged sat on the jury and two others were seated as alternates.[23]

As a preliminary matter, the People argue that the claim is forfeited. To preserve a claim of error in the denial of a challenge for cause, the defendant must exhaust his peremptory challenges, declare his dissatisfaction with the jury as finally constituted, and request additional challenges. (*Black, supra,* 58 Cal.4th at p. 918.)

Defendant did not forfeit the claim as to the seated jurors. He exhausted his allotted peremptory challenges and requested more. The court denied his request and deemed his objection to be continuing. Defendant did not immediately express his dissatisfaction with the jury as sworn. However, shortly thereafter, he moved for a mistrial on the ground that his

---

[23] The relevant jurors are Jurors Nos. 1, 2, 3, 4, 6, 7, 8, 10, 11, 12 and Alternate Jurors Nos. 1 and 5. Original Juror No. 12 was excused during trial and replaced by Alternate Juror No. 3. References to Juror No. 12 are to this seated alternate.

challenges for cause had been improperly denied, resulting in a biased jury. The motion was considered and denied. Although this timing was not ideal, the mistrial motion was specific and timely enough to allow the trial court to take corrective action. At the time of the motion the court was engaged in the selection of alternates and the jury pool had not been discharged. Accordingly, defendant sufficiently preserved the claim of error. (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 (*Peoples*).)

Defendant failed, however, to preserve his objection with respect to the alternate jurors. While defendant exhausted his allotted peremptory challenges and requested more, he did not express dissatisfaction with the ultimate composition of the alternate group. His challenge to the alternates is therefore forfeited. (*People v. Mills* (2010) 48 Cal.4th 158, 186–187 (*Mills*).)

In any event, defendant's challenge fails on the merits. Under both state and federal Constitutions, a criminal defendant is guaranteed the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) To prevail on a claim that the court erroneously denied a challenge for cause, "defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*Yeoman, supra*, 31 Cal.4th at p. 114.)

Defendant cannot make that showing as to the panelists he dismissed peremptorily because none of those panelists sat on his jury. (*Black, supra*, 58 Cal.4th at p. 921; *Yeoman, supra*, 31 Cal.4th at p. 114.) The same is true of Alternate Jurors Nos. 1 and 5 who were sworn but never called to serve. (*Mills, supra*, 48 Cal.4th at p. 186.) Because there was no possible prejudice,

we need not consider the correctness of the trial court's ruling respecting those jurors. (*Yeoman*, at p. 114.)

We find no error in the court's denial of defendant's challenges for cause as to jurors who ultimately adjudicated his case. "A party may challenge a prospective juror for actual bias, defined as a state of mind that would prevent that person from acting impartially and without prejudice to the substantial rights of any party." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488.) "The trial court is in the best position to determine the [juror's] true state of mind because it has observed firsthand [that person's] demeanor and verbal responses. [Citations.] Thus, ' " '[o]n review of a trial court's ruling, if the [juror's] statements are equivocal or conflicting, that court's determination of the person's state of mind is binding.' " ' " (*People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*).) "If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it." (*Hillhouse*, at p. 488.)

Defendant's challenges for cause focused primarily on jurors' knowledge of the case and exposure to pretrial publicity. Qualified jurors "need not be totally ignorant of the facts and issues involved." (*People v. Cooper* (1991) 53 Cal.3d 771, 807 (*Cooper*).) " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a [juror's] impartiality would be to establish an impossible standard.' " (*Murphy v. Florida*, *supra*, 421 U.S. at p. 800.) " ' "It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." ' " (*Cooper*, at p. 807.)

56

Some seated jurors were also challenged by defendant based on their death penalty views. " 'To achieve the constitutional imperative of impartiality, the law permits a [juror] to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741 (*Blair*), quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) A juror's bias in favor of or against the death penalty need not be proven with " ' "unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a [juror] would be unable to faithfully and impartially apply the law . . . ." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497–498 (*Abilez*).) Under this standard, a juror is properly excluded in a capital case if he or she is unable to follow the trial court's instructions and "conscientiously consider all of the sentencing alternatives." (*People v. McWhorter* (2009) 47 Cal.4th 318, 340.)

### a. Juror No. 1

Juror No. 1 wrote in her questionnaire that she did not know the victim or any of his family. She had heard about the case and seen some related photographs but "remember[ed] very little" because "it was some time ago." She had formed no opinion about defendant's guilt or innocence. Neither her knowledge of the case nor the nature of the charges would affect her ability to be fair and impartial. During voir dire Juror No. 1 explained that she had heard coworkers talking about the case when it occurred but did not recall what was said. She recalled news reports that the victim had been shot and that a suspect was arrested in another state. She was aware that the victim went to Arvin High School and played football. She did not

recognize defendant by name or appearance. She explained. "I don't hear much about the case. I don't watch the news a lot, and I don't read the paper."

The juror stated that, based on media accounts, she believed the victim was "murdered." When asked if she could put that belief aside, she agreed that she could "if there's evidence that I feel that he was not murdered. I can't just go by what the media says, because I know it's not fact." The prosecutor explained the burden of proof in a criminal trial, and the juror agreed that "[i]f I feel that it wasn't proved, there was not enough evidence, then I would have to say, yeah, the person is not guilty," "[r]egardless" of what she had heard in the media. She affirmed that she could decide the case based solely on the evidence and from no other source. The trial court denied defendant's challenge for cause.

Defendant's argument that Juror No. 1 prejudged the case fails. She knew very little about the case and said that she could set aside what she had heard to base her verdict on the trial evidence. She stated repeatedly in her questionnaire that she could be fair and impartial. None of her answers during voir dire cast doubt on that representation. Although she initially described the crime as a murder, she readily accepted the prosecutor's explanation of the burden of proof. The court specifically relied on the juror's in-court demeanor in denying the challenge. Its ruling was fairly supported by the record.

Defendant also argues that Juror No. 1 should have been excused based on information she disclosed to the court after the jury was sworn but before evidence was presented. The juror informed the court that she owned two rental properties in Lamont and went there monthly to collect the rent. She was

concerned that she or her property might be the subject of gang retaliation if she served as a juror. When asked to elaborate, the juror said that she did not visit Lamont often and did not know people there. She did not recognize anyone on the witness list. After being shown a map of Lamont, the juror indicated that one of her properties was next door to Garza's house, and another was close to the parking lot from where Leonel Paredes was kidnapped. The court cautioned the juror that it would be inappropriate for her to visit these locations in order to "investigate the case." It further informed her that retaliation was "rare," and that the court was not aware of any cases of such retaliation in Kern County in the past 13 years. The court asked the juror if she could "find someone . . . who could travel out there just to avoid your having to do that" and to let the court know the next court day "if you have made those arrangements," because "if you can't make those arrangements then I want to talk further about it." The juror indicated that she would find someone to collect her rents while she served as a juror on the case. Asked if she was satisfied she could perform her duties, the juror answered affirmatively based on the court's assurances. She did not presently feel that she was in danger, although she continued to have "concerns." She promised she would speak up if at any time during the trial she became fearful or was otherwise unable to perform her duties.

Defendant's request to remove the juror was denied. The court noted that the juror was diligent in reporting her connection to the area, and honest about expressing her concern, which was not unusual in a case of this type. The court was "satisfied, having observed her demeanor, the manner in which she answered the questions, that she can perform her duties"

and was also satisfied that she would inform the court if she had any further doubts about her ability to serve as a juror.

The next session, the court addressed Juror No. 1 and asked if she had anything to add regarding the issue she had raised earlier. The juror responded, "No."

Section 1089 provides for the discharge of a juror at any time the juror "is found to be unable to perform his or her duty." Here, Juror No. 1 expressed some concern about gang retaliation. But she had not been threatened and was not closely associated with the neighborhoods where the crime took place. She was satisfied by the court's representation that retaliation against jurors was rare, and she agreed to revisit the subject if her fears prevented her from performing her duties. When the court revisited the subject, she expressed no such concern at that time, or any time thereafter. The juror's "responses to the trial court's examination revealed no bias, and the trial court found none." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 485.) Defendant offers no sound basis to believe the juror's assurances were insincere. (*Peterson, supra,* 10 Cal.5th at p. 442.) We defer to the trial court's credibility determinations, which are supported by substantial evidence. (*People v. Merriman* (2014) 60 Cal.4th 1, 100; *People v. Harris* (2008) 43 Cal.4th 1269, 1304.)

### b.  *Juror No. 2*

Juror No. 2 wrote in her questionnaire that she did not know the defendant, the victim, or their families. She had "briefly" "glanced at or heard portions" of reports about the case but recalled "no specifics" other than the "nature" of the crime and a photograph of the victim. She had also heard others talking about the case. Her exposure to this information would

not affect her ability to be a fair and impartial juror. She had no preformed opinion about defendant's guilt.

During voir dire Juror No. 2 explained that she had overheard a "brief" conversation between two mothers expressing sympathy for the victim's mother. She had heard on the news that the victim "was a football player, and he was found murdered and there was a truck involved. But that's about all as far as details. I never really took interest in learning more." She recalled hearing on the news that the perpetrators were Hispanic, and the crime was possibly gang related. Although the newspapers described the killing as a "murder," Juror No. 2 "didn't really form any opinion. I just knew a young man was dead, and the newspaper declared it to be a murder." She affirmed that she could set aside what she had heard in the news media and would not prejudge the case. The trial court denied defendant's challenge for cause.

Defendant argues that Juror No. 2 "was close to this case, and not forthcoming about what she knew, or what she thought." He claims she minimized her knowledge of the case when "[i]n truth, she knew plenty of details about the crime. She revealed them in between repeated statements that she didn't really know anything." The record does not support this overstatement. Juror No. 2 was not "close to this case." She knew a few basic details, as would almost anyone who had any media exposure, and she readily disclosed them when asked. She consistently maintained that she had not prejudged the case and that she could disregard pretrial publicity and base her decision on the evidence. The record supports the trial court's determination that she could be fair and impartial.

c.   *Juror No. 3*

Juror No. 3's questionnaire recounted that he did not know the defendant, the victim, or their families.  He had not read about the case in the newspapers or heard about it on television; nor had he spoken to anyone about it.  He had not formed an opinion about defendant's guilt and affirmed he could be fair and impartial.  During voir dire, Juror No. 3 clarified that he had seen "a few brief" news reports about the case, and that his wife had discussed the case with him.  He recalled that there was a carjacking and that police had recovered a truck associated with the crimes.  He knew that a young man had been shot and that a suspect had been arrested in another state.  He disagreed with defense counsel's characterization that he had learned "an awful lot about this case" from discussions with his wife.  The juror explained that his wife mentioned the crime to him but he was getting ready to go out and "wasn't . . . really paying too much attention to what she was saying."  He expressed no doubt that he could set aside what he had heard about the case and base his verdict solely on the evidence presented in court.

The juror had received a subpoena from the district attorney's office to appear at a court date involving child support.  He had not spoken with anyone in the district attorney's office about settling the case.  When asked by the defense if he would "want to help out the D.A. in order to get favorable treatment from the D.A. on that case," the juror responded, "No," and observed, "That's [two] totally different" things.  He was certain that the proceeding would not affect his ability to be fair and impartial.  The trial court denied defendant's challenge for cause.

Defendant again maintains that Juror No. 3 "had learned quite a bit about this case" and was "slow to reveal" that information. He notes, without further elaboration, that the juror indicated in his questionnaire that he favored the death penalty for deliberate murder except in rare cases, and that the juror had a pending child support matter. This record does not support a challenge for cause. The juror's voir dire revealed very little familiarity with the case and he affirmed that he would base his verdict solely on the evidence. The trial court probed the juror about his views on the death penalty. The juror affirmed that he was "very open-minded" on the topic and could impose either death or life without the possibility of parole (LWOP) depending on the evidence. He explicitly denounced the philosophy of an "eye for an eye," explaining, "if a person was found guilty for taking somebody else's life, I don't see that it would, in my beliefs, I don't see that it's right to take that person's life, just because he took somebody else's life, depending on the situation, or the crime that was committed, I should say."

As for the pending child support matter, the juror voluntarily disclosed that fact on his questionnaire, and, when questioned, was emphatic that it would not affect his service. Defendant "offers no sound basis to believe the juror['s] assurances in this case were insincere." (*Peterson*, *supra*, 10 Cal.5th at p. 442.) On the contrary, the juror seemed perplexed by defense counsel's suggestion that he might try to curry favor with the prosecutor, responding, "that's [two] totally different" things. The trial court implicitly credited the juror's representations and denied the challenge "considering all the circumstances." Its determination is fairly supported by the record.

### d.  Juror No. 4

Juror No. 4 was the Dean of Students at Highland High School and was acquainted with members of the Kern High School District Police Department.  She indicated in her questionnaire that she did not know defendant, the victim, or their families.  She had heard about the case on television but did not recall the specifics.  She was not aware of how the victim died.  She had not formed an opinion about defendant's guilt, and her media exposure would not affect her ability to be fair and impartial.  During voir dire, the juror elaborated that she had heard discussions about memorials for the victim at Arvin High School.  She was not personally involved in any such discussions, and observed that such memorials "can get out of hand and disrupt school activity" because it "keeps the students in turmoil."  She stated that she was "somewhere between" favoring the death penalty for deliberate murder and believing that it should only be used in rare cases.  She would keep an open mind between the two punishments.  The trial court denied defendant's challenge for cause.

Defendant argues that his challenge for cause should have been granted.  He offers no analysis in support of this assertion other than to repeat some of the details summarized above.  Juror No. 4 knew very little about the case and she was open to both penalties.  The trial court's ruling was fairly supported by the record.

### e.  Juror No. 6

Juror No. 6 worked as a correctional counselor at Wasco State Prison.  Her job required her to evaluate an inmate's history, medical and psychiatric status, and criminal behavior.  She had many friends who were parole agents, correctional

officers, and correctional counselors.  She would not give the testimony of these people greater weight.

She checked the box "Yes," to the question:  "If evidence in this case shows the involvement of a 'street gang,' is there anything about that which would prevent you from being a fair and impartial juror?"  She wrote, "Street gangs are generally crime-oriented."  During voir dire she explained that she had previously worked with gang members as a parole agent.  Based on that experience she believed that street gangs were formed for the purpose of committing crimes.  She had not worked directly with gang members for at least eight years, and had no special knowledge or experience with gangs in Arvin or Lamont.  She did not claim to have any gang expertise.  She did not believe that gang members are incorrigible and knew of members who had turned their lives around.  The juror affirmed that she could "set aside any experiences, any training, any views or opinions [she had] about street gangs or individuals and not let them influence [her] in this case[.]"  She explained, "I have given it a lot of thought.  And in some ways I think, because of my background, I can be more objective maybe than the average person.  I really do feel I can be objective."

The juror also checked the box "Yes" to the question:  "Is there anything about the use or possession of firearms that would prevent you from being a fair and impartial juror?"  She wrote:  "If carried by other than law enforcement, the carrier often has criminal intent."  During voir dire she explained that she felt gun possession resulted in escalated encounters that might not otherwise be lethal.  If a person intentionally purchased a weapon to commit a crime, she would consider that indicative of criminal intent.  She would be less likely to focus on gun possession if a spontaneous event took place that

prompted a person to take defensive steps. She believed that accidental shootings were common. The juror was a gun owner herself and grew up around firearms. She described herself as "very unbiased . . . about weapon possession."

Juror No. 6 disclosed during voir dire that she had some familiarity with the case. She had heard the victim was kidnapped and killed, and that his body was found in a field. She recalled fundraisers held for the victim's family. She knew nothing about the suspects or how the victim died. Her exposure to pretrial publicity would not affect her ability to be fair and impartial. She had not formed an opinion about defendant's guilt. She affirmed that she could be completely fair to both sides.

Regarding punishment, the juror stated in her questionnaire a preference for the death penalty for deliberate murder. She explained, "If the murder was intentional, the death penalty is fair and just." "I'm in agreement with it in certain clear-cut, premeditated cases." Nonetheless, she felt that life in prison without the possibility of parole "is acceptable in some cases with extenuating circumstances." She confirmed that she was open minded about the penalty to be imposed and would give honest consideration to both outcomes. Specifically, she would consider mitigating circumstances as well as the defendant's intent in assessing an appropriate punishment. She explained, "I worked in Child Protective Services for eight years before going to the Department of Corrections. So it's easy to see how a childhood affects adulthood." Defendant's challenge for cause was denied.

Defendant argues that the juror should have been excused because "[c]orrectional facilities in Kern County were full of

prejudicial talk about this case, including poisonous false rumors and prejudicial beliefs." Aside from Panelist S.L.'s observations (see pt. II.A.3., *ante*), this allegation was largely unsubstantiated. Moreover, Juror No. 6 had heard no such talk. She was unfamiliar with the facts of the crime and was unaware of how the victim had died. Defendant also urges, without further analysis, that the juror should have been excused based on her opinions about gangs, gun possession, and the death penalty. The trial court probed all of these topics. The juror felt that her exposure to gang members would enhance her objectivity. She believed that accidental shootings were common, which was in line with the defense theory of the case. And she said she could be fair and openminded about punishment, citing her service with Child Protective Services as providing insight into the deleterious effects of childhood trauma. The trial court's denial of the challenge for cause was fairly supported by the record.

### f. Juror No. 7

Juror No. 7 disclosed in her questionnaire that she had learned about the case through the newspapers and television, and that she had discussed it with others. This pretrial exposure would not affect her ability to be fair and impartial. The juror elaborated during voir dire. She was aware that a young man was carjacked and fatally shot in Arvin and that his body was found by a family member. She recalled that the suspects had painted the victim's truck. She knew that the victim played high school football and that his brother had stood in for him as homecoming king. She had not prejudged defendant's guilt and could disregard this information to base her verdict solely on the evidence. She was open to the possibility "that the death of Chad Yarbrough was an accident,

as opposed to an intentional murder." The trial court denied defendant's challenge for cause.

Defendant argues that Juror No. 7 "had an extraordinary amount of knowledge about this case." The record does not support this characterization. The juror had no personal connection to the case and was unfamiliar with the victim, the defendant, and their families. Her knowledge of the circumstances surrounding the crime was typical of someone who had been exposed to media coverage and hardly "extraordinary." Qualified jurors "need not be totally ignorant of the facts and issues involved." (*Cooper*, *supra*, 53 Cal.3d at p. 807.) The juror confirmed that she could disregard the information she had heard in the media and base her verdict on the evidence presented.

Defendant also claims that Juror No. 7 "became upset" during voir dire. He cites defense counsel's observation that the juror "got upset when you talked about the brother taking over [as] homecoming king." His reliance on this offhand remark is unpersuasive. Counsel did not elaborate on the juror's demeanor or challenge her specifically on this basis. In any event, a juror's emotional reaction, while relevant, is not automatically disqualifying. (See generally *Adams v. Texas* (1980) 448 U.S. 38, 50; *Clark*, *supra*, 52 Cal.4th at p. 897.) When defense counsel asked the juror about her response, she confirmed that she could set aside her knowledge of the circumstances and focus only on the evidence presented. She said that what she knew about the crime would not affect her penalty determination. The trial court was in the best position to assess the juror's demeanor and the credibility of her representations.

Defendant also criticizes the trial court for limiting defense counsel's voir dire of this juror. Specifically, the court sustained an objection to the following question: "if the jury came to the conclusion that it was a first degree *accidental* murder during a kidnapping or carjacking, do you have any predeterminations as to what the sentence should be?" (Italics added.) The court explained that it would allow defense counsel to probe the jurors' thoughts about possibilities like accident or self-defense, but that referring to a verdict of "first degree accidental murder" was misleading.

The trial court has considerable discretion to place reasonable limits on voir dire, including the process of death qualification. (*People v. Jenkins* (2000) 22 Cal.4th 900, 990.) " '[A]s we have said on many occasions, "[d]efendant ha[s] no right to ask specific questions that invite[] [panelists] to prejudge the penalty issue based on a summary of the aggravating and mitigating evidence [citation], to educate the jury as to the facts of the case [citation], or to instruct the jury in matters of law [citation]." [Citations.]' [Citation.] [¶] 'Nevertheless, voir dire cannot be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair their performance . . . .' [T]he defense cannot be categorically denied the opportunity to inform jurors of case-specific factors that could *invariably* cause an otherwise reasonable and death-qualified juror to vote for death regardless of the strength of the mitigating evidence." (*People v. Tate* (2010) 49 Cal.4th 635, 657–658.)

No error appears. Defense counsel had significant leeway to probe the topic of penalty. He asked the juror if she was open to the possibility that the victim's death was an accident, and she affirmed that she was. He then asked, if the jury returned

a verdict of "murder [in the] first degree with kidnapping or carjacking," whether the juror's knowledge about the case from pretrial publicity would influence her penalty decision. The juror said it would not. Counsel asked if the juror would equally consider death and LWOP as punishments, and the juror said she would. Counsel then asked what punishment the juror would feel was appropriate for first degree murder during a kidnapping or carjacking. She responded that she "would have to hear all the details before [she] would be able to give any opinion on that." She affirmed that she would be willing to listen to evidence of circumstances in mitigation, including the defendant's background, before she made up her mind about penalty. This voir dire was ample. The trial court acted within its broad discretion to curtail counsel's implication that there could be of a verdict of "first degree accidental murder." There is no such offense in the California legal lexicon.[24]

### g. *Juror No. 8*

Juror No. 8 was a correctional officer at North Kern State Prison. During voir dire, he explained that his job would not cause him to be prejudiced against defendant. He treats the inmates he works with as human beings and does not pass judgment on them because they are incarcerated.

The juror had read two newspaper articles about the crime at the time it was committed, and a third article about

---

[24] An unintentional murder committed during the commission of certain felonies may quality as murder in the first degree, under the felony murder doctrine. However, defense counsel did not mention *felony* murder, but instead referred to the nonexistent crime of "first degree *accidental* murder." (Italics added.)

defendant being captured trying to cross the border. He could "[d]efinitely" set aside his knowledge of the case from outside sources and not consider it in reaching a verdict. Although he had checked a questionnaire box stating that he had an opinion about defendant's guilt, he clarified that he did not in fact hold such an opinion. His only opinion was that defendant was innocent until proved guilty.

The juror stated in his questionnaire that he believed the death penalty was appropriate for deliberate murder. He felt that LWOP sentences were not enforced because "our appeal system has opened many doors to life without parole." He checked boxes on the questionnaire indicating that he was open to both penalties and would listen to all of the evidence before making a decision. The court probed these responses during voir dire. It told the juror that "it's going to be your duty to assume that any sentence that's selected by the jury will be carried out ultimately, whether it be the death penalty or [LWOP]." The juror explained that, during his employment, he had seen inmates with LWOP sentences who "are gone [from custody]. One has to assume that they have either died or they were released from prison. And it's an assumption, your Honor. It's not a fact." The juror confirmed that he could set aside that assumption and accept that the sentence would be carried out. The court emphasized that it would be improper for the juror to return a sentence of death instead of LWOP simply because the juror was concerned that defendant might be released from custody. The juror agreed. He had "[n]o doubt" that he could have an open mind about penalty and base his decision on the evidence presented at trial.

In response to questions by defense counsel, the juror stated that he did not believe the death penalty should be

imposed for every first degree murder committed during a kidnapping or carjacking. He favored the death penalty for an intentional murder committed while "lying in wait." When asked by the court if he could set that view aside and base his penalty decision on the evidence presented, the juror responded, "I believe I could. I really do. Because, as I said, I stress very strongly that, in my type of job, I try very hard not to be judgmental. And I think I could." He reiterated, "I'm satisfied that I could be very fair." He would consider the circumstances of defendant's background in making a penalty determination, and could return a verdict of LWOP if the mitigating circumstances warranted it. The court denied defendant's challenge for cause.

Defendant argues that the juror's penalty views warranted disqualification. Not so. The juror stated repeatedly that he would consider all penalty options and could return an LWOP sentence if warranted by the facts of the case. Giving deference to the trial court, which had the opportunity to observe and listen to the juror, the court's ruling is fairly supported by substantial evidence in the record. (*People v. Holt* (1997) 15 Cal.4th 619, 651.)

Defendant also contends that the trial court erred in limiting counsel's questioning about circumstances in mitigation. Specifically, counsel asked whether the juror would consider defendant's upbringing. He gave as an example: "If evidence is presented at the penalty phase, for example, that the defendant had some type of abused childhood or some problems in childhood . . . ." The court interjected, and directed counsel to "stay with the general nature of the juror's duties to consider circumstances in aggravation or mitigation and address it more generally, please." Defense counsel then asked more generally,

"Are there circumstances regarding the defendant's background that you would not consider in mitigation?"  The juror replied, "I don't know I think probably what you are trying to say is that if someone has some problems as a child and that is the cause of a violent crime later on in his lifetime should that be considered. Is that what you are saying?"  When counsel responded, "Yes," the juror said, "In some cases, yes, very much so" and confirmed that he was "open to considering that evidence."

Death qualification voir dire " 'must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried' and 'it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented.' [Citation.]  In striking this balance, the trial court may not categorically deny the defense an opportunity to inform prospective jurors of case-specific factors that could invariably cause them to vote for death." (*People v. Nieves* (2021) 11 Cal.5th 404, 425–426 (*Nieves*).)  Here, notwithstanding the trial court's admonishment, the juror ventured back into the area of childhood circumstances and affirmed that he believed them to be a significant factor in mitigation.  The topic was adequately covered.

### h.  Juror No. 10

Juror No. 10 worked for Kern County as a physician's assistant.  She did not know any of the listed witnesses, but was acquainted with people in the Bakersfield Police Department, the county Sheriff's Department, and doctors from the Kern Medical Center.  The people she mentioned by name were not

called as witnesses in the case. She also knew the court interpreter.

Juror No. 10 indicated in her questionnaire that she had read about the case in the paper and heard others talking about it. She did not recall specifics and any such information would not affect her ability to be fair and impartial.

The juror indicated in her questionnaire that "[w]hile [she was] somewhat in favor of the death penalty, [she did] not believe it should be used as a punishment for most murder cases, even where a life has been taken deliberately." She believed that each case is different and that the penalty depends on the individual facts of the crime. Although the juror is Catholic, she disagrees with her church's position against the death penalty. She confirmed during voir dire that she would consider circumstances in mitigation and keep an open mind about both penalties. Defense counsel and the prosecutor both unsuccessfully challenged the juror for cause.

Defendant claims error. He repeats some of the details set forth above but offers no analysis as to why the record shows the juror could not be fair and impartial. Defendant observes that the prosecutor joined in the challenge. But the prosecutor's concern was that the juror would not be able to vote for death given her religious beliefs. That view does not demonstrate a bias against defendant. In any event, the juror emphasized that she would keep an open mind about penalty and base her decision on the facts of the case. The trial court's denial of the challenge for cause was fairly supported by the record.

### i. *Juror No. 11*

Juror No. 11 worked as a postal clerk. Her son was a Kern County Sheriff's Deputy. She knew two people on the potential

witness list: Jill Johnson was the daughter of her friends from church, and Steve Urner was her son's partner in the sheriff's department. She affirmed that she would not view these people's testimony more favorably because of her relationship with them. Ultimately neither of them testified.

The juror indicated in her questionnaire that the involvement of street gangs in the case would not affect her ability to be fair and impartial. Asked how she felt about street gangs, she wrote, "They scare me." She was not asked to expound on this comment.

The juror stated in her questionnaire that she had seen newspaper and television accounts of the case at the time of the crimes but did not recall any details. During voir dire she elaborated that she remembered the crime involved "teen-agers, somebody was killed, it was out in Arvin . . . ." Her exposure to pretrial publicity would not affect her ability to be fair and impartial.

Asked on the questionnaire to circle the response that best corresponded to her view on the death penalty, the juror circled the following: "The death penalty should be imposed in every case where someone deliberately takes another human being's life." Asked if LWOP was an appropriate punishment for first degree murder, she wrote, "I'm not sure — it would depend on the circumstances." During voir dire the juror again stated that she believed death was the appropriate penalty for homicide in the course of kidnapping or carjacking. When asked if she would automatically vote for death under those circumstances, she clarified: "Oh no. When I was circling that, in my mind — and it was very confusing, the whole questionnaire, I think. [¶] . . . [¶] But when I was getting down to that, I was thinking, okay,

this is, when you break the law, this is the penalty. That's what I was thinking." She confirmed that she would keep "a completely open mind" between the two available penalties and base her decision on the evidence presented at trial. The prosecutor sought further clarification, asking, "If you are saying, as you seem to indicate, that you would have an open mind, can you see yourself considering life without parole even though someone murdered somebody?" The juror responded, "I guess, yes." She continued: "Yes. Because, to me, it was very confusing on the answers of the questions." She affirmed that she could impose a sentence of LWOP for a murder committed during a carjacking or kidnapping, and that she would "have an open mind" about penalty. The trial court then asked if the juror was "satisfied that you can set aside any personal views or opinions you have about the death penalty and follow the law and keep an open mind as to the two possible penalties that might be imposed here?" The juror responded, "Yes." When asked if she had "any doubt about that?" the juror replied, "No."

Defense counsel questioned further. He observed that when the juror said she could vote for LWOP, she "did not sound certain in your answer, and you rolled your eyes to the top of your head." The juror apologized, saying, "It's just very confusing." She again confirmed that she felt death was the appropriate penalty for a killing during a kidnapping or carjacking. The trial court denied defendant's challenge for cause.

Defendant argues that the juror's preference for the death penalty warranted her excusal. But the juror explained that she found the questionnaire confusing. She clarified that her understanding was that the death penalty was the punishment provided by law. After being told that she could choose between

death and LWOP, the juror confirmed that she could keep an open mind about penalty and make her decision based on the evidence. No more is required of a juror, even one who expresses a preference for death. (*Rountree, supra*, 56 Cal.4th at p. 843; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1343–1345.)

Defendant argues that the juror contradicted herself immediately thereafter by restating that she felt death was the appropriate penalty for a killing during a kidnapping or carjacking. Variations are not surprising, however, when a juror is "less than consistent in her answers. 'In many cases, a [juror's] responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a [panelist] in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of [the] . . . juror's state of mind, and such evaluation is binding on appellate courts.' " (*People v. Moon* (2005) 37 Cal.4th 1, 15–16, quoting *People v. Fudge* (1994) 7 Cal.4th 1075, 1094.) The trial court's finding that Juror No. 11 could conscientiously consider all of the sentencing alternatives is fairly supported by the record.[25]

### j. Juror No. 12

Juror No. 12 (previously Alternate Juror No. 3), worked at Wasco State Prison as a personal services supervisor. Her ex-husband was a Kern County Sheriff's Deputy and one of her sons was a correctional officer. She had learned about the case in news articles and television reports, and had seen related

---

[25] Defendant's claim that the trial court erred in failing to discharge Juror No. 11 for asserted bias revealed during the trial is discussed *post* at part II.B.1.

photographs. Specifically, she had heard that the victim was bound and shot in the back of the head, "execution style" after his truck was stolen. Her exposure to pretrial publicity would not affect her ability to be fair and impartial, and she would base her decision solely on the evidence presented in court. Defense counsel noted that she had used the word "hope" in connection with these statements and asked if she was concerned about her ability to do that. The juror replied, "I would try to the best that I could, to do what I needed to do."

The juror was familiar with several persons on the witness list, including Greg Justice, John Soliz, Glenn Johnson, Robert Castaneda, Stan Moseley, and Patty Poeschel. Robert Castaneda was a friend; the others were people she had met "a long time ago" and no longer knew, had worked briefly with, or recognized the name but did not know personally. She confirmed during voir dire that she could set aside her affiliations with the witnesses and judge them by the same standard as anyone else. Only two of the people mentioned, Glenn Johnson and Stan Moseley, actually testified. Regarding Glenn Johnson the juror wrote: "met him a long time ago — don't know him now but see him on TV news." Regarding Stan Moseley, the juror wrote: "don't know [him] — but have heard name, either through ex-husband or TV or paper."

The juror indicated in her questionnaire that her views on the death penalty were best reflected by the following statement: "While I favor the death penalty, I do believe there are rare cases where the death penalty should not be imposed even if someone has deliberately taken another human being's life." She also wrote that "I often wonder how it will affect my life should I choose to return a death penalty verdict." Asked if LWOP was an appropriate sentence for first degree murder, she

wrote: "It would depend on the circumstances related to the murder." During voir dire the juror stated that she generally felt the death penalty was a "good idea" but that she had "mixed feelings" about it. Specifically, she felt that "I don't have a right to put my beliefs on somebody else about how I would feel as to whether they should be put to death or not."

The jury questionnaire asked: "At this point, before you have heard the evidence, do you believe you are open minded about what the penalty should be?" Juror No. 12 wrote, "No." During voir dire, the juror stated that she had misunderstood the question. She affirmed that she had not predetermined penalty and could be open minded. This clarification was consistent with another answer on her questionnaire, where she answered, "Yes" to the question: "If you were a juror at a penalty phase, would you be able to listen to all the evidence, as well as the judge's instructions on the law, and give an honest consideration to both death and life without parole before reaching a decision?" When asked by defense counsel what she felt was the appropriate penalty for first degree murder, she replied, "I don't have an opinion right now." Defendant's challenge for cause was denied.

Defendant argues that the juror should have been excused for cause because of her familiarity with the facts of the case through news media. As noted above, total ignorance is not required for juror qualification. (*Cooper*, *supra*, 53 Cal.3d at p. 807.) The juror had no concern that she could put aside what she had heard and fairly and impartially judge the evidence presented at trial. The trial court credited the juror's representation, taking into account her answers and demeanor. Its ruling was fairly supported by the record.

Defendant also argues that the juror's views on the death penalty warranted her excusal. But the juror was not a particularly strong death penalty proponent. Although she supported capital punishment in principle, she expressed hesitation about personally returning such a verdict. Ultimately, she was quite clear that she could keep an open mind about both penalties, and that she would base her decision on the facts of the case. Again, the trial court credited this representation, taking into account the juror's answers and her demeanor. Its ruling was fairly supported by the record.

For the reasons discussed above, the trial court did not err in denying defendant's challenges for cause as to any of the seated jurors. Because no incompetent juror was forced upon defendant, his claim of error fails. (*Black, supra*, 58 Cal.4th at pp. 920–922.)

### 5. *Judicial Misconduct*

In addition to challenging the for-cause rulings discussed above, defendant claims that the court's "overbearing, leading, and directive voir dire, and refusal to remove biased jurors" amounted to judicial misconduct. He maintains that the court "refused to accept prospective jurors' plain indications of bias or prejudgment," and used leading and suggestive questions "to press until a juror said that he or she would do their duty." He further contends the court was "hypersensitive, quick to threaten defense counsel, and unwilling to acknowledge error." The court's conduct, he claims, evidenced actual bias in violation of his state and federal constitutional rights.

These arguments were unsuccessfully raised in a motion for mistrial, and reasserted in a motion to disqualify the trial judge for bias. (Code Civ. Proc., § 170.1.) Another judge was

assigned to rule on the disqualification motion. That jurist considered written motions and reviewed approximately 6,700 pages of voir dire record. He subsequently found that the trial judge was "very thorough in his voir dire of the jurors" and was "very deliberate" in his effort to assure the jurors could fairly and impartially judge the case. He found no evidence that "the trial judge was anything but fair and impartial to both sides." He further observed that "[i]t is obvious from the record the trial judge exhibited great tolerance, patience and judicial restraint with the defense counsel's conduct which bordered on insolence." He concluded: "the trial judge exercised patience and judicial restraint in dealing with the many attacks alleging bias and prejudice on the record of the trial court. It is also very apparent that the trial judge carefully ruled on all objections and conducted extensive voir dire to assure both the defendant and the prosecution were to receive a fair trial. The court finds that trial judge was neither bias[ed] nor prejudiced against the defendant nor his counsel. The court further finds the defendant's allegation that he cannot receive a fair trial is unfounded."

### a. Questioning of Panelists

"Trial courts must of course 'be evenhanded in their questions to [panelists] . . . and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors.' [Citation.] But the court has 'broad discretion over the number and nature of questions about the death penalty.'" (*Mills, supra*, 48 Cal.4th at p. 189.) "We trust our trial courts understand and appreciate the importance of the voir dire procedure and the need to be 'evenhanded' in questioning [panelists] in a capital case. [Citation.] We assume the trial

court formulated its questions based on the individual characteristics of each juror, including the juror's questionnaire answers and in-court demeanor. To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all [panelists] irrespective of their individual circumstance, something we have declined to do." (*Id.* at p. 190.)

Here, defendant complains, not that the court asked too few questions (see *Mills, supra*, 48 Cal.4th at p. 189), but instead that it asked too many, effectively rehabilitating jurors who showed obvious bias. We have reviewed the record of voir dire, with particular attention to the jurors identified by defendant in support of his argument. We conclude the court did not commit misconduct or demonstrate actual bias against defendant. Nothing in the record suggests the trial court lacked impartiality during voir dire.

### i. Panelist J.D.

Defendant cites the voir dire of Panelist J.D. as an example. J.D. worked as a correctional officer. When asked if there was any reason he could not be fair, J.D. explained: "I work in a setting where I deal with convicted felons on a daily basis. And I have done that for 16 years. And it's hard to be in that environment and not become a little bit callused in the way I view certain things." The court asked if the panelist's feeling was related to this particular case or to criminal trials in general. J.D. replied, "I don't know anything about this case. I think it would be in any case. I would probably tend to look more on a negative way of looking at it. To be honest, it would probably be harder for me to believe in innocence than guilt. I have been trained in my job they are guilty, and that's kind of hard not to look at after 16 years. And I could try to be fair, and

I really would.  But I have thought about it since I was here last, and, honestly, inside, I have become a little bit cynical in my job.  And I think that would affect me.”

The court stated that it wanted to explore this topic and cautioned that it was “not trying to change any views or opinions that you have.”  The court explained that all panelists come to the courtroom with feelings, opinions, and biases.  The question was whether J.D. could honestly assure the court that he could set those views aside and not let them influence his verdict.  The panelist affirmed that he sets aside his biases every day at work “[b]ecause I have to be fair at all times.  It’s something that I have been trained to do for a long time.  I think I can do it, and I would sure give it a try.  I would do the best I could.”  The court then asked if J.D. thought he could decide the case based solely on the evidence and the law.  The panelist responded, “I would definitely try my hardest.  Honestly, I would have a hard time.  But I would be willing to make the effort to put it aside.”

The court then observed, “I’m not trying to put you in an impossible situation here, where you really, you know, have a serious doubt as to whether you can perform your duties.”  The court asked whether J.D.’s doubt was hypothetical and based on potential human frailties, or if the panelist actually had a reasonable doubt about his ability to perform his duties.  J.D. replied, “I believe I can do it, because I’m sitting here, being as honest as I can with you, and that’s putting it aside in itself.”  The court continued to probe, asking if J.D. was truly satisfied he could perform his duties “[b]ecause if you have some doubt about it, I want you to tell me.”  J.D. replied, “I do have a doubt about it.  It would be a daily thing that I have to deal with.”  The court then asked if it would be difficult or impossible task.  J.D. replied, “I don’t think it would be difficult or impossible.  I think

it would be reasonable. I would expect every juror to be able to do it to an extent, and I believe I could do it to that extent that you are asking."

The court asked, "Are you feeling pressured in any way to give me the right answers here?" J.D. responded, "No. No, I'm not." The court repeated that it needed the panelist's "honest response" and that he should not be embarrassed to share his feelings or be concerned that the court would be upset with him. J.D. replied, "I can perform my duties." The court asked whether the panelist had any doubt, and J.D. replied, "There's a little doubt." The court asked J.D. to explain, and he replied, "[I]t's just daily situations I have had to face every day. My whole attitude has gone to the cynical side of life. It's kind of sad to say, but, in being fair here, I would make the effort to keep it centered best I can. [¶] . . . [¶] But I do have doubts." The court asked again if the panelist had "reasonable doubt, meaning that it's not likely that you are going to be able to perform your duties here." J.D. replied, "I don't feel that it would be unreasonable for me to do it or too difficult. I could do this."

The court received J.D.'s assurance three more times that he could perform his duties. The court then said that if the panelist became aware of a bias during the trial, he would need to disclose that and the court did not "want to set us up for that. In other words, we certainly want to find out now the likelihood of your being able to perform your duties. Because you understand if we excuse jurors in the middle of a trial that creates other problems." J.D. then volunteered that he had shot three inmates a few days before and "it's staying with me. It's like I'm kind of angry about having to be placed in that situation. So when I'm sitting here and I see things that I have dealt with

or attitudes that I have dealt with, it's those angers." The court then asked, "Because of the scenario you just described where things can happen at work that then can be disturbing, sounds like you are concerned that could happen during the trial." J.D. agreed. Upon stipulation of both parties, the panelist was excused.

After the panelist's excusal, defense counsel objected to the manner of questioning, asserting that the trial court had confronted J.D. and pressured him to say he could follow the law. The court stated for the record that "I am going to be as even handed as I'm capable of being in asking jurors these questions. And if a juror expresses a bias, I am always going to have to try to have them bring up honestly what that bias is and then go to the next step and explain what their duties are. And it's necessary to explain what their duties are in order for them to answer the questions. [¶] It's the jurors' duty to set aside bias if they are able to, and they have to tell the Court honestly if they can or can't set that aside. And that's whether it's a bias that favors the prosecution or favors the defense. And I'm going to go through that process with each juror."

The court did not abuse its discretion while questioning J.D. The court encouraged the panelist to answer honestly; emphasized that it was not trying to change J.D.'s views or pressure him; and told him not to be embarrassed or concerned about the court's reaction. The court conscientiously probed whether the panelist's uncertainty about his ability to abide by the presumption of innocence was theoretical or actual. In doing so, the court did not attempt to lead the panelist to the "right" response. Rather, the court refused several times to accept at face value J.D.'s representation that he could be fair, and instead asked questions designed to test the accuracy and depth

of that response. The court did not simply stop questioning when J.D. said he could be fair, as it might have done were it seeking an answer unfavorable to the defense. Indeed, it was the court's thorough questioning that ultimately led to the panelist's removal. When J.D. disclosed his recent experience with a shooting, the court promptly excused him for cause with the agreement of both parties. This record reveals no bias in the court's manner of questioning or its ruling on the panelist's qualifications to serve.

### ii. Panelist G.K.

Defendant also looks to the voir dire of Panelist G.K. He formerly served as a sergeant and police officer in the Army. His daughter was a police officer. He expressed the opinion that gang members are accused of considerable criminal activity. The court observed that defendant had not been charged with a gang crime and that it would be improper to convict him of murder and related allegations simply because a street gang was involved. The panelist affirmed that he could set aside his opinions and base his decision on the evidence. Asked if it would be difficult, G.K. replied, "I think we — you know, we say set aside, but we really can't take away 55 years of background, where I come from, where we all come from. I think so, yes. I would do the best I could. [¶] But you can't take away where you come from, what you've been through. Life's experiences, I guess is good." The court agreed that all jurors bring their life experiences to the task, but cautioned that G.K. must be willing to set aside feelings like bias and anger. The panelist acknowledged that he would try to set his feelings aside and follow the law. He commented, "I think I would be guided more by the facts than emotion" and that "I don't think I would have any trouble with setting the emotions to the side."

When asked if he could evaluate the testimony of all witnesses using the same standard, G.K. replied, "[M]y gut feeling is I would tend to give more credence to testimony from a police officer." The court noted that it was common for people to respect police officers but said that it would be the juror's responsibility to evaluate each witness based on that person's credibility and ability to recall, rather than a belief about law enforcement officers in general. G.K. indicated that he understood and agreed, stating, "I have no problems. I think I — I could do that, yes." He qualified, however, that "for me, it would be tough to do that, to be honest." G.K. commented that it was "tough" to have "[n]o opinion" on things. The court agreed that "we ask jurors to do some tough things" and emphasized "there's no right or wrong answer here. [¶] Any time you have a doubt about something, you let me know." "I want you to be honest about that, and tell me if you don't think you can perform your duty, as I described it." G.K. responded that he would have "some problems" giving every witness the same level of credibility. The court then asked the panelist if he could conceive that a police officer might be dishonest or mistaken in the officer's observations or recollection. G.K. replied, "Yes." He affirmed that he could look at each witness individually without generalizing about that person's occupation, although it would be "[t]ough to do." The court then asked, "If it's so tough that it's creating a question in your mind as to whether you can perform your duty, then you need to let me know. [¶] If it's tough, but you can do it, I need to know that too." G.K. replied, "I guess I could do it. [¶] I know I can do it." The court asked the panelist if he was "satisfied honestly in [his] mind" that he could perform his duty, or if he had "a reasonable doubt" about it, and urged the juror to "look[] within" himself. Again, G.K.

replied, "I can — I feel or — I can do it. That's how I feel about it."

Defense counsel pursued the topic in voir dire, asking the panelist if he was "not at all certain that [he] would not let this favoritism toward police officers" affect him. G.K. said that was "stronger language than how I really feel," and that "I don't think I would lean that heavily towards law enforcement." He expressed his belief that officers are not always truthful, and cited the Los Angeles police as an example. All things being equal, G.K. would tend to believe a police officer, but he would be alert for a feeling that there was "something that's not coming out" or that's "not quite right."

Out of the presence of the panelist, defense counsel objected to the manner of questioning, asserting that the trial court had pressured G.K. to say he could be fair in assessing the credibility of police officers. The court denied a challenge for cause.

No misconduct appears. Panelists may often arrive at court with preconceptions or leanings. The question is whether they can set those feelings aside and impartially consider the evidence. They may have only a vague understanding of a juror's role or the precise meaning of legal terms and expectations. Often they will not have spent much time probing their own thinking in the context of its impact on potential jury service. These realities highlight the important role of voir dire by both court and advocates. The process is designed to uncover panelists' honest and thoughtful estimation of their own ability to be fair. Sometimes those attitudes are apparent, at other times open and patient dialogue is needed. Such an approach helps ensure that advocates base their excusal decisions on an

individual assessment, rather than their own preconceptions.  It also helps to ensure meaningful appellate review.

Here the court properly reminded G.K. that police officers are human beings who may be untruthful, inaccurate, or forgetful, just like any witness.  The panelist agreed with this assessment, and the court credited his statements based on his demeanor.  The record reveals neither error nor bias.

### iii. Panelists G.M. and D.K.

Two other panelists, G.M. and D.K., were the subject of a motion for mistrial after the trial court failed to excuse them for cause.  Defendant argues that the trial court spent an inordinate amount of time trying to rehabilitate these death leaning panelists.  On the contrary, the voir dire was entirely proper.

After the trial court explained the process of the guilt and penalty phases, G.M. indicated that he "[c]ertainly" had an open mind as to penalty.  Asked by defense counsel what the appropriate penalty would be for first degree murder, G.M. replied, "I believe, the way the law is written, it's the death penalty."  He affirmed his belief that the law would require him to impose a death sentence for first degree murder and stated that he agreed with that punishment.  The prosecutor then clarified that "even when special circumstances are found to be true, the death penalty is not automatic."  G.M. affirmed that he could follow the law, consider mitigating circumstances such as the defendant's background and psychological status, and keep an open mind about both penalties.  He stated that he had "no problem" with either LWOP or the death penalty.

The court then asked about a particular questionnaire answer in which G.M.  indicated that he would always vote for the death penalty for a premeditated murder.  The court said, "I'm not trying to change your answer.  I want to make sure you

understand what the law provides.  [¶]  The law provides, if the jury has found the defendant guilty of this willful, deliberate, premeditated murder and it goes to the penalty phase, the jury must keep an open mind now to consider which penalty should be returned by the jury, either the penalty [of] life in prison without the possibility of parole or the death penalty."  G.M. again stated that he believed in the death penalty for premeditated murder.  The court asked if the panelist was stating what he understood the law to be, and G.M. said, "I believe so.  That's my understanding.  There again, I'm not a student of the law."  The court stated that the panelist's understanding was incorrect, and explained, "The law doesn't provide for a death penalty automatically in that situation or any situation."  G.M. indicated he understood.  The court then said, "I'm not trying to change your mind.  And you tell me honestly how you feel."  G.M. replied, "I had always understood it to be the death penalty applies to a premeditated murder.  So that's why I wrote what I wrote."  The panelist confirmed that he would not automatically vote for death in any given circumstance, and that he believed "the facts will tell me which direction to go."  The court then asked G.M., "So do you think this is just a matter of clarifying what your understanding of the law was?"  He responded, "Yes, absolutely.  Because I was obviously — I was wrong."  Asked if he would have any difficulty following the law as the court instructed him, G.M. responded, "No, none whatsoever."

Defense counsel then asked the panelist if he would consider the defendant's childhood in determining punishment, and G.M. replied, "No."  The court explained that the law provides for the consideration of mitigating circumstances such as the defendant's background in selecting the appropriate

penalty and asked if the panelist had a predisposition that would prevent him from considering such evidence. G.M. affirmed that he would "go by what the law states" and that he would "have to hear the whole story." The prosecutor requested additional voir dire, prompting G.M. to apologize. The court responded, "don't apologize, sir, because there's no right or wrong answers. And I appreciate you feel you are kind of on the hot seat, but we need to be able to explore your thoughts and the reasons for [them]. Bear with us, please. It's kind of a difficult process, but we want your honest responses." The prosecutor then asked if G.M. was open to considering mitigating factors, including the defendant's childhood. He replied, "Yes, I believe I can be open-minded." The trial court denied defendant's challenge for cause.

No misconduct appears. The court's thorough voir dire exposed G.M.'s misunderstanding that the penalty of death automatically applied to a first degree murder. When the law was clarified, G.M. confirmed that he could consider all relevant evidence and keep an open mind about penalty. The court was careful to reassure the panelist three times there were no right answers, and that he should give his honest opinion. This questioning does not demonstrate bias.

The court asked D.K. if she could keep an open mind about the penalties of LWOP and death without leaning in favor of one or the other. She affirmed that she could. When asked what she felt about an LWOP sentence for the crime of first degree murder, she replied, "I don't agree with it" and "I feel like if somebody takes somebody's life and they are proven guilty that they should die too." The court thanked the panelist for her honest opinion and asked if she could keep an open mind until she had heard all of the evidence, including mitigating

circumstances such as the defendant's background and childhood. D.K. said it was a "hard question to answer if you don't know what the evidence is or you haven't heard anything about it. [¶] . . . [¶] I mean, I wouldn't go one way or the other without hearing everything, but that's a hard question to answer." The court acknowledged it was a hard question and encouraged D.K. to do her best to answer honestly. The court observed that "[s]ome jurors feel so strongly about the death penalty one way or the other that they honestly cannot perform their duties, and that's okay too. It doesn't mean you are a bad person or that we are going to punish you in some way." D.K. responded that she would "[j]ust equally weigh the evidence, whichever opinion I come up with or conclusion." Asked if she could give equal weight to both penalties for first degree murder, she replied, "Well, of course, depending on the evidence."

During voir dire by defense counsel, the panelist stated her opinion that a "bad childhood" does not justify murder. Asked to describe what circumstances she felt would justify an LWOP sentence for first degree murder, D.K. said, "Not hearing anything about this, I don't know. I couldn't answer that question." Asked what the appropriate penalty should be for a deliberate murder, she answered, "Death." But immediately thereafter, D.K. qualified that "[i]t would depend on what the extenuating circumstances would be." She observed that it would be very hard to make a decision to end someone's life. She confirmed that she had not formed an opinion of what the penalty should be and was open to a penalty of LWOP for first degree murder. She could set her personal feelings aside and consider all of the evidence in the penalty phase before determining a verdict. She clarified that "what was asked of me

is do I believe in the death penalty. Yes, I do, but not for all cases." Defendant's challenge for cause was denied.

No misconduct appears. The trial court allowed ample voir dire by both parties to probe the panelist's views on the death penalty. Ultimately, the court credited D.K.'s responses based on her demeanor in court. The record supports the court's determination that the panelist could fairly and impartially determine punishment. The fact that the court ruled against a defense challenge does not, standing alone, evidence a bias.

In addition to the panelists discussed above, our review of the voir dire reflects that the court spent a considerable amount of time questioning jurors whose answers initially suggested they would be unable to impose a verdict of death, and ultimately denied the prosecutor's challenges for cause to several of those jurors. Panelist C.G., for example, indicated in response to the questionnaire that he was strongly opposed to the death penalty except in rare cases, and that his views would affect his ability to follow the law. When asked by the court if he could keep an open mind as to penalty, the juror responded, "No, if it's the death penalty, I'd go the other way," and "I just don't believe in it." The court then told the panelist, "[T]hat's your personal view" but asked if he could set that view aside and follow the law, which required him to keep an open mind as to both penalties. The panelist confirmed he could keep an open mind. The court then reviewed other answers on the panelist's questionnaire that suggested he would not consider a verdict of death. When asked, the panelist affirmed that he could keep an open mind because "I've got to go along with, you know, with the law." On questioning by the prosecutor, the panelist stated that he was opposed to the death penalty for religious reasons. The prosecutor then asked, "Is there any murder case where you

would vote for the death penalty?" to which the panelist responded, "Not that I know of." The panelist indicated that, if selected, he would consider the evidence and discuss penalty with the other jurors. The prosecutor questioned, "Can you keep an open mind[] to giving the death penalty?" to which the panelist replied, "I don't think so." The court followed up, asking the panelist if he had such strong feelings against the death penalty that he would always vote against it, no matter the evidence. The panelist responded, "Yes, sir." The court asked the panelist to explain. The panelist stated that he did not personally believe in the death penalty. However, he would listen to the evidence and discuss the case with the other jurors, and could ultimately keep an open mind as to penalty. The court denied the prosecutor's challenge for cause observing, "I appreciate that the juror has given some conflicting or ambiguous answers, but I'm satisfied in the totality, that this juror did understand the Court's questions, and counsel's questions, to the extent that they are relevant to the ultimate issues, as to whether he could perform his duties, and again, I'm making every effort that I can to be consistent, and just as I have advised counsel, that jurors that have strong personal views, in either direction, whether they have strong views that the death penalty should be imposed in every murder case, or that the death penalty should never be imposed, for any murder, that's not the end of the story, I'm going to examine then whether the juror can honestly set those views aside and perform their duty as a juror. I'm making every effort to be neutral on this subject." Questioning of panelists G.G., L.M., and E.H. was similar, with the court denying the prosecutor's challenges for cause to these panelists. This record reflects the court's balanced approach to voir dire.

### *iv. Panelists M.T., K.D., E.W., C.H., and S.L.*

Defendant identifies five panelists, M.T., K.D., E.W., C.H., and S.L., who initially survived challenges for cause but were later excused when they disclosed biases that would affect their ability to serve. He argues that the voir dire of these panelists shows that the court overreached to qualify them, only to have them reveal later that they could not be fair. The record does not support this assertion.

First, the court did not find any juror qualified until it was satisfied that the juror's views had been completely examined. More fundamentally, jury selection is an ongoing process. Jurors may have no idea what kind of case they may be called upon to judge when they report for service. Often when they learn the case to which they have been assigned is a capital one, they wrestle with weighty considerations to which they may not have previously devoted much thought. Even when all panelists have been passed for cause, the court may ask, before swearing the panel, whether anyone in the box has any question about their ability to be fair and impartial to both sides if called upon to judge the facts, or to decide upon the appropriate verdict under the law, should that decision become necessary. It is also not unknown for jurors, who honestly believed they were up to the task, to report, even during trial, that they now doubt their ability to be fair and impartial. We turn to the panelists to which defendant refers.

Each of these panelists was individually questioned on voir dire, and then called to the jury box approximately a month

later for the final selection process.[26]  At that time, each panelist was again asked if there was "any reason" why he or she should not be on the jury.  Each panelist brought up a concern not previously disclosed.

Panelist M.T., who worked for the Department of Corrections and Rehabilitation as a vocational instructor, stated during the initial voir dire that his employment would not affect his ability to be fair, observing "I feel like I don't judge [the inmates].  [¶]  Actually, I don't even get involved in their cases.  [¶]  I'm just there to educate them."  However, when M.T. was called to the jury box for the final selection process, he raised a concern that he could not be fair due to his place of employment.  The court noted that the panelist had not previously revealed that sentiment, and M.T. replied, "I have been giving it a lot of thought."  He was dismissed by stipulation of both parties.

Panelist K.D. worked for the railroad and initially mentioned no conflicts arising from his job.  However, when he was called to the jury box approximately a month later, he expressed concerns that he could not be fair.  He recounted that, at his work, a group of people from Arvin had been discussing the case.  They knew Chad's father and said he was having a hard time and wanted revenge on those responsible for his son's death.  K.D. did not participate in the conversation but was concerned that he would not be able to avoid such talk if he worked during the trial.  The court inquired whether K.D. actually planned to work during the trial, and he indicated that

---

[26]     This approach is reflective of *Hovey* voir dire in which all eligible jurors are questioned, but peremptory challenges are not exercised until that questioning of all panelists has been completed.

he would be seeking weekend shifts. After the panelist stated a concern about his ability to be fair, the trial court excused him.

Panelist E.W. disclosed in the initial voir dire that his son's girlfriend had previously dated the victim, and that the couple visited the Yarbroughs at home shortly after the victim's death. E.W.'s son said that the victim's bedroom was "like a shrine." The girlfriend had discussed the victim's death with E.W., but he did not recall the specifics of the conversation other than that the victim was partially clothed and his hands bound behind his back. The panelist himself had never met the Yarbrough family. The visit of his son and his girlfriend would not affect his ability to be fair and impartial. When asked if he felt he had "some kind of a bond with the Yarbrough family" or would have a bias because of those relationships, E.W. responded, "No," and explained, "I think whoever killed Chad Yarbrough should be punished, whether it's this guy or somebody else. Yes, I'd listen to the evidence and decide from that." E.W. was "satisfied that [he was] completely fair and impartial to both sides."

Approximately a month later E.W. returned to the jury box. He responded, "Yes," when asked if there was any reason he could not be completely fair to both sides. He stated that, since the time of his initial voir dire and now, he had come to believe he could not be impartial, citing his son's relationship with the victim's former girlfriend. The court asked E.W. if he had "further thoughts about the subject of being fair," and E.W. replied that he had. When asked what his "honest feeling" was, E.W. said, "I'm leaning way too far for guilty." Upon stipulation of both parties, the court dismissed the panelist.

Panelist C.H. worked in Arvin as an elementary school teacher. Two of her coworkers, whom she had known for about

10 years, were friendly with the victim and attended his funeral. The court inquired whether the panelist's relationship with these coworkers would affect her ability to be fair and impartial, and she replied, "I don't think it would affect that at all," and affirmed she could be completely fair to both sides. The court then asked C.H. to imagine how she would feel if her coworkers were critical of the jury's verdict in the case. C.H. observed that her coworkers were professional people and doubted that they would question her. But if they did, she would not consider the verdict her sole responsibility but rather the collective decision of 12 jurors. She suspected that she "would probably just say that I really am not supposed to talk about it, and that would be the end of it." The court emphasized the importance of deciding the case independently and without outside pressures like criticism or support. C.H. responded, "I understand now what you're saying. I don't think that would happen."

Asked about her knowledge of the case, C.H. stated that she had heard in the media that the victim was carjacked, tied up, and shot in the head. She described it as a "horrible crime." She also heard a coworker say that the victim's mother was taking his death "very hard" and needed sleeping pills to be able to rest. When questioned by defense counsel, C.H. confirmed her belief that the victim's death was not accidental. Counsel then asked, "So you assume, without hearing any evidence at all in this trial, that Chad Yarbrough's death was an intentional first degree murder?" The panelist replied, "Yes." Asked if there was anything she could do to change that opinion, C.H. answered, "There's nothing. No." But when the prosecutor clarified that she was required to put aside her outside knowledge and base her decision on the evidence presented at trial, C.H. confirmed that she could do that, stating: "Yes, I

could be fair and open-minded as to whether or not a murder has been committed." The court then questioned C.H. again: "I want you to be honest with us, because this is not a situation where you're being pressured to either be on this jury or not be on this jury." "Can you really put out of your mind your opinion that Chad Yarbrough was murdered, and keep an open mind to listening to the evidence here in the courtroom, which may be entirely different from what you've heard about or read about previously?" C.H. responded, "Yes." The court then asked, "Do you understand how important that is?" Again, C.H. responded, "Yes." Finally, the court asked, "You're satisfied that you can do it?" C.H. once again answered, "Yes."

Approximately one month later, C.H. was called to the jury box as an alternate. Asked if she had concerns about serving, she replied, "Yes." Without further voir dire, both parties stipulated to her excusal.

Panelist S.L. worked as a correctional officer and institutional gang investigator for the Department of Corrections and Rehabilitation. He was familiar with a Mexican Mafia prison gang operating in the Arvin area but had not interacted with gang members outside the prison setting. S.L. expressed no doubt that he could set aside his specialized knowledge and not act as a "surprise expert." The panelist had heard about the case in the news media and from coworkers. He had heard that the victim was carjacked and shot in the head at close range while kneeling. He understood that the victim was killed over a "disrespect issue," and that his penis was severed and put in his mouth. When asked if he would be surprised that these rumors were false, S.L. responded, "No." He indicated that he could disregard what he had heard and base his decision on the facts presented at trial.

About a week later, S.L. asked to speak to the court. He said that he would lose about $400 if jury duty interfered with his ability to attend a mandatory job training. The loss would be a financial hardship. He also suspected based on defendant's name that his gang unit was asked to investigate matters related to this case. He understood that "there was a telephone call from an associate of the defendant, that spoke to somebody on the outside about this case." He was not personally involved in the investigation and did not attempt to confirm this information. Defendant renewed his challenge for cause, which the trial court granted.

We find no judicial misconduct with respect to the questioning of any of these panelists. The court allowed ample voir dire and received multiple assurances of impartiality from each of them. After reflection, and/or changed circumstances, each raised concerns not previously expressed. The fact that they disclosed new information or reconsidered their views about things in no way suggests the court's initial questioning was overbearing. Once the court received the new information, it dismissed each of the panelists without attempting to rehabilitate them. No judicial bias appears.

### v. *Panelist N.C.*

Defendant complains that the court's manner of questioning was so overbearing that it brought Panelist N.C. to tears. N.C. was a 19-year-old, part-time student who worked in a grocery store. At one point in the voir dire, the panelist began to cry. The court asked if she needed a break or a glass of water, but N.C. indicated that she was okay. When asked if she felt uncomfortable, N.C. explained, "Yeah. [¶] I'm just — I've never done this before. I don't know what to do." The court emphasized that it did not want N.C. to feel "under any

unnecessary pressure" and that it was "okay to be nervous." It then asked, "Was there something that I was doing that caused you to become upset this afternoon and cry this afternoon in court?" N.C. responded, "It's just that I've never done this, and I'm not sure about the questioning. I'm not used to thinking about this." The court then emphasized that "I hope you don't think I'm trying to pick on you or make you feel embarrassed," to which the panelist replied, "No." Voir dire continued without incident and the trial court ultimately excused N.C. for cause. The court explained that it was concerned about her display of emotion and that she "was not giving a lot of independent thought to her answers, but was rather tending to agree with whoever was asking her the questions, and that she was having a difficult time comprehending the subject matter, and that she was basically becoming confused by the process." The prosecutor opined that the court had a "brusk" manner and spoke loudly when it told the panelists to explain their answers: "That's the way it comes across to myself, defense counsel, and I think to the jurors." He opined, "I don't think it's offensive, in any way, but I can see how it can be misconstrued by the juror." The court responded, "I appreciate constructive criticism from counsel. [¶] If I'm becoming brusk, and if I'm not aware of it, then I appreciate counsel respectfully suggesting that I consider my tone, and I do have a loud voice, in general —"

The record suggests that this young panelist was overwhelmed by the process of voir dire and being questioned before strangers in an unfamiliar setting using somewhat arcane procedures. Participating in such a process can be stressful and unsettling. Different people respond differently to these circumstances. A review of the record shows this to be an aberration, however. The other panelists readily answered the

court's questions and participated fully and honestly in voir dire. Although we cannot discern tone from the cold record, later observations by both the parties and the court on the record indicate that the court was generally even in its tone. That this youthful and inexperienced panelist was overwhelmed is unfortunate, but it does not demonstrate judicial bias against defendant or his counsel or a failure of the voir dire process as a whole.

Finally, defendant complains that the trial court impermissibly limited counsel's voir dire, preventing counsel from probing the panelists' views on what circumstances might support a verdict of less than death. A review of the voir dire record as a whole, with particular emphasis on the panelists discussed above, belies this claim. The court conducted thorough voir dire of all panelists on the topic of the death penalty. It allowed defense counsel considerable leeway to follow up and did not enforce any specific time limit on questioning.

In summary, a review of the entire voir dire, and particularly the panelists identified by the defendant, shows that the court conscientiously conducted a thorough voir dire and conscientiously probed areas that might reveal bias. The court's inquiry, in turn, prompted honest and thorough responses by the panelists.

### b. Treatment of Defense Counsel

Defendant also criticizes the court's demeanor towards counsel, arguing that the court was hypersensitive, quick to threaten, and unwilling to acknowledge error. " 'Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court "commits misconduct if it persistently makes discourteous and disparaging remarks to

defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" [citation]. Nevertheless, "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior." ' " *(People v. Woodruff* (2018) 5 Cal.5th 697, 768 (*Woodruff*).) As for allegations of actual bias, the " 'controlling principle' " rests on a " 'general concept of interests' that may prevent adjudicators from remaining ' "disinterested in the conviction or acquittal of those accused," ' " such as "bias toward [the] defendant or a group to which she belonged," "past controversy between the judge and [the] defendant, pecuniary interests, or other 'influence at issue.' " (*Nieves, supra*, 11 Cal.5th at p. 499.)

Defendant cites the voir dire of panelist T.B. as an example supporting his claim of misconduct and bias. The court asked this panelist: "If the evidence and law required it, could you return a verdict for the death penalty?" T.B. responded, "Yes." The court then asked, "If the evidence and law required it, could you return a verdict for life without parole?" T.B. again responded, "Yes." Defense counsel objected to the court's question on the ground that "the law never requires death." The objection was overruled. Both parties passed for cause. Defense counsel then objected, in T.B.'s presence, that the panelist had been "misinformed about the law." T.B. was asked to leave the courtroom, after which defense counsel said that the court had improperly asked the panelist "if he could find the death penalty, if the law required it." He observed that "[t]he law never requires the death penalty." The court countered that counsel had misquoted the court; the question asked about returning a verdict of death "if the *evidence* and law required it."

(Italics added.)  Defense counsel and the court debated whether there was a material difference between referring to what the law requires and what the evidence and law requires.  The court commented: "Mr. Bryan, do you understand what the Court told the juror.  I said if the evidence and the law require it.  That's standard language in asking jurors if they can follow the evidence, follow the law, return a fair verdict."  The court noted that it had asked the same question respecting both death and LWOP, and that the panelist would understand that "he would have to consider either verdict, and return the verdict that was proper under the evidence and the law.  That was the point I was making."

Courts should take care not to suggest to the jury that a death verdict would ever be "required."  (See *People v. Medina* (1995) 11 Cal.4th 694, 781 [jury's role is to determine whether a death verdict is " 'warranted' "]; *People v. Hendricks* (1988) 44 Cal.3d 635, 654 [jury must determine whether death is the " 'appropriate' " penalty].)  T.B. was questioned separately from other panelists and ultimately did not serve.  There is no concern that a sitting juror was misled about the law.  Moreover, the court changed its approach to that question with subsequent panelists.  For example, in the next voir dire session, the court asked a panelist who ultimately served as Juror No. 4:  "Could you listen to all the evidence both during the first phase, which we call the guilt phase on the murder charge, and, if we got into the penalty phase, also listen to any evidence in that penalty phase?  It might include evidence regarding the defendant personally, perhaps his background, his life.  And some of the evidence might be argued to be circumstances in mitigation, which *might cause the jury to find* that the appropriate penalty would be life in prison without parole.  Other evidence might

support circumstances in aggravation, *which might cause the jury to* decide that the appropriate penalty would be the death penalty. [¶] Can you keep an open mind to consider what weight to give, if any, to all of that evidence, all of those circumstances, and in that way decide which penalty the jury should return with?" (Italics added.) Subsequent questioning was similar. (See, e.g., reference to the "appropriate" penalty; reference to circumstances that "might cause a jury to lean toward a death penalty" and a decision about "what penalty would be appropriate"; reference to "whether the proper penalty should be the death penalty or life in prison without parole"; reference to "evidence [that] would support circumstances in mitigation . . . and that might cause the jury to lean toward a penalty of life in prison without parole" and "evidence [that] might support circumstances in aggravation, which might cause the jury to lean toward a verdict of death penalty" and asking the juror to "keep an open mind as to which of those two possible penalties it would return.") The record demonstrates that the court, responding to defense counsel's objection, modified its phrasing of the questions. Its response was neither hostile nor inflexible.

As for defendant's criticism of the trial court's demeanor, a review of the voir dire indicates that the trial court took a firm but diplomatic approach with both parties in an attempt to rein in inappropriate conduct and maintain an atmosphere of decorum. The following example is illustrative. Outside of the presence of the panelists, defense counsel objected "strenuously" to the court's questioning. The court instructed counsel to avoid such inflammatory and disrespectful language. Counsel retorted: "Strenuously is a very proper adverb in our lexicon, and that's the word I've chosen to use." The court observed: "I'm

telling you that you have been using words like strenuously but then going beyond that, like accusing me of badgering jurors. And that's the kind of language I think is inflammatory, Mr. Bryan. And it's unnecessary, and it creates an unnecessary tone in this courtroom. And I'm not accusing [you of] intentionally being disrespectful. But if you continue to use that kind of language, it suggests to me that you are going to get into that area, and I want to avoid that. [¶] Do you understand my concern?" Defense counsel retorted, "I understand your words, your Honor. And I understand — I certainly understand what you have said, yes." The court responded, "Then let's all maintain an atmosphere of respect for each other. [¶] If you object, state your objection. Put it on the record. I'll consider it, and then I'll rule on it. But I'm not impressed by language that is unduly exaggerated or inflammatory. That's not going to make me more likely to grant motions or sustain objections. You state your objection. You do it in a professional manner. You can be a forceful advocate, but you don't have to do it by using language that's unnecessary." The court took the same approach with the prosecutor. At one point outside of the presence of any panelist, the prosecutor objected to defendant's argument, stating, "[T]hat's the most outrageous thing I have ever heard" and calling the argument "ridiculous." The court cautioned the prosecutor to "keep your voice calm when you express your objection." The court continued: "I'm going to remind Mr. Barton I appreciate all of you have strong feelings about certain issues and you want to state your points forcefully. But the Court is not impressed [by] any language that's not necessary. And I understand the nature of your objection. [¶] You are going to make your points with me, Mr. Barton, in a manner without using words like ridiculous. Because I don't

want [defense counsel] to think that's giving you an advantage by using that kind of language. I don't want them to use that type of language either. Let's use logic and reason and advocacy."

Defendant maintains that the court threatened to "pursue" counsel for making false characterizations on the record. In one exchange outside the presence of any panelists, defense counsel accused the court of "intimidat[ing]" one of the panelists by speaking in a loud tone. The court responded that counsel should be "very careful" in making such an allegation "because I don't take that as an allegation to make lightly." The court observed that "we all have our good days and bad days. [¶] But I think I'm having a pretty good day in terms of being fairly neutral and not overly loud with jurors today, Mr. Bryan. [¶] And I specifically don't recall having any sharpness to my voice or raising my voice unduly with" panelist G.K. The court then invited defense counsel to give a specific example, and to be "very careful when you give your response, because if you're making an allegation without some good faith basis, I may have to pursue that." Counsel clarified that his objection was to the repetitive nature of the questioning, and acknowledged that "I agree with the Court, by the way, the Court's tone of voice has been very low all day today. [¶] I agree with that." There was nothing improper in this exchange. The trial court had an obligation to make a record regarding counsel's allegation that the court had raised its voice, because the "tone" of voir dire would not be reflected on the printed transcript. When the court challenged counsel's assertion, defense counsel admitted he had overstated his case as to the court's demeanor.

In another exchange outside of the presence of any panelists, defense counsel argued that the court's voir dire of

prospective panelists and its rulings on motions demonstrated the court had "a bias towards the prosecution," had "prejudged" the guilt phase and the venue motion, and that there was "a serious miscarriage of justice going on in this courtroom." When asked for more specifics, defense counsel opted to reserve and renew the motion at a later time. The court then observed, "I appreciate counsel are going to be aggressive advocates for your sides. [¶] But once again, I caution counsel that to the extent that you make representations about what the record is, if you feel that this Court is engaging in some activity which is to be construed as unfair, then I ask you to please be careful and have a good faith basis for making those types of challenges. Because, again, they can be certainly proper, if you think there's a good faith basis for it. But if you don't have a good faith basis for it, there can be subsequent proceedings, including State Bar proceedings, if counsel are engaging in tactics that are not good faith. [¶] I'm not suggesting that's [what] happened. [¶] It's just that we don't lightly accuse either counsel or courts of being biased or unfair without good faith. [[¶] If there is lack of good faith, there can be implications. [¶] I'm not saying that as a threat. I'm asking counsel to have a basis for making those kinds of accusations." Counsel retorted that he should not have to "worr[y] about my livelihood, my license," and that "I'm going to do my job, and if the Court sends me to jail, that's fine." The court reassured counsel that "I have not threatened to send you to jail nor to refer you to the State Bar."

Defendant observes that, despite these assurances, the court did, at some point, file a complaint against defense counsel Bryan with the State Bar. Counsel became aware of the complaint months after the trial ended, when he received a letter from the State Bar informing him that the investigation

had been completed and no disciplinary action would be taken. The record does not reflect that the complaint was filed during the course of the trial. In any event, the mere act of referring an attorney to the State Bar for investigation, without more, does not demonstrate actual bias. And, significantly, Bryan was unaware of the pending referral while the trial was ongoing, so it could not have adversely affected his performance. Defendant cites to defense counsel's statements during a hearing on the motion for new trial that he was, in fact, intimidated by the court's suggestion that it might take disciplinary action against him. But counsel did not urge that his performance was adversely affected. Instead, he argued that defendant was entitled to a trial "that was free from so much acrimony." A review of the record shows that counsel provided vigorous advocacy throughout, and appeared more emboldened than cowed by the trial court's repeated requests for moderation and civility.

In summary, the record as a whole demonstrates that the court made every effort to be fair to both sides and to maintain civility and decorum. Although "a few of the court's comments to defense counsel were more pointed, the comments did not rise to the level of 'an unconstitutional display of judicial bias,' but instead amounted to correct rulings occasionally accompanied by [frustration] at defense counsel's argumentative . . . and improper remarks." (*Woodruff, supra,* 5 Cal.5th at p. 768.) "Such instances of friction . . . 'are virtually inevitable in a long trial.' " (*Id.* at p. 770.) They in no way resemble the type of disparaging and pervasive remarks that we have found to be reversible misconduct. (See, e.g., *Nieves, supra,* 11 Cal.5th at pp. 477–485, 505–507; *People v. Sturm* (2006) 37 Cal.4th 1218, 1233–1243.) Moreover, we have refused to find misconduct

"when the record does not demonstrate how [the court's comments] might have influenced the jury or otherwise affected the trial." (*Nieves, supra*, 11 Cal.5th at p. 496.) None of the examples defendant cites took place in front of any panelists or sworn jurors. Indeed, the trial court took great pains not to expose the jurors to such disagreements. "The isolated comments [defendant has identified] in a lengthy trial in which the court exhibited some impatience with counsel's argumentative comments and questions do not demonstrate misconduct or bias, much less misconduct that was 'so prejudicial that it deprived defendant of " 'a fair, as opposed to a perfect, trial.' " ' " (*Woodruff*, at p. 772.)

The record reflects that this was a hard-fought and thoroughly litigated trial. Advocates, of course, have a responsibility to urge their positions forcefully and forthrightly. Friction can result, however, in the heat of the moment. As some of the excerpts quoted or described here reveal, at times counsel were far from cordial with each other or the judge. A trial court presiding over contentious litigation has an obligation to ensure that zealous advocacy does not devolve into ad hominem attack and that the jury is not influenced by a hostile courtroom atmosphere. A complete review of this record shows that the court's intervention was directed at both counsel and appropriately focused on maintaining professionalism and courtesy.

### 6. *Witherspoon/Witt Error*

Defendant contends the trial court's dismissal of Panelist K.G. violated the principles of *Witherspoon v. Illinois* (1968) 391 U.S. 510 and *Witt, supra*, 469 U.S. 412. We find no error.

As noted, "To achieve the constitutional imperative of impartiality, the law permits a [panelist] to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*Blair*, *supra*, 36 Cal.4th at p. 741, quoting *Witt, supra,* 469 U.S. at p. 424.) A panelist's bias in favor of or against the death penalty need not be proven with " ' "unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a [panelist] would be unable to faithfully and impartially apply the law in the case before the juror." ' " (*Abilez*, *supra*, 41 Cal.4th at pp. 497–498,)

Panelist K.G. indicated in her questionnaire that she felt LWOP was the appropriate punishment in a murder case. She wrote, "Yes" to the question, "Would the nature of the punishment affect your ability as a juror to follow the law?" Asked to mark the answer that best corresponds to her views on the death penalty, K.G. circled: "While I am somewhat opposed to the death penalty, I do believe there are cases where a death sentence should be imposed for a deliberate murder." She also wrote, "I have mixed feelings about it." She did not have any religious or moral views that would make it impossible for her to return a verdict of death. She indicated that she could set aside her personal views about the death penalty and reach a verdict in accordance with the law and evidence. Her feelings were not so strong that she would automatically vote against the death penalty regardless of the evidence. She was open minded and would give consideration to both penalties based on the evidence presented at trial.

The court and parties probed these answers during voir dire. Asked by the court if she could consider both LWOP and death as possible penalties, K.G. replied, "I'm not sure." She explained, "[I]n my opinion, if they show remorse, then I mean I don't think they should be sentenced to death." When asked if she could keep an open mind and consider all the circumstances, K.G. responded, "I don't think I'd have an open mind. I mean, I don't think I could have any part in sentencing somebody to that — to death." Asked if the prosecution proved a murder in connection with kidnapping and carjacking whether she could return a verdict of death, K.G. said, "Well, if the evidence was there, I believe I could." She affirmed that "if I had all the evidence, I would have an open mind about it." The court then asked if the panelist was "satisfied, then, that you do have an open mind to consider the two possible penalties at a penalty phase, either death or life without parole?" K.G. replied, "Yes."

The prosecutor probed: "I'm a little bit confused. You told the Judge that you could have no part in sentencing somebody to death. Is that correct?" K.G. responded affirmatively. The prosecutor then asked, "Is that how you feel? You wouldn't want to be responsible for sentencing somebody to death?" She replied, "I think it would weigh heavy on me, knowing that I had apart [*sic*] in it." When asked what type of "rare" circumstances K.G. felt would warrant death, she said, "[I]f they showed no remorse for what they did and they were like, you know, they just really didn't care about it, then I think they should be sentenced to death." The prosecutor then asked K.G. if she could "search your soul" and "look inside yourself and say okay, I wouldn't be leaning towards life without parole going into that penalty phase? Can you say that?" The panelist replied, "No." He then said, "[C]an you say honestly that even if you felt

somebody didn't have remorse, and — you sit in this courtroom, you'd be looking at the defendant every day, you actually have the ability to say I vote for the death penalty. You can't do that, can you?" The panelist replied, "No."

Defense counsel attempted to rehabilitate K.G., asking, "[Y]ou would follow the law in this case and do what the Judge instructed you, wouldn't you?" to which she replied, "Yes." He asked if she felt this was a "cold-blooded calculated murder and the man deserved to die, you could vote for the death penalty, couldn't you?" Again, K.G. replied, "Yes."

The trial court then addressed K.G. again, asking, "What is your honest feeling about your ability to keep an open mind and come out here and sit down and look at all of us, and either say yes, I voted for the death penalty or yes, I voted for life without parole, could you do that and look at every one and say yes, I voted for the death penalty?" She answered, "No." When asked to explain her prior answer to defense counsel, she replied, "[G]osh I don't think I could. [¶] . . . [¶] [e]xplain it. I just know that I wouldn't be able to come out here and — I don't think I could have any part in somebody going to — sentenced to death."

The court granted the prosecutor's challenge for cause, observing that K.G. "had mixed feelings about this, was very apprehensive." It found "under the circumstances, including the demeanor of the [panelist], that she was clearly equivocal in her responses, and that she would be unable to carry out the duties that she would be required to, that her views on capital punishment would prevent or substantially impair her ability to be neutral and follow the Court's instructions."

The record supports the trial court's ruling. K.G. expressed concern that she could not return a sentence of death, stating that she was not sure, that she had mixed feelings, and that the decision would weigh heavily on her. She did believe that she could follow the law and the court's instructions. Nonetheless, when asked directly if she could impose a sentence of death, she thrice stated that she could not. The trial court and the parties engaged K.G. in extensive voir dire. As a result, the court was "in the unique position of assessing demeanor, tone, and credibility firsthand — factors of 'critical importance in assessing the attitude and qualifications of [panelists].'" (*People v. DePriest* (2007) 42 Cal.4th 1, 21.) "[W]e defer as we must to the trial court's evaluation of the [panelist's] demeanor, which the court expressly stated it had carefully observed, together with her responses. The trial court was entitled to credit [the panelist's] statement that she would not consider death as a potential penalty in this proceeding." (*People v. Lynch* (2010) 50 Cal.4th 693, 734 (*Lynch*); see also *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 25 [panelist's conflicting responses supported a challenge for cause].)

Defendant argues that K.G. said she could impose the death penalty in rare circumstances, such as when the crime was cold-blooded and the defendant had no remorse. But the prosecutor inquired on that topic, and the panelist ultimately stated that she could not impose a death sentence even under these circumstances. "[T]he mere theoretical possibility that a [panelist] might be able to reach a verdict of death in some case does not necessarily render the dismissal" erroneous. (*People v. Martinez* (2009) 47 Cal.4th 399, 432; accord *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 607–608.) While K.G. allowed there might be some theoretical possibility she could impose a

sentence of death, her comments made clear it was not a realistic possibility. The court was "left with the definite impression that she was substantially impaired, and that determination is supported by substantial evidence." (*Beck and Cruz*, at p. 608.)

Defendant also objects that the trial court engaged in one-sided voir dire designed to disqualify K.G. Not so. The panelist's answers were conflicting. The trial court's voir dire was neutral and aimed at clarifying her responses. To that end, the court focused appropriately on whether K.G. could set aside her personal views and base a decision on the law and evidence.

Defendant complains that the court unfairly asked the panelist if she could "look at all of us" in the courtroom and announce a verdict of death. But we have found such questions proper, explaining that they are "an acceptable means of impressing upon each [panelist] that the verdict of death would affect a real person who would be in the courtroom at that time, and sought to elicit whether, under these circumstances, the [panelist] nevertheless would be able to vote for death." (*People v. Samayoa* (1997) 15 Cal.4th 795, 853; accord, *Lynch, supra*, 50 Cal.4th at p. 734.) The "predicate of the question was sound" because "[j]urors must be prepared to affirm their verdicts." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1235.)

The trial court acted within its discretion in excluding K.G for cause.

### 7. *Wheeler/Batson Error*

Defendant argues that the prosecutor's peremptory challenges to one Black and three Hispanic panelists violated *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79. The trial court found defendant

failed to make a prima facie case with respect to all four panelists and did not require the prosecutor to explain the challenges. Although the issue is close, upon independently reviewing the record we find there was no prima facie showing.

On January 17, 2001, defendant brought a *Wheeler* motion following the prosecutor's exercise of a peremptory challenge against T.B., a Black man. The trial court denied the motion. Defendant renewed his motion following the excusal of three additional panelists with Hispanic surnames and/or appearance: J.B. and T.D. were women; F.R., a man. Again, the motions were denied.

During a break in the proceedings, the trial court expanded the record in this regard. The court confirmed that T.B. was Black, and that T.D. and F.R. appeared to be Hispanic. It indicated that J.B. appeared to be White and questioned whether her surname was Hispanic. The prosecutor agreed that the panelist appeared to be White, while defense counsel opined she was a "mix of Hispanic and Filipino" with a Hispanic surname. The court concluded that "[s]he had the appearance of a [W]hite female, and I have categorized her as such." To ensure complete review we will accept defendant's characterization of panelist J.B. as Hispanic for purposes of our analysis. "We have held that Spanish surnames may identify Hispanic individuals, who are members of a cognizable class for purposes of *Batson/Wheeler* motions. (*People v. Trevino* (1985) 39 Cal.3d 667, 686, disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194.) 'Where . . . no one knows at the time of challenge whether a particular individual who has a Spanish surname is Hispanic, a showing that [panelists] are being excluded on the basis of surname alone' may nonetheless constitute a prima facie case of impermissible strikes based on

association with a cognizable group. (*People v. Trevino*, at p. 686.) 'Although the correlation between surname and group membership is not exact, such precision is unnecessary.' (*Ibid*.)" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1156, fn. 2.)

In ruling on the motion, the court stated that it had "considered" the *Wheeler* line of cases along with all relevant circumstances, which included the ethnic and racial background of others in the box, other panelists remaining, and the circumstances of those who had been excused. It ultimately concluded: "I don't find a prima facie case." The prosecutor accordingly declined to state any reasons for excusing the challenged panelists.[27]

The jury as sworn contained three Hispanics and nine Whites. The five alternates included two Whites and three Hispanics. As noted, original Juror No. 12, a White woman, was excused during trial and replaced by Alternate Juror No. 3, a Hispanic woman. Thus, the final composition included four jurors of Hispanic descent.

We recently summarized the governing principles in *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719 (*Holmes, McClain and Newborn*):

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' (*People v. Parker* (2017) 2 Cal.5th 1184, 1210.) ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury

---

[27]  Defendant brought *Wheeler* challenges to three additional Hispanic panelists dismissed by the prosecutor, T.G., R.F. and alternate B.D. The motions were denied and defendant does not challenge the court's ruling as to these panelists on appeal.

drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' (*Id.* at p. 1211.) The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." [Citation.] "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' (*Ibid.*)" (*Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at pp. 759–760.)

"When this jury was selected in [2001], there was some confusion as to the nature of the required prima facie showing. In *People v. Johnson* (2003) 30 Cal.4th 1302, 1318, we held: 'to state a prima facie case, the objector must show that it is more likely than not the . . . challenges . . . were based on impermissible group bias.' The United States Supreme Court subsequently disapproved the 'more likely than not' formulation as setting too high a threshold. Instead, it explained that *Batson*'s first step is satisfied if the objector produces sufficient evidence to support an inference that discrimination occurred. (*Johnson v. California* (2005) 545 U.S. 162, 170.) For cases tried before *Johnson v. California*, we have 'adopted a mode of

analysis under which, rather than accord the usual deference to the trial court's no-prima-facie case determination, we "review the record independently to determine whether the record supports an inference that the prosecutor excused a [panelist] on a prohibited discriminatory basis." ' (*People v. Rhoades*[ (2019)] 8 Cal.5th [393,] 428−429.) We apply that analytical approach here and consider ' "all relevant circumstances" ' in doing so. (*Id.* at p. 429.)" (*Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 760.)

"Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the [panelists] in question share only this one characteristic — their membership in the group — and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same [panelists] in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining [panelists] belong, these facts may also be called to the court's attention.' (*Wheeler, supra*, 22 Cal.3d at pp. 280–281, fn. omitted; see also *Batson* [*v. Kentucky*], *supra*, 476 U.S. at pp. 96–97 [in assessing a prima facie case, the trial court should consider 'all relevant

circumstances,' including 'a "pattern" of strikes against black [panelists] and 'the prosecutor's questions and statements during *voir dire* examination']; [citations].)" (*People v. Bell* (2007) 40 Cal.4th 582, 597.)

Exercising our independent review on appeal, we conclude the defense failed to make the required prima facie showing.

The only Black panelist excused by the prosecutor was T.B. Beyond the fairly extensive questioning of the court and defense counsel, the prosecutor did not engage T.B. in additional voir dire, and ultimately, there were no Black jurors or alternates. But neither the defendant nor the victims were Black, lessening concerns that the prosecutor had an improper motive for excluding this particular group. (*People v. O'Malley* (2016) 62 Cal.4th 944, 980 (*O'Malley*).) Moreover, the record does not disclose the number of Black panelists in the jury panel, or whether some Blacks were excused by the defense or by the court for hardship or cause. Defendant offers no substantive discussion of T.B.'s questionnaire or voir dire responses. On this record, no prima facie case was made out respecting this panelist.

As for the prosecutor's excusal of Hispanic jurors, we note that defendant shared the same ethnicity, while the victim was White. " '[R]acial identity between the defendant and the excused person,' or between the victim and the majority of remaining jurors, raises heightened concerns about whether the prosecutor's challenge[s] [were] racially motivated." (*O'Malley*, *supra*, 62 Cal.4th at p. 980.)

Reviewing the 85 panelists who remained after excusals for hardship or cause, 17 had Hispanic surnames. Thus, Hispanic surnamed panelists composed 20 percent of the

available panelists. Ordinarily, both sides would have an equal number of peremptories: 20 each in a capital case. (Code Civ. Proc., § 231, subd. (a).) However, in this case, the court allotted six additional peremptories to the defense and one additional peremptory to the prosecutor after the parties raised objections to the court's rulings on *Witherspoon/Witt* qualifications. As a result, the prosecutor had 21 peremptories for the jury and an additional five for the alternates; the defense had 26 peremptories for the jury and an additional five for the alternates. In selecting jurors and alternates the prosecutor excused a total of eight Hispanic panelists, or roughly 30 percent of his 26 allotted challenges. The prosecutor exhausted all 21 challenges to the main panel; he accepted the alternates with three challenges remaining. The defense peremptorily challenged two Hispanic panelists. As noted, four Hispanics sat on the final panel, and another two served as alternates. One Hispanic panelist was left in the pool when the jury was sworn.

Our independent review of the prosecutor's pattern of strikes reveals a disparity early in the selection process. When peremptory challenges began, there were two Hispanic panelists seated in the box: D.M. and T.D. The prosecutor first struck D.M. and used his second challenge to strike a non-Hispanic. He then made a series of strikes against Hispanic panelists: C.A., T.D., F.R., and J.B., and he challenged T.B., the only Black panelist. When J.B. was struck, eight Hispanics had entered the box. Defendant had struck one (G.M.), and the prosecutor had struck five. The defense brought *Wheeler* motions after the challenges to T.B., T.D., F.R., and J.B. When the court denied defendant's *Wheeler* motion challenging the excusal of J.B., the prosecutor had used five of seven peremptories (71.4 percent) to strike five of the eight Hispanic panelists who had entered the

box (62.5 percent). These rates were disproportionate to the percentage of Hispanic prospective jurors in the venire (20 percent) and to the percentage of Hispanics among those who had entered the box at that time (eight out of 28, or 28.6 percent). Numerical strike and elimination rates, considered alone, reflect a notable disparity. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 411, 439 [prosecutor's use of four of ten peremptories (40 percent) to challenge four of six Hispanic jurors (66 percent) "might suggest a discriminatory purpose"].)

However, in conducting our independent review, we consider " 'all relevant circumstances.' " (*People v. Rhoades*, *supra*, 8 Cal.5th at p. 429 (*Rhoades*).) Other factors in this record ultimately persuade us that the prosecutor's challenges did not give rise to an inference of discrimination.

Of the panelists defendant challenges on appeal, the prosecutor did not question J.B., and excused her at the first opportunity. The prosecutor engaged T.D. in voir dire and accepted four panels that contained her before excusing her. The prosecutor engaged F.R. in voir dire. Although the prosecutor excused him at the first opportunity, the prosecutor had earlier opposed defendant's challenge for cause to F.R. These circumstances suggest that some reason other than ethnicity ultimately prompted the prosecutor to excuse T.D. and F.R. (See *People v. Battle* (2021) 11 Cal.5th 749, 777 (*Battle*).)

Between the peremptory challenges to C.A. and T.B., the prosecutor accepted a panel with two Hispanics three times, and once accepted a panel with three Hispanics. (See *Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 764; *People v. Johnson* (2019) 8 Cal.5th 475, 508; *People v. Sanchez, supra*, 63 Cal.4th at p. 439.) In the end, the prosecutor used eight of the

23 strikes he exercised (34.8 percent) to remove eight of the 16 Hispanic panelists (50 percent) who entered the box. The prosecutor's final strike rate was therefore less disproportionate than earlier in the peremptory challenge process. While the inference to be drawn from this statistic may be lessened somewhat by the fact that the prosecutor's strike rate improved after defendant's *Wheeler* motions, it is nonetheless a relevant consideration. (*Holmes, McClain and Newborn*, at pp. 763–764; *Battle, supra*, 11 Cal.5th at p. 777; *People v. Johnson, supra*, 8 Cal.5th at p. 507.) The circumstances here stand in contrast to those in *Miller-El v. Dretke* (2005) 545 U.S. 231, where the prosecutor made a "late-stage decision to accept a [single] black panel member," (*id.* at p. 250), here, the ultimate Hispanic participation on the jury was 33 percent of voting jurors (four of 12), a figure 13 percentage points greater than their representation among those Hispanic panelists available for selection (*see Holmes, McClain and Newborn*, at p. 762; *Battle*, at p. 777). Considered in totality, these factors counter any inference of discrimination that the pattern of the prosecutor's strikes against Hispanic panelists earlier in the selection process might otherwise imply.

Defendant offers no analysis of the individual panelists or their questionnaire and voir dire responses. He asserts without elaboration that the trial court failed to adequately inquire into his motion or to provide a sincere and reasoned explanation for its rulings. His characterization ignores the trial court's observation that it took into account the ethnic and racial characteristics of the jurors in the box, the remaining panelists, and the circumstances of the jurors excused. In any event, because we have independently reviewed the record, we need not comment further on defendant's assertion.

We have taken into account the pattern of strikes and passes to the panel, the final jury composition, and the defendant's general assertions in support of his claim. Because we have concluded that defendant failed to raise an inference of discrimination, we have not hypothesized as to any permissible reasons that may have been the basis for the prosecutor's challenges. (See *Holmes, McClain and Newborn, supra,* 12 Cal.5th at pp. 765–766; *People v. Johnson, supra,* 8 Cal.5th at p. 510, fn. 7.) On this record, defendant's assertions of error fail.

### B. Guilt Phase Issues

#### 1. Juror Misconduct

Defendant asserts that Juror No. 11 committed misconduct by discussing the case with her father during the trial and then mentioning the conversation to other jurors. The trial court properly denied defendant's motion to remove the juror on this basis.

On February 5, 2001, during the trial, Juror No. 11 reported that her father had asked her during lunch if she was getting bored with the case. When she said no, he replied, "[W]hat's taking them so long[?] They know he did it." She responded that she could not discuss the case. Her father was hard of hearing and spoke in a loud voice that others around them could hear. Juror No. 11 did not see any other jurors in the vicinity at the time. She stated that her father's views would not affect her own.

The court brought in the entire jury and asked if any members or alternates had overheard Juror No. 11 discussing an incident during lunch. Juror Nos. 2, 4, 6, 9, and Alternate Juror No. 2 replied affirmatively. Juror Nos. 2, 6, 9, and Alternate Juror No. 2 said that Juror No. 11 had told them she

had lunch with her father and he said something inappropriate but did not give specifics. Juror No. 4 said that he overheard Juror No. 11 say she would probably be kicked off the jury, but nothing else. The trial court declined to dismiss the juror. The court found it noteworthy that the juror brought the incident to the court's attention herself, an indication she was aware of and trying to comply with her duties.

" 'An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is " 'capable and willing to decide the case solely on the evidence before it' " [citations].' [Citation.] [¶] [W]e first determine whether misconduct actually occurred. [Citation.] Misconduct 'raises a presumption of prejudice "[which] the prosecution must rebut . . . by demonstrating 'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.' " ' " (*People v. Hensley* (2014) 59 Cal.4th 788, 824.)

"[A] juror's inadvertent receipt of information that [has] not been presented in court falls within the general category of 'juror misconduct.' " (*People v. Nesler* (1997) 16 Cal.4th 561, 579.) Such inadvertent exposure, "even if not 'misconduct' in the pejorative sense, may require . . . examination for probable prejudice" (*In re Hamilton* (1999) 20 Cal.4th 273, 295), because it "poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut" (*Nesler*, at p. 579). We conclude that the father's unsolicited comment to Juror No. 11 about defendant's guilt was misconduct that must be assessed for prejudice.

Juror bias "can appear in two different ways." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) "First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror." (*Ibid.*) Second, "even if the extraneous information was not so prejudicial, in and of itself, as to cause 'inherent' bias under the first test," we consider the totality of the circumstances "to determine objectively whether a substantial likelihood of actual bias nonetheless arose." (*Id.* at p. 654.)

*People v. Danks* (2004) 32 Cal.4th 269 (*Danks*), presents similar facts. There a juror encountered her pastor, who was aware she was serving as a juror in the defendant's case. The juror's husband suggested she and the pastor discuss some bible passages she had read, but she responded she did not need to discuss anything. The pastor then said he understood she had read several scripture verses. The juror affirmed she had, and that they gave her comfort. The pastor commented that she had chosen good scriptures, and then jokingly said if he were a juror, he would impose the death penalty on the defendant. (*Id.* at pp. 298–301, 306.) We found the encounter constituted misconduct, but was not prejudicial. The pastor's "gratuitous personal view" was not "inherently and substantially likely to have influenced" the juror in light of the extraordinary penalty phase evidence. (*Id.* at p. 307.) Additionally, the juror did not solicit the pastor's views and did not engage in further conversation about them. Nor did she repeat her pastor's views to the other jurors. (*Ibid.*)

Likewise, here, Juror No. 11's father offered an unsolicited and gratuitous opinion about defendant's guilt. The juror did not inquire into the basis for her father's opinion or discuss any trial evidence with him. She simply responded that she could not discuss the case. The juror then commented to other jurors

that she had an incident with her father that she needed to report to the court. She did not convey to the other jurors the substance of her father's comment, and she promptly reported and confirmed to the court that the comment would not affect her. These circumstances, "judged objectively, were not inherently and substantially likely to have influenced, i.e., biased," Juror No. 11, and "the surrounding circumstances fail to demonstrate actual bias." (*Danks, supra,* 32 Cal.4th at p. 307.)

### 2. *Admission of Gang Evidence*

Defendant contends the trial court committed prejudicial error by admitting the testimony of a gang expert about defendant's membership in the LFS gang. He contends the evidence was irrelevant and unduly prejudicial, and that its erroneous admission violated his due process right to a fair trial. He also claims the expert's testimony was inadmissible hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

Defendant was not charged with a gang enhancement. Before trial, he filed a motion to exclude evidence of his gang membership as irrelevant to any issue in the trial and highly prejudicial. The People opposed the motion. They argued that defendant's gang association with others who committed the crime was relevant to prove his identity as one of the perpetrators in the crimes against Paredes. The People further argued that defendant's gang membership established a motive for the crimes. The People proposed to leave out the gang evidence if defendant would stipulate to his presence during the Paredes and Juan Carlos carjackings. No such stipulation was forthcoming. The court admitted the evidence as "relevant . . . to the issues of identification, as well as issues of motive and intent, with respect to the charges pending against the

defendant," and found the probative value of the evidence was not substantially outweighed by its prejudicial effect. (Evid. Code, § 352.)

As set forth in further detail below, Deputy Contreras testified about gangs in Lamont and offered his opinion about defendant's gang membership in LFS. He identified several other persons as members of LFS or VCL based on their admissions or other gang indicia: Freddy "Shadow" De La Rosa, Daniel "Bonkers" Quintana, Efrain "Baby" Garza, Hector Valenzuela, Carlos Rosales, Gabriel Flores, and Willie Santiago.

On cross-examination, defense counsel elicited that there is a street gang in Arvin called the "Arvinas." LFS and VCL have rival gangs in Arvin. The witness acknowledged that sometimes people associate with gang members without actually having been "jumped in," either because they are personal friends of the members or because they are seeking protection from rival gangs. The field contacts that were made with defendant regarding his gang associations occurred when he was 14 or 15 years old.

The trial court admonished the jury as follows: "[T]o the extent that this witness is being offered as an expert witness on the subject of street gangs, his testimony related to street gangs is going to be admitted at this time for the limited purpose of being circumstantial evidence on the subjects of identification, motive, or intent. And it's limited to those areas — identification, motive, and intent. [¶] Keep in mind those limitations as you listen to this testimony."

### a. Relevance and Evidence Code Section 352

"We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition"

and may have a highly inflammatory impact. (*People v. Williams* (1997) 16 Cal.4th 153, 193.) Nonetheless, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect. (*Williams*, at p. 193.) A court's admissibility ruling is reviewed for abuse of discretion. (*People v. Champion* (1995) 9 Cal.4th 879, 922–923 (*Champion*).)

Here, defendant's gang membership was relevant and admissible to bolster Paredes's identification of defendant as one of his assailants. Proof that defendant and Efrain "Baby" Garza were members of the same gang "formed a significant evidentiary link in the chain of proof tying them to the crimes in this case." (*Champion*, *supra*, 9 Cal.4th at p. 921.) Paredes identified defendant and Garza as two of the people who kidnapped him. Defendant was also identified along with Garza and several other LFS members[28] in the kidnapping and robbery of Juan Carlos. There was evidence that defendant and Garza kidnapped and killed Chad.

---

[28] Valenzuela, De La Rosa, Rosales, and Quintana.

Defendant challenged his identification in the Paredes crimes. He presented an expert witness who testified that lighting and stress can affect the reliability of an eyewitness identification. He also presented two alibi witnesses who testified that defendant was at Ashley Medina's home the night that Paredes was assaulted. Finally, defendant himself testified and denied involvement in the Paredes kidnapping.

In *Champion, supra,* 9 Cal.4th 879, we found gang evidence admissible to bolster witness identification under similar circumstances, explaining: "[E]vidence that defendants were members of the same gang as other persons involved in the commission of the crimes in this case fortified the testimony of the persons who identified defendants as participants in the murders. Thus, evidence of defendants' gang membership tended 'logically, naturally, and by reasonable inference' to establish their identities as perpetrators of those offenses, and the trial court did not abuse its 'broad discretion' [citation] when it determined that the evidence of gang membership was relevant." (*Id.* at p. 922.)

In addition, long before trial, defendant himself injected the subject of gang affiliation as a motive for both Chad's behavior and his own. In his statement to police, defendant said that he confronted Chad, asking repeatedly if Chad knew who defendant was. After abducting Chad, defendant "slapped the bitch," and told him that "it wasn't a game to be playing around with gangbangers . . . ." Defendant told the officers that he intended to scare Chad because of a conflict with defendant's cousin and because Chad "was banging for Arvin." Defendant described the incident at the Rosales house, and referred to Jose and Freddy Gomez as "Arvin [B]oys." At trial, defendant elicited testimony that there was a violent rivalry between Lamont 13

and the Arvinas. Carlos Rosales had seen Chad associating with Arvinas gang members.

We have held that introduction of gang evidence is proper where the defendant himself identifies gang affiliation as a motive. In *Hernandez, supra,* 33 Cal.4th 1040, the defendant "identified himself as a gang member and attempted to use that status in demanding money from the victim." (*Id.* at p. 1051.) We reasoned that testimony by a gang expert "helped the jury understand the significance of Hernandez's announcement of his gang affiliation, which was relevant to motive and the use of fear." (*Ibid.*) And evidence of an alliance between two gangs "served to explain why Hernandez and Fuentes were acting together in the commission of this crime, thus buttressing such guilt issues as motive and intent." (*Ibid.*) Likewise here, defendant's gang affiliation provided context for his own explanation of why he confronted Chad and supplied a motive for the crimes.

Moreover, the trial court did not abuse its discretion in concluding that the probative value of such evidence was not substantially outweighed by its prejudicial effect. (Evid. Code, § 352.) The gang evidence was fairly brief. Deputy Contreras testified to the existence of LFS, described defendant's tattoos, and opined that he and several others were members of the gang. He did not discuss gang culture in general or describe any criminal activity committed by the gang. Although the evidence was admitted in part to prove motive, Contreras did not offer an opinion on that point. The jury was instructed on the limited use of the evidence to prove defendant's identity, motive, and intent. And defendant was able to use the evidence to his advantage by suggesting that Chad associated with the Arvinas gang and had sparked the confrontation by targeting

defendant's cousin and the latter's mother. The evidence tended to place the popular high school student in a less than favorable light. The rulings were not improper.

For the same reasons, we reject defendant's claim that admission of gang evidence rendered his trial "fundamentally unfair" in violation of his constitutional right to due process. "Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035 (*Kraft*); accord, *Prince*, *supra*, 40 Cal.4th at p. 1229.) Defendant fails to persuade that the circumstances here constitute an exception to that general rule.

### b. *Hearsay and Confrontation Clause Claims*

In a letter filed before oral argument, defendant identifies *Sanchez*, *supra*, 63 Cal.4th 665 as new authority relevant to his claim that the trial court erroneously admitted the gang expert's testimony. We find no prejudicial error.

In *Sanchez*, the defendant was convicted of drug and firearm offenses with attached gang enhancements (§ 186.22, subd. (b)(1)) and the substantive offense of active gang participation (§ 186.22, subd. (a)). (*Sanchez*, *supra*, 63 Cal.4th at p. 671, fn. 1.) On appeal, he argued that the gang expert was erroneously permitted to testify about five prior contacts Sanchez had with police which were recounted in police reports and other sources but were not personally known to the expert. (*Id*. at pp. 672–673.) The expert recounted the particulars of the police contacts to explain the basis of his opinion that Sanchez was a gang member and committed the charged offenses for the gang's benefit. (*Id*. at p. 673.) The jury was instructed that the

testimony was not admitted for its truth but only to explain the basis for the expert's opinion. (*Id.* at p. 684.)

*Sanchez* affirmed that expert witnesses "can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 685; see also *id.* at pp. 677, 683–685.) But *Sanchez* held an expert may not relate case-specific, out-of-court statements, including multiple level hearsay, about which the expert has no personal knowledge, as a basis for the expert's opinion. Because the jury must consider such statements for their truth in order to properly evaluate the expert's opinion, they are inadmissible unless they fall within a statutory hearsay exception or are proved by other competent evidence. (*Id.* at pp. 670, 675–676, 679, 686.)

*Sanchez* further recognized that admission of case-specific statements for their truth will violate the Sixth Amendment's confrontation clause if the statements are *testimonial* hearsay as the high court defines that term, unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine the witness or forfeited the right by the defendant's own wrongdoing. (*Sanchez*, *supra*, 63 Cal.4th at p. 680; *Crawford v. Washington* (2004) 541 U.S. 36, 61–62, 68 (*Crawford*); *Giles v. California* (2008) 554 U.S. 353, 357–373.)

Finally, *Sanchez* explained: "Once we recognize that the jury must consider expert basis testimony for its truth in order

to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.)

We consider deputy Contreras's testimony here[29] in light of the principles articulated in *Sanchez*.

First, the deputy provided several details about gang activity in Lamont, including: (1) Lamont has a street gang, Lamont 13, which has two subsets, LFS and VCL; (2) Contreras has had regular contact with gang members in Lamont; (3) gang members in Lamont use signs to identify themselves and regularly congregate at Myrtle Avenue school; (4) 13 stands for the letter "M," the 13th letter of the alphabet; (5) the Mexican Mafia identifies with the letter "M," the number 13, and Southern California; (6) "Sureño" and Sur are Spanish words meaning southern and south; (7) persons do not necessarily need to be formally initiated or "jumped into" a gang to be gang members, committing crimes for the benefit of the gang will suffice; (8) tattoos can signify gang membership or affiliation; (9) the gang will not allow someone who is not a member to use "LFS" as a tattoo, or to write those letters, nor was the witness aware of instances of nongang members getting gang tattoos. Under *Sanchez*, this was permissible expert background testimony. (*Sanchez*, *supra*, 63 Cal.4th at pp. 676, 685, 698.) "[G]eneral testimony about a gang's behavior, history, territory,

---

[29] We examine the testimony elicited by the prosecutor. Additional details about gang activities were elicited by the defense on cross-examination, but that testimony cannot form the basis for a claim of error based on hearsay or the Sixth Amendment. (*Sanchez*, *supra*, 63 Cal.4th at p. 680, fn. 6.)

and general operations is usually admissible. [Citation.] The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*People v. Valencia* (2021) 11 Cal.5th 818, 838 (*Valencia*).)

Second, Contreras answered "Yes" to the following hypothetical question: "So if somebody left the State for a period of time, came back, committed three carjackings and a murder with other fellow gang members of that same Lamont gang, would it be your opinion at the time they were committing those, that they were still members of the Lamont gang?" This testimony, too, was permissible. Gang experts "can give an opinion based on a hypothetical including case-specific facts that are properly proven." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) Here, there was properly admitted evidence[30] as to each of the facts included in the hypothetical question.

Third, the witness opined that various people were gang members or associates, and stated the bases for his opinion. As to Rosales and Flores, the witness relied on photographs and a posterboard found in Rosales's home, all of which the witness authenticated. The posterboard had various references to "Lamont," "Familia," Sureños," and the numbers "1" and "3." It also contained a roster of names entitled "LFS XIII Boys." There were pictures depicting Rosales and Flores together, with Flores forming the letters LFS with his arms and hands. The deputy's testimony about photographs depicting gang indicia and hand signs that the deputy was able to authenticate was a permissible

---

[30]    Admissibility of evidence of each participant's gang membership is discussed immediately below.

basis for his opinion that Rosales and Flores were LFS members. (*Sanchez, supra,* 63 Cal.4th at p. 677.)

As to defendant, Contreras relied on a photograph seized from Rosales's house which showed defendant with several people throwing gang signs, and photographs of defendant's tattoos, including a "1" and a "3" on the back of his arms, "LFS" and the number "13" on his shoulder, a wide brimmed Mexican hat with the word "Lamont" on it, and the word "Sur." Because the witness was able to authenticate these photographs, they were a permissible basis for his opinion that defendant was an LFS associate. (*Sanchez, supra,* 63 Cal.4th at p. 677.) Notably, there was ample independent evidence of defendant's gang association as well. Both Rosales and Quintana testified from personal knowledge that defendant associated with LFS. In his statement to officers Wahl and Johnson, defendant admitted membership in a Lamont gang but claimed to have left the gang around 1995. And defendant's own gang expert opined that defendant was an LFS gang member based on his tattoos, although the expert believed that the gang was defunct by 1995 and that Chad's death was not gang related.

Finally, Contreras opined that De La Rosa, Garza, Quintana, and Valenzuela were LFS gang members, and that Santiago was a VCL gang member. Over defense objection, he testified that De La Rosa, Garza, and Quintana had personally admitted gang membership to him. He testified he was familiar with Santiago and Valenzuela and that they "claim[ed]" membership in the gangs, but he did not otherwise explain the basis for his knowledge. The testimony was admitted on the theory that the speaker's out-of-court admissions formed the basis for the expert's opinion and were not admitted for the truth of the matter asserted. No hearsay exception was proffered.

(See *People v. Turner* (2020) 10 Cal.5th 786, 822–823.) This failure constitutes state law error. (*Sanchez, supra,* 63 Cal.4th at pp. 674–676, 685–686; see *Valencia, supra,* 11 Cal.5th at pp. 839–840.)

The record is insufficiently developed to determine whether the recounted hearsay statements admitting gang membership were testimonial, and therefore also violated the Sixth Amendment's confrontation clause. (*Crawford, supra,* 541 U.S. at pp. 62, 68.) Contreras testified generally that he obtains intelligence from what gang members tell him, from reading police reports, and from field interview cards documenting police contacts on the streets. He did not specifically describe the circumstances under which these admissions were made to himself or others.

We need not resolve whether admission of this testimony was state law error only, or also violated the confrontation clause, because it was harmless under either standard. (*Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18; see *People v. Navarro* (2021) 12 Cal.5th 285, 310 (*Navarro*).) There was compelling, independently admissible evidence that De La Rosa, Garza, Quintana, Valenzuela, and Santiago were gang members.

Contreras personally took photographs of Garza's and Quintana's gang tattoos, which he authenticated at trial.

Quintana testified at trial and admitted that he associated with LFS and had an LFS tattoo. He testified from personal knowledge that Rosales, Valenzuela, and Garza were LFS gang members, and that Santiago and De La Rosa were members of VCL. Defendant's cousin, Rosales, also testified from personal knowledge that Valenzuela, Garza, Quintana, and De La Rosa,

all claimed Lamont affiliation and had gang tattoos, and that Santiago claimed VCL. Santiago testified and admitted his membership in the VCL gang.

Finally, no gang enhancement or substantive gang offense was charged in this case. The gang evidence was admitted for the limited purpose of proving defendant's identity, motive, and intent. (Evid. Code, § 1101, subd. (b).) The jury was so instructed.

Given the substantial independent evidence that the persons at issue, including defendant, were gang members, and the limited purpose for which this evidence was admitted, the erroneous admission of hearsay evidence to support Deputy Contreras's opinion that various men were gang members was harmless beyond a reasonable doubt.

### 3. *Admission of Defendant's Statement*

Defendant contends the trial court erroneously admitted his statement to Sergeants Glenn Johnson and Rosemary Wahl on July 24, 1998. He argues that he did not validly waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) and that his statement was involuntary. Defendant's statement was properly admitted.

### a. *Proceedings Below*

The following evidence was adduced at a hearing on the statement's admissibility. Sergeants Johnson and Wahl first interviewed defendant on July 19, 1998, at a jail in El Paso, Texas. After being read his *Miranda* rights, defendant said he understood them and was willing to speak with the officers. During the interview, defendant consistently and repeatedly denied any involvement in Paredes's carjacking and Chad's murder. He claimed to be living in Arizona or New Mexico

around the time of the crimes. The officers made clear that they thought he was lying. At the conclusion of the interview, the officers told defendant that they would let him "rethink everything" while they left the room to complete paperwork and that he could choose to talk to them again before they left Texas. Defendant responded, "I don't have nothing else to say to you guys." There was no further questioning at that time.

The officers returned five days later, on July 24, 1998, to extradite defendant to California. Sergeant Johnson gave defendant a complete *Miranda* advisement while they drove to the airport in the event that defendant initiated a conversation about the charges. Defendant indicated that he understood his rights. The trip to California took approximately eight hours, and the officers bought defendant a meal during the journey. They did not question him about the crimes during this period, and he did not invoke his right to silence or an attorney.

At the California station house, defendant asked Sergeant Wahl what would happen with the charges and she alerted Sergeant Johnson. Johnson in turn reminded defendant of the previous *Miranda* admonition but did not reread the admonition from a printed source. Specifically, he stated: "Okay, like I said it's uh, you know I'm gonna, before we get there I'm gonna remind you that the rights I read to you uh in the car when we picked you up (inaudible). You have the right to have an attorney and you have a right to have an attorney present before and during questioning, one will be appointed by the court. If you can't afford one and anything you say can and will be used against you in a court of law. I don't have the card in front of me uh but I was reminding you of those rights. Having those rights in mind do you wish to tell us about it now?" Defendant

replied, "Yeah." He then admitted his involvement in the murder as described above.

The trial court found the July 24 statement admissible.[31] It found that defendant was properly advised of his *Miranda* rights on July 19 and voluntarily waived them. The court found that defendant did not invoke his right to remain silent at the end of that interview and that his statement was more reasonably understood to mean that he had nothing more to say to the officers at the time. The court found that Sergeant Johnson advised defendant of his *Miranda* rights on July 24 on the way to the airport and that defendant voluntarily waived those rights. Finally, it found that there were no promises of leniency or coercive statements made during any of the interviews and that his statements were voluntary.

The trial court subsequently allowed defendant to reopen the hearing so that defendant could testify. Defendant recounted that, after he spoke to Sergeants Johnson and Wahl on July 19, 1998, he was photographed in the hallway of the El Paso police station. Two El Paso detectives commented to him that he "should rat out whoever did it" so that he "wouldn't go down for something that [he] didn't do." A few days later, defendant was taken before a judge for extradition proceedings. In an elevator, he told the officer who had transported him that he wanted an attorney, but no attorney was appointed for him at that time. On the way back to jail, the officer encouraged defendant to "take a deal that they offered me and just rat out whoever was doing it." Defendant further testified that on the car trip to the airport, Sergeant Johnson began reciting the

---

[31] The People did not seek to admit the July 19 statement.

*Miranda* rights to defendant. But the officer got lost while driving and did not finish the advisement.

The prosecution called several witnesses to rebut defendant's testimony. On July 19, 1998, Officer Jose Luis Gomez of the El Paso Police Department received defendant from federal authorities and brought him to the county jail. He advised defendant of his *Miranda* rights but did not interrogate him. Defendant did not request an attorney. Approximately three hours later, Officer Gomez took defendant before a magistrate for arraignment. Defendant was again advised of his rights to an attorney and did not request one.

Detectives Carlos Ortega and David Samaniego of the El Paso Police Department transported defendant to and from the interview with Sergeants Johnson and Wahl on July 19, 1998. The distance was approximately three to five miles each way. After the interview, Ortega had defendant sign a consent form to search his property and Samaniego took pictures of defendant's tattoos. Neither detective gave defendant *Miranda* warnings or questioned him about the case. Defendant did not request an attorney.

Detective Edward Provencio of the El Paso Police Department escorted defendant downstairs to meet with Judge Edward Marquez regarding extradition. The detective advised defendant that he was wanted on out-of-state charges and described the extradition process. He did not read defendant his *Miranda* rights and defendant did not request an attorney. Defendant signed a waiver of extradition before the judge.

At the conclusion of the hearing, the court again denied the motion to exclude defendant's statement: "[W]eighing all the evidence, I do not find that the defendant's *Miranda* rights were violated, that he was not denied his right to remain silent,

he's not denied his right to have counsel present during interrogation, within the meaning of *Miranda.*"

### b. *Invocation of the Right to Silence*

Defendant does not challenge his initial waiver of *Miranda* rights on July 19. He argues, however, that he asserted his right to silence at the end of the interview when he commented, "I don't have nothing else to say to you guys." He claims that the officers violated the rule in *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), when, five days later, they questioned him about the crimes despite his earlier invocation of *Miranda* rights. The claim fails.

When a suspect knowingly and intelligently waives the *Miranda* rights, "law enforcement may interrogate, but if at any point in the interview [the suspect] invokes the right to remain silent or the right to counsel, 'the interrogation must cease.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 947 (*Martinez*).) Once the suspect has invoked, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation . . . . [There is to be no] further interrogation by the authorities . . . unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards, supra*, 451 U.S. at pp. 484–485; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 384.) "In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching' — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request [to remain silent or] for counsel's assistance." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.)

A defendant who has waived the *Miranda* rights must make a "clear assertion" of the right to silence or counsel before

officers are required to cease questioning. (*Davis v. United States* (1994) 512 U.S. 452, 460; accord, *People v. Williams* (2010) 49 Cal.4th 405, 427.) "The applicability of the ' "rigid" prophylactic rule' of *Edwards* requires courts to 'determine whether the accused *actually invoked* his right[s] . . . .' " (*Davis*, at p. 458.) Ambiguous or equivocal references to an attorney or the right to silence do not require cessation of questioning. (*Id.* at pp. 458–459; *Martinez, supra*, 47 Cal.4th at pp. 947–949.) Whether the defendant made an invocation is analyzed from the perspective of a reasonable officer (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381), and takes into consideration the context of the statement (*People v. Flores* (2020) 9 Cal.5th 371, 417 (*Flores*)). If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right," then the officer need not cease all questioning immediately. (*Davis*, at p. 459.)

Defendant did not clearly and unequivocally invoke his right to silence at the end of the July 19 interview. After being advised of and waiving his rights, defendant willingly participated in a long interview with the officers. He repeatedly denied any involvement in Chad's murder and claimed not to have been in California at the time. The officers repeatedly accused defendant of lying in light of numerous eyewitnesses who saw defendant enter Chad's truck before the shooting. Defendant remained steadfast in his denials and did not complain of the absence of an attorney, or interpose a request for one. Eventually, the officers told defendant that they would let him "rethink everything" while they left the room and filled out paperwork and that he could choose to talk to them again before they left Texas. Defendant responded, "I don't have nothing else to say to you guys." Viewed in context, a reasonable

officer would have understood defendant's statement to mean that he had nothing to add to his claims of innocence, not that he was invoking his right to silence.

We have rejected defendants' claims of a clear and unequivocal invocation under similar circumstances. In *Martinez*, *supra*, 47 Cal.4th 911, the defendant received a *Miranda* advisement and indicated he was willing to speak with the officer. He was questioned about an assault and denied any involvement. The officer confronted the defendant with inconsistencies in his story and then asked him why the victim would falsely accuse him. The defendant responded, " 'That's all I can tell you.' " (*Id*. at p. 944.) We concluded that the officer reasonably understood defendant's statement to mean " '[t]hat's all the information he had for me,' " rather than that defendant was invoking his right to silence (*Id*. at p. 950.) The following day officers interviewed the defendant again. They "confronted him with inconsistencies in his version of events, told him to think it over, announced that they were taking a break, and [began] to leave the room." (*Id*. at p. 951.) Defendant stated, " 'I don't want to talk anymore right now.' " (*Ibid*.) Based on the context, we again concluded that the defendant had not clearly invoked his right to silence. (*Ibid*.) Similarly, in *In re Joe R.* (1980) 27 Cal.3d 496, we concluded that the defendant's statement, " ' "That's all I have got to say," ' " was not an invocation. (*Id*. at p. 515.) The defendant made the comment immediately after the officer confronted him with adverse evidence and challenged his veracity. (*Id*. at p. 516.) In that context, we concluded it was not unreasonable for the court to conclude defendant was conveying, "That's my story, and I'll stick with it." (*Ibid*.)

Defendant's statement here, "I don't have nothing else to say to you guys," was made in a similar context. Defendant had repeatedly denied involvement in the crimes, the officers had accused him of lying, and they had invited him to "rethink everything." His response could reasonably be construed as an affirmation of his statements and a declaration that he had nothing more to add, rather than an assertion of the right to silence.

### c. *Validity of* Miranda *Waiver on July 24*

Defendant argues that he did not make a knowing, voluntary, and intelligent waiver of his *Miranda* rights before the July 24 interview. We reject the claim.

The governing principles are well established. "Before subjecting suspects to custodial interrogation, the police must inform them of their *Miranda* rights and obtain a waiver that is knowing, voluntary, and intelligent. [Citation.] The test for validity is as follows. 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' [Citation.] The prosecution must demonstrate the validity of a suspect's waiver by a preponderance of the evidence." (*People v. Molano* (2019) 7 Cal.5th 620, 648, fn. omitted (*Molano*).)

Here, defendant was advised of his *Miranda* rights twice before making his initial statement on July 19. Officer Gomez

of the El Paso Police Department gave the *Miranda* advisements when he took him to the county jail, and the right to counsel was reiterated at the arraignment. Sergeants Johnson and Wahl read defendant his *Miranda* rights before interviewing him. Defendant stated that he understood those rights and agreed to speak with the officers.

Five days later, on July 24, defendant was again advised of his rights on the way to the airport. Although the conversation was not recorded, both officers testified that defendant was given a complete *Miranda* advisement and he indicated that he understood his rights. Defendant was not questioned at that time.

Eight hours later, at the police station, after defendant inquired about what would happen with his charges, the officers spent several minutes encouraging defendant to tell them the truth about his involvement in the murder. Defendant responded, "Okay, I guess I'll talk to you then." Sergeant Johnson then "remind[ed] [defendant of] the rights I read you uh in the car when we picked you up (inaudible)." He repeated that defendant had the right to an appointed attorney and that any statements could be used against him, but did not mention the right to silence. He then said, "I don't have the card in front of me uh but I was reminding you of those rights. Having those right in mind do you wish to tell us about it now?" Defendant replied, "Yeah."

Although the advisement at the police station on July 24 was incomplete, we have held that "readvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations] The courts examine the totality of the circumstances, including the amount of time that has passed

since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights." (*People v. Mickle* (1991) 54 Cal.3d 140, 170 (*Mickle*).)

Here, on July 19 defendant received two complete sets of *Miranda* warnings and waived his rights. He received another complete admonishment on July 24, approximately eight hours before the interview in question. During the July 24 interview, the officers reminded defendant of the prior advisement. Under similar circumstances, where the defendant was "read his *Miranda* rights the night before and on at least four prior occasions," we concluded that "the record fails to support any inference that defendant was unaware of his rights and the significance of his waiver." (*Martinez*, *supra*, 47 Cal.4th at p. 950.) Similarly, we held that readvisement was unnecessary when the "interview occurred only 36 hours after defendant had twice received and twice waived his *Miranda* rights." (*Mickle*, *supra*, 54 Cal.3d at p. 171.)

Significantly, defendant does not claim that he was inadequately admonished or that he did not understand his rights. He instead argues that he never waived those rights during the July 24 interview. The record belies this claim. After reminding defendant of the earlier advisement in the car, which included all of defendant's rights, Sergeant Johnson asked defendant, "Having those right in mind do you wish to tell us about it now?" Defendant replied, "Yeah." His waiver was express.

### d. *Voluntariness of the July 24 Statement*

Defendant perfunctorily asserts that "[t]he extended period in which [he] was subject to the deputies' control . . . together with their insistence that he cooperate and their suggestions of benefits that might flow from his cooperation . . . show that [his] confession was not made of his own free will." The trial court rejected this claim, concluding that there was no coercive conduct, no promises of leniency, and no threats.

"In determining whether the prosecution met its burden of establishing by a preponderance of the evidence that defendant's confession was voluntary, we consider the totality of the circumstances. [Citation.] '[N]o single factor is dispositive. [Citation.] The question is whether the statement is the product of an " 'essentially free and unconstrained choice' " or whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " by coercion.' " (*Flores*, *supra*, 9 Cal.5th at p. 426.)

Defendant testified pretrial that, while he was being photographed on July 19, the El Paso detectives encouraged him to "rat out whoever did it" so that he "wouldn't go down for something that [he] didn't do." He asserted that, a few days later, a transporting officer encouraged him to "take a deal that they offered me and just rat out whoever was doing it." But the officers in question testified at the hearing and denied making any such statements. The trial court implicitly credited their testimony in denying defendant's motion.

As for the conduct of Sergeants Johnson and Wahl, defendant was in their custody for eight hours while traveling from Texas to California. During that time, they provided him with a meal and made no attempt to interrogate him. Once at the police station, after defendant asked about the charges,

Johnson and Wahl urged him to explain his role in the shooting and said that his truthfulness might have an impact on sentencing. Sergeant Wahl said: "[W]hat you tell us may be the difference though. Like he said you know cold blooded calculated murder or something . . . just went wrong." Sergeant Johnson observed, "[T]he person who didn't pull the trigger is going to be equally guilty to a certain extent but sometimes the truth may make a difference. I don't know. It may not." Sergeant Wahl then commented that "it's gonna make a difference with you I think, with the way you feel inside, cause I know it's bothering you. I know that." Defendant replied, "Uh huh." Sergeant Johnson then invited defendant to "make an adult decision" and "start doing something right for a change and what's right is the truth." Shortly thereafter, defendant responded, "Okay, I guess I'll talk to you then."

An officer's statements urging a suspect to tell the truth and pointing out the benefits that might naturally flow from a truthful and honest confession do not render a statement involuntary. (*People v. Krebs* (2019) 8 Cal.5th 265, 305–306 (*Krebs*).) The officers' comments here were of that tenor. They observed that defendant and Garza were equally guilty of murder, but that being truthful about who pulled the trigger might assist defendant at sentencing. At the same time they reminded him that any statements he made could be used against him and that the truth might not make a difference in the outcome. The sergeants then focused on the emotional benefit defendant would derive by taking responsibility for his actions. They allowed defendant to "tell it in your own words," commenting that "[w]e won't ask any questions or stop you." Defendant provided a narrative confession admitting that he confronted Chad in the street, that he and Garza kidnapped him

at gunpoint, and that he accidentally shot Chad in a field. Under the totality of the circumstances, the prosecution met its burden to establish voluntariness.

### e. *Asserted Violation of the Vienna Convention*

Defendant also moved to exclude his July 24 statement on the ground that police did not advise him in a timely manner of his right to have the Mexican Consulate notified of his arrest, in violation of Article 36 of the Vienna Convention on Consular Relations, April 14, 1963, 21 U.S.T. 77 (Vienna Convention). The motion was denied, as was defendant's related new trial motion. He urges this court to defer consideration of this claim while he investigates evidence of prejudice in a habeas corpus proceeding. To the extent defendant claims in this appeal that he was prejudiced by the Vienna Convention violation, he has not established prejudice on this record.

### i. *Proceedings Below*

The following facts were stipulated to at the hearing: (1) defendant is a Mexican citizen; (2) the Mexican consulates in Fresno and El Paso were available and willing to help any Mexican national requesting their assistance; (3) from the time of defendant's arrest in El Paso through the time he made his two statements, no law enforcement officer advised him of his consular rights; (4) defendant did not request contact with the Mexican consulate at any time before his attorney, Bryan, became involved in the case; and (5) since that time, defendant had been actively receiving consular assistance. Defense counsel offered no additional testimony from defendant on this topic.

Citing then-recent authority from the Ninth Circuit (*U.S. v. Lombera-Camorlinga* (9th Cir. 2000) 206 F.3d 882), the trial

court denied the motion, concluding that "suppression of statements is not one of the remedies available if the Court finds a violation of the Vienna Convention, Article 36."

Defendant reasserted his claim in motions for new trial and to modify the death judgment, arguing that the improperly admitted confession entitled him to one of those remedies. The Mexican Consulate wrote in support of the motions. Both motions were denied.

### ii.   Legal Background

In 1969, the United States ratified the Vienna Convention. (Vienna Convention, *supra*, 21 U.S.T. at p. 79.) Article 36, paragraph 1(b), provides that law enforcement officials "shall inform" arrested foreign nationals "without delay" of their right to have their consulate notified of their arrest, and if a national so requests, "shall, without delay, inform the consular post" that the national has been arrested. (Vienna Convention, *supra*, art. 36, par. 1(b), at p. 101.) Article 36 does not provide for a judicial remedy. Instead, paragraph 2 provides that "[t]he rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State" provided that "said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." (*Id.*, par. 2, at p. 101.)

"California implemented the Convention's requirements in section 834c." (*People v. Leon* (2020) 8 Cal.5th 831, 845 (*Leon*).) That statute requires law enforcement officials to advise a "known or suspected foreign national" of the right to communicate with an official from the consulate if that person is arrested or detained for more than two hours. (§ 834c, subd. (a)(1).) The statute "does not specify a remedy for violations"

(*People v. Suarez* (2020) 10 Cal.5th 116, 164 (*Suarez*)), and, notably, is inapplicable to defendant in any event because it was not effective until 2000, over a year after defendant's arrest (*ibid.*).

Defendant is among a group of Mexican nationals whose cases were reviewed by the International Court of Justice (ICJ) in *Case Concerning Avena and Other Mexican Nationals* (Mexico v. U.S.), *supra,* 2004 I.C.J. at page 25. We summarized that litigation in *People v. Mendoza* (2007) 42 Cal.4th 686 (*Mendoza*): "On January 9, 2003, the Government of Mexico initiated proceedings in the International Court of Justice (ICJ) against the United States, alleging violations of the Vienna Convention in the cases of defendant and 53 other Mexican nationals who had been sentenced to death in state criminal proceedings in the United States." (*Id.* at p. 709.) "The ICJ held that the United States had breached article 36, paragraph 1(b) of the Vienna Convention in the cases of 51 of the Mexican nationals, including defendant, by failing 'to inform detained Mexican nationals of their rights under that paragraph' and 'to notify the Mexican consular post of the detention.' [Citation.] The ICJ further held that in 49 cases, including defendant's, the United States had breached its obligation under article 36, paragraph 1(a), 'to enable Mexican consular officers to communicate with and have access to their nationals, as well as its obligation under paragraph 1(c) of that Article regarding the right of consular officers to visit their detained nationals.' " (*Id.* at pp. 709–710.) Like Mendoza, defendant here is also among those for whom the ICJ found a violation of the rights to notification and access.

As to remedy, the ICJ denied Mexico's request to annul the convictions and sentences of the named individuals, "but held United States courts must provide review and reconsideration

of the convictions and sentences 'with a view to ascertaining whether . . . the violation . . . caused actual prejudice to the defendant . . . .' " (*Mendoza, supra*, 42 Cal.4th at p. 710.)

Subsequently, the high court held that ICJ's judgment in *Avena* is not directly enforceable as domestic law in state court and that its provisions did not preempt application of state limitations on filing successive habeas petitions. (*Medellin v. Texas* (2008) 552 U.S. 491, 504–511.) The court reached the same conclusion with respect to President George W. Bush's February 28, 2005 memorandum stating that "the United States would 'discharge its international obligations' under *Avena* 'by having State courts give effect to the decision.' " (*Medellin*, at p. 498.) "[T]he non-self-executing character of a treaty constrains the President's ability to comply with treaty commitments by unilaterally making the treaty binding on domestic courts." (*Id.* at p. 530.) Accordingly, the president's memorandum was not a binding rule that preempts contrary state law. (*Id.* at pp. 525–530.)

### iii. Analysis

In the trial court, defendant sought to exclude his statements to police as a remedy for a violation of his rights under the Vienna Convention. "We have assumed, without deciding, that Article 36 gives foreign nationals individual, enforceable rights." (*Leon, supra*, 8 Cal.5th at p. 846.) Even so, it is well established that the "failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible." (*People v. Enraca* (2012) 53 Cal.4th 735, 756.) As the high court explained in *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331 (*Sanchez-Llamas*): "The few cases in which we have suppressed evidence for statutory violations do not help

Sanchez-Llamas. In those cases, the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interest . . . . [¶] The violation of the right to consular notification, in contrast, is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." (*Id.* at pp. 348–349.) In addition, "[t]he failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions. And unlike the search-and-seizure context — where the need to obtain valuable evidence may tempt authorities to transgress Fourth Amendment limitations — police win little, if any, practical advantage from violating Article 36. Suppression would be a vastly disproportionate remedy for an Article 36 violation." (*Id.* at p. 349.)

The *Sanchez-Llamas* court also emphasized that "other constitutional and statutory requirements effectively protect the interests served . . . by Article 36. A foreign national detained on suspicion of crime, like anyone else in our country, enjoys under our system the protections of the Due Process Clause. Among other things, he is entitled to an attorney, and is protected against compelled self-incrimination. [Citation.] Article 36 adds little to these 'legal options,' and we think it unnecessary to apply the exclusionary rule where other

constitutional and statutory protections — many of them already enforced by the exclusionary rule — safeguard the same interests Sanchez-Llamas claims are advanced by Article 36." (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.)

We have already considered and rejected defendant's claim that his statement was taken in violation of his *Miranda* rights.  There is no independent remedy of exclusion for failing to notify him of his consular rights under the Vienna Convention.

"A consular notification claim may be raised as part of a broader challenge to the voluntariness of a confession." (*Leon*, *supra*, 8 Cal.5th at p. 846, citing *Sanchez-Llamas*, *supra*, 548 U.S, at p. 350.)  Defendant did challenge his statement as involuntary, but not on any basis related to consular rights. Although defendant testified at the suppression hearing, he never claimed that he would have remained silent or requested an attorney had he been advised of his right to consular notification.  It is also notable that defendant came to this country as an infant, was educated here, and is fluent in both written and spoken English.  Defendant has not established a relation between his lack of consular notice and his confessions.

Finally, on this record, we see no evidence of trial prejudice from the Vienna Convention violation.  *Sanchez-Llamas* observed that if a defendant "raises an Article 36 violation at trial, a court can make appropriate accommodations to ensure that the defendant secures, to the extent possible, the benefits of consular assistance." (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.)  Defense counsel represented below that he had made contact with the Fresno Consulate of the government of the Republic of Mexico in the summer of 2000, several months

before jury selection began on December 4, 2000. According to counsel, "They have been involved ever since," and they "ha[ve] been helpful in this case in other areas" by "expend[ing] time and effort in assisting their National, Juan Ramirez."

Defendant asserts that he is entitled to an evidentiary hearing to examine whether the lack of consular notification was prejudicial. (See *Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.) He quotes this court's observation that "prejudice based on facts outside of the record is a matter for a habeas corpus petition." (*Mendoza*, *supra*, 42 Cal.4th at p. 711.) This is true, and we do not foreclose defendant from developing such evidence. But to the extent defendant claims on appeal that he suffered prejudice as a result of the Vienna Convention violation, he has not established it on this record.

### 4. Admission of Carlos Rosales's Statement

Defendant contends the trial court erred in admitting a recorded statement of his cousin, Rosales, made to police on January 2, 1998. Rosales testified as a prosecution witness. The court admitted his statement on the prosecutor's motion to rebut defense counsel's allegations through cross-examination that officers pressured Rosales into making the statement. Defendant contends that the evidence was inadmissible hearsay, that it was not probative on any issue, and that it was unduly prejudicial. He further contends that the statement referenced uncharged criminal conduct that was not admissible as a circumstance in aggravation under section 190.3. He claims the evidentiary error violated his rights to due process, counsel, confrontation, and fair trial under the state and federal constitutions. There was no error.

Rosales was implicated in the robbery of Juan Carlos. He agreed to plead guilty to one count of robbery and testify truthfully at defendant's trial. Because Rosales's prior statement was offered by the prosecutor in response to defense counsel's cross-examination of the witness, we recite that testimony here in some detail.

At trial, Rosales described the Juan Carlos crimes and implicated defendant in them. Rosales testified he, along with defendant, Valenzuela, Garza, Quintana, and De La Rosa, got into the victim's truck. The victim drove to an orchard as Valenzuela held him at gunpoint. Rosales and Quintana stayed in the truck; the others took Juan Carlos into the field. Both Garza and Valenzuela hit the victim with guns and the latter took his money, belt, and neck chain. Then everyone in the group descended on the victim in a "big rumble," hitting him as he laid on the ground, screaming and crying. The men bound the victim with a rope and there was talk about shooting him. Ultimately, they took the truck and left Juan Carlos in the field. Valenzuela split the money among all six of them.

Rosales also testified that, on the night of Chad's murder, defendant was cleaning and loading a gun. Later, defendant and Garza approached Chad's truck and Rosales heard a gun being cocked. Garza and defendant got into the truck with Chad between them and the truck left.

On cross-examination, defense counsel inquired extensively about Rosales's statement given to police on October 22, 1997, during which he denied knowing anything about the

abduction and murder.[32]  Rosales testified that the arresting officers, Contreras and Studer, threw him against the wall repeatedly and ignored his request for counsel.  Various officers threatened that he would be tried as an adult and sentenced to life in prison and that he would be "burn[ed] . . . to the cross." They pressured him to identify who was at Quintana's house that evening.  They commented that Rosales had a motive to kill Chad because of the earlier confrontation at his mother's house.

Defense counsel also cross-examined Rosales about his statement on January 2, 1998.  By that time, Rosales had entered into a plea agreement that required his testimony against defendant and Garza.  Rosales testified that he was "under a lot of pressure" and "stress" at the time he gave the statement.  Counsel asked Rosales if he was "pressured at any time by law enforcement or the Office of the District Attorney to testify that [he] saw [defendant] tie up Juan Carlos?"  Rosales testified, "I could have.  Because the detectives are questioning you.  They are at you and at you and at you.  Trick questions.

---

[32]    The prosecutor objected on hearsay grounds to several of defense counsel's questions.  Defense counsel responded that the questioning went to the witness's state of mind and to provide context under Evidence Code section 356.  He urged that the prosecutor "went into great detail about [Rosales's] deal with the Kern County District Attorney's Office and how he's got a deal to tell the truth, and he's telling the truth now.  [¶]  And I'm entitled to go into all the events that led up to that deal, including the beating of a minor, threats that were given to a minor, and the fact that this minor was looking at life imprisonment as an adult, in terms of signing that deal."  "It starts with the statement of October 22, where he was beaten, he was denied an attorney, and he was threatened on tape."  Defense counsel was allowed to pursue the line of questioning.

And, I mean, it's kind of hard.  And you are already — it's kind of hard."

In response to this questioning, the prosecutor moved to introduce the entire January 2 interview under Evidence Code section 356, commenting:  "they have attacked it to such a degree that they have got the witness saying he was asked trick questions, repeatedly saying he was pressured.  I think the entire tone of the interview is now relevant . . . ."  Defense counsel objected to the playing of the recording in its entirety, arguing that the officers had asserted things in the interview that were hearsay, speculative, and highly prejudicial.  The prosecutor responded that defense counsel "would like to have it both ways; that is, make insinuations as to what was done being improper, yet not play the actual evidence of what occurred, so the jury could hear for themselves in the tone and manner of questioning and make their own determination of whether it was proper.  He repeatedly insinuated and characterized it as pressuring.  I don't think there's anything pressuring when you listen to the tape."  The prosecutor also indicated that the January 2 interview impeached several statements that defense counsel had proffered from the October 22 interview, and that Rosales had testified the January 2 interview was the "truthful version."  He requested an admonishment to the jury that the recording would be admitted for the limited purpose of placing Rosales's testimony in context and as evidence of the tone of the interrogation.

The court admitted the recording, finding it to be relevant and not unduly prejudicial.  Before playing the recording, the court admonished the jury that "this evidence is not being admitted for the truth of what . . .  [the] detectives are saying.  [¶]  It is not offered for the truth of what they're saying.  [¶]

Anything that they said to the witness is limited to explain this witness's answer, his state of mind, his subsequent conduct. [¶] So don't consider the detective's statement for the truth of what was stated."

Defendant's motion for a mistrial based on the admission of the recording was denied.

The court did not abuse its discretion in admitting the recording. (See *People v. Rowland* (1992) 4 Cal.4th 238, 264.) Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute. (*People v. Montes* (2014) 58 Cal.4th 809, 863 (*Montes*); *People v. Hill* (1992) 3 Cal.4th 959, 987.) It is also admissible under Evidence Code section 356 where necessary to provide context. That section provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." In applying the rule, " 'courts do not draw narrow lines around the exact subject of inquiry.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 959.)

In *People v. Clark* (2016) 63 Cal.4th 522, we upheld the admission of a recording in its entirety to rebut defense counsel's implication on cross-examination, that the officer had " 'spoon-fed' " details of the crimes to the witness during the interview. (*Id.* at p. 599.) We concluded that Evidence Code section 356 authorized admission " 'to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a

misleading impression on the subjects addressed.' " (*Id.* at p. 600, quoting *People v. Arias* (1996) 13 Cal.4th 92, 156.)

Likewise here, the court did not abuse its discretion in concluding that defense counsel opened the door to evidence of the statement by putting Rosales's state of mind at issue. He was cross-examined extensively about the statement and testified that, during the interview, he was under "pressure" and "stress." The officers were "at [him] and at [him] and at [him]," asked "[t]rick questions," and threatened and abused him. The court acted within its discretion to allow the prosecutor to rebut this testimony by introducing the whole interview to reveal the officers' tone and manner of questioning. Indeed, the recording, which we have reviewed, was quite probative on that score. The officers were respectful and spoke in measured tones throughout the interview. Rosales was read his *Miranda* rights, indicated that he understood them, and expressly waived them. Significantly, his counsel was present during the entire interview. The officers began by asking for a narrative description of the crimes against Juan Carlos and Chad. Rosales gave a detailed account with minimal interruption. The officers then asked questions to clarify and fill in details. They did not ask leading questions, badger Rosales, or accuse him of lying. At one point Sergeant Wahl asked Rosales whether he and others talked about what to say to Brent, who was left sitting on the curb. When Rosales said he did not remember, the sergeant replied, "Think hard because I, I know about that discussion." The comment was hardly overbearing. She also asked Rosales why he did not tell officers what he had seen when he was interviewed on October 22. Rosales explained that he feared retaliation from the other participants. He did not mention being frightened or intimidated by the interviewing

officers. Rosales's explanation of his state of mind tended to impeach his cross-examination testimony that he was intimidated by the officers. The court did not err in concluding that the whole of the interview was probative to show that Rosales was not pressured or coerced into making the January 2 statement.

Defendant argues that the recording was irrelevant because the allegations of coercion involved the October 22 interview and the "recording made in January 1998 is [not] relevant to dispel charges of coercion that took place in mid-October 1997." But defense counsel elicited testimony about coercive conduct during *both* interviews. Defense counsel was allowed to inquire about the circumstances in the October 22 interview, which he asserted were coercive.[33] By the same token, it was within the court's discretion to allow the prosecutor to demonstrate that the January 2 interview, which the witness subsequently testified was truthful, was not coerced.

The court likewise did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect. It legitimately concluded that playing the recording in its entirety was an appropriate and effective way to rebut Rosales's testimony that he was pressured and tricked by the officers. And the tape, while lengthy, was not highly prejudicial. Defendant claims that the interview was filled with hearsay and speculative assertions. Yet, the details Rosales provided in his January 2 statement about the crimes against Juan Carlos and

---

[33] Indeed, defense counsel at one point observed that he himself might seek to play the entire tape of the October 22 interview for context. Ultimately, he did not make that request.

Chad were largely the same as his trial testimony and based upon his own knowledge. Rosales was subject to extensive cross-examination, so those details did not go untested. In addition, the trial court instructed that the officers' questions were not evidence but could only be used to explain Rosales's answers, his state of mind, and his subsequent conduct.

Defendant also argues that the tape included prejudicial evidence of a prior burglary he committed that was not admissible as a circumstance in aggravation under section 190.3. The assertion is exaggerated. At one point, Rosales recounted that defendant had tried to visit his children in order to give them clothing and a bracelet, but that their mother was opposed to it and called security. According to Rosales, "they tried to say that he was trying to break in the house." But Rosales understood that the mother had invited defendant to the house so that she could "set him up." The jury was not reasonably likely to interpret this statement as evidence of an uncharged burglary. Indeed, the actual statement reflected that defendant had innocent motives and was himself the victim of vindictiveness. Tellingly, defense counsel did not pursue the prosecutor's suggestion that the jury be admonished not to consider the incident as a circumstance in aggravation. Such an instruction could have drawn greater attention to the otherwise ambiguous incident.

We reject defendant's claims that the evidence violated his rights to due process, counsel, and confrontation. Initially, the People assert defendant forfeited these issues by failing to lodge a timely objection below. Not so. Defendant specifically raised a confrontation claim in his unsuccessful mistrial motion. The motion identified the asserted error at a time when the court could have taken corrective action. (See *Peoples*, *supra*, 62

Cal.4th at p. 801.) Defendant also objected to the recording on Evidence Code section 352 grounds, which preserves a claim that admission of the evidence rendered the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 433–439.) Finally, an ineffective assistance of counsel claim need not be preserved by objection.

Nonetheless, defendant's claims fail on the merits. He was not deprived of his right to confrontation because Rosales testified and was subject to cross-examination. (*People v. Clark*, *supra*, 63 Cal.4th at p. 601.) The court did not place any limits on defense counsel's cross-examination of the witness, nor did it impinge upon his rendering of assistance. The statement, properly admitted under the rules of evidence, did not deprive defendant of a fundamentally fair trial. (*Kraft*, *supra*, 23 Cal.4th at p. 1035.)

> 5. *Sufficiency of the Evidence in Support of the Crimes Against Leonel Paredes and Juan Carlos Ramirez*

At the close of the prosecution's case, defendant moved for dismissal of the charges relating to the Paredes and Juan Carlos crimes. (§ 1118.1.) The motion was denied. The standard applied at both the trial and appellate level is whether each element of the charges is supported by substantial evidence. (*People v. Gomez* (2018) 6 Cal.5th 243, 307.) " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the

existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

### a. *Kidnapping, Carjacking, and Robbery of Paredes (Counts 7, 8, and 9)*

Defendant contends Paredes's identification was unreliable. "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see Evid. Code, § 411.) Paredes's testimony was neither.

Sheriff's Deputy James Ashley interviewed Paredes on October 5, the same day he escaped from his attackers. Ashley described Paredes as being "rather upset and emotional, some signs of visible shaking, some sense of being tired." Paredes described three men involved in his abduction. The man with the knife was Hispanic, about 5 feet 8 inches tall, 175 pounds, with brown hair and brown eyes, and a thin mustache. That man demanded his keys and drove his car. He recalled the second man was Hispanic, had a small rifle or shotgun, and got into the back seat with Paredes. That man wore a nylon stocking over his face when they were in the garage, but not

when he first confronted Paredes. He described the third man as Hispanic.[34] Deputy Robert Contreras, who subsequently interviewed Paredes, recalled his statement that he thought he knew one of the men and may have gone to high school with him.

After speaking with officers, Paredes told his cousin, Rosalio, that he thought he might know one of the people involved in the crime. Paredes had seen the person in Lamont and believed that he was acquainted with Rosalio. Rosalio showed Paredes photographs of his friends, and Paredes recognized Efrain Garza. Rosalio did not recall showing a photo of Garza, but testified that he told Paredes he knew Efrain Garza. Rosalio denied showing Paredes any photographs of defendant, and said Paredes did not ask him about defendant.

After Chad was killed on October 14, Rosalio made a connection between the two crimes, and told Paredes that the people involved in the murder case were probably involved in his own kidnapping. Rosalio also testified that he probably gave Paredes defendant's name and nickname.

During a second interview conducted by Deputies Contreras and Justice on October 21, Paredes said one of the attackers was Little Loco, whom he identified as defendant.

---

[34] Paredes testified that he had difficulty talking to Deputy Ashley, who was English-speaking, and that Ashley's report contained factual errors. At trial, Ashley's testimony regarding Paredes's statement varied from Paredes's own description at trial. Paredes further testified that a couple of weeks after he spoke to Ashley, he corrected some of the errors when he spoke to Deputy Justice, who spoke Spanish. Paredes confirmed that on two previous occasions, he testified that he saw the two men who held firearms, that the person with the revolver was Garza, and that the person with the shotgun-like weapon was defendant.

Defendant held a shotgun on him while the other two men taped him up. Paredes also provided the name Efrain Garza, known as Baby. He told the deputies Garza's name was given to him by a friend, but he would not reveal who the friend was.

During the October 21 interview, Paredes identified defendant in a six-person photographic lineup. At trial, Paredes identified defendant in court as the person who held the shotgun during the carjacking. He explained that he had an opportunity to see defendant's face for 30 to 45 seconds when defendant initially approached him in the parking lot. The evidence supports the jury's finding that defendant was one of the perpetrators.

Defendant argues that Paredes's identification was unreliable for several reasons: Paredes did not identify defendant or pick him out of a lineup the day after the kidnapping.[35] Paredes's later identification on October 21 was tainted by the fact that Paredes's cousin, Rosalio, gave Paredes defendant's name and nickname and said defendant was the likely perpetrator. Paredes saw defendant on television as a suspect in the killing, and Deputy Contreras told Paredes defendant's name before showing him a photographic lineup.

All of these facts were presented to the jury. Defendant cross-examined Paredes at length about his identification, and presented an identification expert who described the possible inaccuracies of eyewitness testimony and the factors that can affect an identification. Ultimately, it was for the jury to decide what weight to give Paredes's identification in light of

---

[35] According to Deputy Ashley, he did not show Paredes a photographic lineup at that time.

defendant's claims. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Defendant argues that the above-referenced circumstances so tainted Paredes's in-court identification that the trial court should have excluded this testimony, and, without it, there was insufficient evidence to support the verdict. His argument misses the mark.

First, "[i]n contending that the evidence was insufficient to support his convictions, defendant misunderstands the effect of a finding of [evidentiary] error. Evidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission." (*Navarro, supra*, 12 Cal.5th at p. 311, citing *People v. Story* (2009) 45 Cal.4th 1282, 1296–1297.)

Second, the circumstances he cites generally go to the weight and not the admissibility of the witness's testimony. (*People v. Elliott* (2012) 53 Cal.4th 535, 585 (*Elliott*); *People v. Virgil* (2011) 51 Cal.4th 1210, 1256 (*Virgil*).)

Third, his challenge to the reliability of Paredes's identification is overstated. Although some of Deputy Contreras's testimony was unclear as to whether the deputies suggested defendant as a suspect, Contreras ultimately confirmed that neither he nor Justice suggested defendant's name or moniker to Paredes. Rosalio testified that he made a connection between the crimes against his cousin and the killing. He then told Paredes that the same people were probably involved in his kidnapping, and he gave Paredes defendant's name and nickname. He never told Paredes to pick out defendant or to lie. Finally, according to Paredes, Rosalio

did not provide him defendant's name, and Paredes did not see defendant's photograph on television.

The inconsistencies in the cousins' recollections were for the jury to resolve. They do not, in any event, establish that Paredes's identification of defendant was unreliable. The fact that Rosalio may have told Paredes that he thought defendant was also involved in his kidnapping does not render Paredes's identification physically impossible or inherently improbable. (*Elliott*, *supra*, 53 Cal.4th at p. 585.) In short, Paredes's testimony provided substantial evidence of defendant's guilt.

### b. Robbery of Juan Carlos Ramirez and Kidnapping During the Commission of a Carjacking (Counts 4 and 6) [36]

Defendant argues the kidnapping of Juan Carlos "happened before [defendant] knew anything about what was happening, and that he and the three others who jumped in the back of the truck at the invitation of Hector Valenzuela and

---

[36] Section 209.5, subdivision (a) provides: "Any person who, during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person who is not a principal in the commission of the carjacking shall be punished by imprisonment in the state prison for life with the possibility of parole." Subdivision (b) provides: "This section shall only apply if the movement of the victim is beyond that merely incidental to the commission of the carjacking, the victim is moved a substantial distance from the vicinity of the carjacking, and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself."

Freddie De La Rosa were essentially clueless as to what had happened until arriving at the field."[37]  He fails to persuade.

Juan Carlos testified that Valenzuela and De La Rosa approached him while he sat in his truck.  After Valenzuela pointed a gun at him and demanded a ride, the two men then got into the truck.  Juan Carlos drove to a field where they robbed him.  De La Rosa drove the truck about a half of a mile and got into an accident, so he directed Juan Carlos to drive to where his friends, including defendant, were waiting.  When De La Rosa called to his friends, defendant and three others climbed into the back.  This evidence supported the jury's finding that Valenzuela and De La Rosa had committed a kidnapping during the commission of a carjacking.  A kidnapping "continues until . . . the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety."  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159 (*Barnett*).)  Accordingly, the kidnapping was ongoing when defendant entered the truck.

An aider and abettor's intent to facilitate the crime must be formed before or during the commission of the offense.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039–1040.)  Here, the evidence supported the jury's finding that defendant harbored the specific intent to aid and abet the kidnapping of Juan Carlos to facilitate the carjacking.  Defendant spent time with Valenzuela and De La Rosa moments before the crime began.  When the two men returned with Juan Carlos still in the truck,

---

[37]  Defendant also asserts there is insufficient evidence to support count 5, the charge of carjacking Juan Carlos Ramirez.  Defendant was acquitted of that charge.

Rosales could see Valenzuela pointing a gun at the victim. The jury could reasonably infer that defendant could see the gun as well. Valenzuela continued to hold a gun on Juan Carlos and directed him to drive to an orchard about five minutes away. There, defendant, along with Valenzuela, De La Rosa, and Garza beat Juan Carlos and stole from him. Defendant also tied him up and expressed a desire to shoot him. Defendant and the others drove off in Juan Carlos's truck and divided the victim's property among them. The circumstances surrounding defendant's entry into the truck and defendant's subsequent conduct supported an inference that, while the crime was ongoing (*Barnett*, *supra*, 17 Cal.4th at p. 1159), defendant formed the specific intent to aid and abet in the kidnapping in order to facilitate a carjacking.

Although the jury acquitted defendant of carjacking, there is no requirement of consistency among verdicts on separate charges so long as substantial evidence supports the offenses convicted upon. (*Harris v. Rivera* (1981) 454 U.S. 339, 345; *People v. Palmer* (2001) 24 Cal.4th 856, 860–861; § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count"].) "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*Palmer*, at p. 860.)

As to the second degree robbery (§ 212.5, subd. (c)),[38] defendant urges the evidence showed that Valenzuela and De

_____

[38] Section 212.5 specifies the kinds of robbery that are of the first degree, and provides that all other kinds of robbery are of

La Rosa took property from the victim and later gave defendant a chain or pendant. He also states that there is evidence that he struck and assaulted Juan Carlos after being told the victim had attacked De La Rosa's sister. From these facts, he concludes, "This evidence might sustain convictions for receiving stolen property and felony assault, but it does not support the crimes for which he was convicted." To the contrary, defendant's active participation in the assault on Juan Carlos while property was taken, his departure in Juan Carlos's truck after tying him up, and his accepting the gold charm as part of his "take," amply supports the jury's robbery verdict.

### 6. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed multiple acts of misconduct rendering his trial fundamentally unfair. Most of the challenges fail; the remaining did not result in prejudice.

"Prosecutorial misconduct requires reversal when it 'so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 795, quoting *People v. Watkins* (2012) 55 Cal.4th 999, 1031.) "We review the trial court's rulings on prosecutorial misconduct for abuse of discretion." (*Peoples*,

the second degree. Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

*supra*, 62 Cal.4th at pp. 792–793; accord, *People v. Dworak* (2021) 11 Cal.5th 881, 910; *People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

### a. Manner of Preserving Objections

As a threshold matter, defendant contends that the trial court prevented defense counsel from lodging timely objections to misconduct and deprived defendant of an effective remedy by delaying rulings. Not so. The trial court has broad discretion to control the conduct of a criminal trial (§ 1044; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 386), including the manner and timing of objections (see *People v. Fudge, supra*, 7 Cal.4th at p. 1108). The court may require that an objection be made at a sidebar to "efficiently dispose of matters outside the hearing of jurors or testifying witnesses." (*Virgil, supra*, 51 Cal.4th at p. 1237.)

Here, during the cross-examination of defense witness Dr. Gomez, defense counsel lodged an objection to one of the prosecutor's questions on the grounds of "prosecutorial misconduct." Later, out of the presence of the jury, the prosecutor objected to defense counsel's characterization of his conduct in front of the jury. The trial court responded, "I will admonish in the future, if there is a motion based on prosecutorial misconduct, you can ask for a side bar. [¶] This is not a motion to state in the presence of the jury, because it does have a prejudicial effect if the Court denies it." During a later hearing on a motion for mistrial, defense counsel observed that he had been "ordered by the Court not to put prosecutorial misconduct on the record" in front of the jury. The trial court clarified its ruling: "The Court will confirm that the practice that I asked counsel throughout the case to follow is to state the

legal basis for an objection on the record, without having speaking objections. [¶] I've always allowed counsel to state the legal basis for any objection, but I did in response to Mr. Barton's argument about prosecutorial misconduct, I did agree that that is an objection that could be preserved by stating it for the record and then arguing it outside the presence of the jury. [¶] What I have not done is made some blanket order that defense counsel cannot ask for side bars, and in fact, we have had numerous side bars at the request of defense counsel, and a number of those side bars addressed either the subject of a motion for mistrial or an objection based upon prosecutorial misconduct. [¶] I appreciate that not every time that you make a motion do you ask for a side bar. [¶] And again consistent with whatever experienced judges do, we don't just have side bars for every objection. [¶] It becomes very disruptive to do so. [¶] That's why we frequently allow counsel to reserve a motion, have the court rule on an objection, and then counsel can reserve a motion, whether it be for mistrial or prosecutorial misconduct. [¶] And unfortunately at the end of the day on Friday, we had no time, based on the court's schedule, to argue the matters. [¶] There's no prejudice to now arguing them and if there's a need to admonish the jury, make any curative admonitions or instructions, we can still do that and avoid prejudice. [¶] I don't find there is any delay that is going to inure to the prejudice of the defendant, by taking up the matter now."

The defense made repeated motions for mistrial alleging prosecutorial misconduct. While such misconduct may well give rise to a mistrial, it is seldom a free-standing evidentiary objection. The more appropriate legal grounds to assert during questioning include objections that questions are argumentative; call for speculation, hearsay or irrelevant

matter; or assume facts not in evidence. If the objection is overruled, the claim of error is preserved. If the objection is sustained, the defense may move for a mistrial, asserting misconduct and requesting other sanctions. Such requests are commonly made outside the jury's presence.

The trial court did not abuse its discretion in adopting this procedure to preserve a claim of prosecutorial misconduct. Defense counsel was permitted to lodge a contemporaneous evidentiary objection and to state the basis on the record. He could argue motions at side bar or during a recess outside of the jury's presence. He was simply not allowed to make the accusation of "prosecutorial misconduct" in the jury's presence. This limitation was well within the court's discretion to prevent a suggestion of prejudice or disallow argumentative objections. And, as discussed in further detail below, it did not render defense counsel ineffective. Each of the instances of misconduct defendant asserts on appeal was timely and effectively litigated.[39]

### b. *Questioning of Daniel Quintana*

During cross-examination of prosecution witness Daniel Quintana, defense counsel elicited testimony about the rivalry among local residents. Quintana was bused from Lamont to a

---

[39] Defendant perfunctorily asserts that the court's ruling on the timing of objections "appears unprecedented" and created "the appearance, if not the reality, of prejudgment. These preconceptions are those of a biased tribunal." Defendant's argument, which we choose not to characterize further, is unsupported by analysis, citation to authority, or courtroom experience. We decline to consider it. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984–985.)

school in Arvin. He said that he had problems with the Arvin students, and that his friend and neighbor, Carlos Rosales, was threatened by the "Arvinas" every day he went to class. Quintana was aware of the incident at Rosales's home. On redirect, the prosecutor asked Quintana if he "[took] a Tec-9 and ever [shot] anybody from Arvin three times in the back of the head because of that?" Before the witness could answer, defense counsel asserted prosecutorial misconduct, moved to strike the question, and moved for a mistrial. The court immediately took up the objection outside the jury's presence. The prosecutor explained that he asked the question "[b]ecause the defense is putting forth the theory, through this witness, that a justifiable explanation for the defendant's actions is because he's from Lamont, and he had had hard times with Arvina kids and he was somehow upset about what happened at the aunt's house." Defense counsel responded that the prosecutor had not accurately represented the defense theory of the case and that the question was designed to inflame the jury. The court sustained the defense objection to the question as "argumentative" and denied the motion for mistrial. The court admonished the jurors that it had sustained an objection, the jurors were to disregard the question, and the attorneys' questions are not evidence.

"An argumentative question is a speech to the jury masquerading as a question. . . . Often it is apparent that the questioner does not even expect an answer. . . . An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony . . . ." (*People v. Chatman* (2006) 38 Cal.4th 344, 384 (*Chatman*).) The trial court acted within its discretion to find the question argumentative.

But the question, while ruled improper, did not introduce inflammatory facts to the jury. The jury was informed during opening statement of the prosecutor's theory that defendant had shot Chad three times in the head in retaliation for an act of disrespect. Substantial evidence, which included the details in the question, supported that theory. Moreover, the court sustained an objection. Its admonition informed the panel that the question was ruled improper and should be ignored. Any prejudice was cured. (*Id.* at p. 385; *Peoples*, *supra*, 62 Cal.4th at p. 794; *People v. Pinholster* (1992) 1 Cal.4th 865, 943 (*Pinholster*).)

### c. *Reference to Chinese-manufactured Ammunition*

During the testimony of prosecution witness Lieutenant Tom Hodgson, the prosecutor showed the witness photographs and asked if they showed the ammunition found in the Arizona apartment of defendant's brother. Defense counsel objected to the question as irrelevant and argued at sidebar that "these highly prejudicial photographs and items seized have no relation to the defendant whatsoever." Counsel noted that some of the ammunition was not nine millimeter and would not fit the murder weapon. The prosecutor observed that defendant admitted having brought the murder weapon from Arizona but noted, in any event, that he had not asked for that particular photograph to be admitted into evidence. On cross-examination, the witness clarified that the ammunition in question would not fit into the murder weapon. He described it as "Chinese made" 7.62-millimeter bottleneck rounds.

Defense counsel later moved for a mistrial based on the reference to one photograph in particular, People's 185, which was displayed on a 32-inch television screen. The photograph

showed an open box and multiple rounds of ammunition. The prosecutor conceded that the 7.62 rounds shown there were only relevant to counts 10 and 11, which had been bifurcated. He observed that the image in question was on the screen for about 15 to 20 seconds, argued that the brief display did not result in prejudice, and observed that the jury could be instructed to disregard the photograph. The court denied the mistrial motion. It found the prosecutor erred by referring to the rounds, relevant only to bifurcated counts, but that he did not act in bad faith and that defendant suffered no prejudice. It ruled that People's 185 and 189 would not be admitted into evidence and ordered the prosecutor to make no further reference to this ammunition.

"A court should grant mistrial ' "only when a party's chances of receiving a fair trial have been irreparably damaged." ' [Citation.] This generally occurs when ' " ' "the court is apprised of prejudice that it judges incurable by admonition or instruction." ' " ' [Citation.] We review the trial court's refusal to grant a mistrial for abuse of discretion." (*People v. Johnson* (2018) 6 Cal.5th 541, 581.) While the court appropriately found that the prosecutor erroneously displayed the challenged evidence, no prejudice appears. The picture was only briefly displayed. The jury was aware that the ammunition was seized from the brother's residence and did not fit the murder weapon.

### d. Cross-examination of Defense Witness Stan Mosley

Defendant contends that the prosecutor's cross-examination of private investigator Stan Mosley about the circumstances under which he left his prior employment amounted to misconduct. The claim fails.

Mosley worked for the Bakersfield Police Department for 16 years, and then as a private investigator for 10. He testified for the defense concerning code words used to refer to quantities of narcotics. The testimony was proffered to support defendant's theory that Juan Carlos had driven to the carjacking location to participate in a narcotics transaction. During voir dire of the witness's qualifications, Mosley testified about his undercover narcotics work as a police officer. On cross-examination, the prosecutor asked the witness if he had left the department "under accusation of dishonesty." Defense counsel objected on the grounds of prosecutorial misconduct and moved for a mistrial. At sidebar, the prosecutor represented that Mosley was investigated and found to possess property from some of the cases he had worked on. Mosley resigned and no theft charges were filed. The prosecutor offered to call the internal affairs investigators and produce their reports. He asserted that the incident "goes to the issue of credibility." The court ruled that the prosecutor could inquire about the witness resigning from the police department, but excluded any reference to theft of property or pending charges. (See Evid. Code, § 352.) The court denied the motion for mistrial. In the jury's presence, the court sustained the defense objection and admonished the jury that the question was not evidence.

The general rule is that "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) The court held the fact of Mosley's resignation was relevant to credibility. It excluded the prosecutor's proffered additional evidence, not as irrelevant, but as unduly prejudicial and time consuming. It rejected the misconduct claim. That conclusion was within its discretion. "A witness may be impeached with any prior conduct involving moral turpitude whether or not it

resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*Clark*, *supra*, 52 Cal.4th at p. 931.) The alleged theft was a crime of moral turpitude, relevant to credibility. (*Id*. at p. 932). The prosecutor had a good faith basis for the question (see *Krebs*, *supra*, 8 Cal.5th at p. 340), based on internal affairs reports. In any event, the objection was partially sustained and the jury admonished, thus minimizing any tangential prejudice to defendant. (*Pinholster*, *supra*, 1 Cal.4th at p. 943.) Mosley's testimony was on a minor point, involving Juan Carlos's reason for being in the area. It did not relate to defendant's subsequent conduct.

### e. Cross-examination of Defendant

Defendant contends that the prosecutor lacked a good faith basis for cross-examining him about whether he had purchased ammunition and multiple "guns," his animosity towards Arvinas, his involvement with drugs, and his theft of money. "The permissible scope of cross-examination of a defendant is generally broad." (*Chatman*, *supra*, 38 Cal.4th at p. 382.) The prosecutor's questions were permissible.

Regarding the guns and ammunition, defendant references the following exchange:

"Q.: So you went to Arizona and you said you weren't acting like a gang member there, were you?

"A.: No.

"Q.: But you were using marijuana and buying guns, correct?

"A.: Bought one gun.

"[Defense Counsel] MR. GARDINA: Objection, would like to reserve a motion at this time, your Honor.

"THE COURT: You may.

"Q.: And the ammunition that was in the gun when you shot Chad and the S&B ammunition, that was ammunition that was brought in the gun from Arizona, correct?

"A.: The one in the clip, yes. I didn't bring it from Arizona. When I got it from Visalia, that's the ammunition that was in it.

"Q.: When you bought the gun, did you buy ammunition?

"A.: It had some in the clip.

"Q.: You didn't buy the boxes that we saw, that were taken?

"MR. GARDINA: Objection, argumentative.

"THE COURT: Overruled.

"MR. GARDINA: We're going to reserve a motion at this time, your Honor.

"THE COURT: You may.

"MR. GARDINA: Thank you.

"BY MR. BARTON:

"Q.: Specifically, I'm talking about the S&B ammunition that was in the gun — remember — you were here for all the testimony of Mr. Laskowski, right?

"A.: Yes.

"Q.: And Mr. Hodgson?

"A.: Yes.

"Q.: And the testimony that the rounds that killed Chad had the S&B on them, correct?

"A.: Yes.

"Q.: And the rounds that were seized from your brother's apartment had the same base marks, correct?

"A.: Yeah.

"Q.: Is that the same ammunition that you would shoot with when you were back in Arizona?

"A.: No, I didn't buy that ammunition.

"Q.: So there was ammunition that you used in Arizona, that it's your testimony now was in the gun when you bought it, period?

"A.: Yes.  There was some in it.

"Q.: Do you know what kind it was?

"A.: No.  I didn't look.

"Q.: Well, was there only a few rounds or was it a full clip or what?

"A.: It was a full clip."

Out of the jury's presence, the trial court heard and denied a motion for mistrial based on prosecutorial misconduct.  As for the reference to "guns," the court found that the prosecutor "did not phrase the question as clearly as it could be phrased" but observed that the question was generically referring to "what gang members do," and defendant responded that he had purchased one gun.  The court found no prejudice from this exchange.  It admonished the prosecutor not to refer to "guns" in the plural.  The court did not interpret the prosecutor's questioning to refer directly to the Chinese ammunition and noted that there was no image displayed when the prosecutor

asked these questions. The court found that the prosecutor had not violated any previous court orders.

To prevail on a claim of prosecutorial misconduct, the defendant must show "a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568; accord, *People v. Potts* (2019) 6 Cal.5th 1012, 1036.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970.) The trial court was within its discretion to conclude that the jury was not reasonably likely to construe the prosecutor's reference to "guns" in the most damaging light. The prosecutor's question was prefaced by an observation about what gang members generally do, and did not explicitly accuse defendant of having purchased multiple guns. Defendant immediately and unequivocally responded that he had purchased only one gun. The prosecutor accepted this answer and did not ask about any other weapons defendant may have purchased. The trial court was likewise within its discretion to conclude that the prosecutor's questioning did not suggest a reference to the 7.62-millimeter Chinese ammunition. The prosecutor asked defendant if he had bought "the boxes" of ammunition that were seized, but immediately clarified that he was referring to "the S&B ammunition." This questioning did not amount to misconduct.

As for defendant's animosity towards Arvinas, the prosecutor asked defendant "if an Arvina was caught in Lamont after dark by himself, and you and other Lamont 13 gang members caught him, he would be in trouble, wouldn't he?" Defendant responded, "If somebody else caught him, maybe." The prosecutor then asked, "You've never caused any harm to

any Arvina 13 member?" Defense counsel objected as "improper impeachment," and reserved a motion for mistrial. The trial court sustained the objection and defendant did not answer. It later denied a mistrial motion based on prosecutorial misconduct.

Defendant argues that the prosecutor's question was asked without a good faith belief that defendant had actually harmed an Arvina gang member. He cites an earlier comment by the prosecutor in which he claims the prosecutor acknowledged having no such evidence. This assertion mischaracterizes the record. The prosecutor did acknowledge that he had no evidence defendant had engaged in gang activity in Arvin or had contacts with Arvin police. But the prosecutor's question was focused on what defendant had done or would do with respect to gang members who entered his Lamont territory. The prosecutor had introduced competent evidence that defendant was a Lamont 13 gang member. It was defendant who raised the specter of animosities between Lamont 13 and Arvinas. He testified at length on direct examination about Arvinas targeting him and his friends because he was from Lamont. He claimed that the Arvin Boys had thrown a Molotov cocktail and shot at his mother's house. He further volunteered that he had kidnapped Chad at gunpoint because he was an Arvina associate who, along with two other Arvina gang members, had threatened defendant's aunt. As the prosecutor observed, defendant's testimony suggested that he was an innocent victim wrongly targeted by Arvinas, when in fact there was an ongoing violent rivalry that put both sides at risk. The prosecutor's follow-up question about whether defendant posed a threat to Arvinas or had ever harmed Arvinas fell within the broad scope of permissible cross-examination, and defendant

has not shown it was asked in bad faith. Defendant's objection to the question was sustained in any event.

Next, defendant claims the prosecutor asked a series of questions designed to denigrate his character by suggesting he furnished drugs to young women, made bail using drug money, and was fired for drug use. For example, the prosecutor asked defendant "when you were arrested in 1997, specifically August 22, 1997, that wasn't for just possessing drugs. That was for furnishing them as well to the girls whose apartment you were in?" Defendant denied furnishing drugs. The trial court had specifically ruled that defendant could be impeached with this incident and defense counsel did not lodge a contemporaneous objection to this question. At the later motion for mistrial, counsel argued that the prosecutor did not have a good faith belief defendant actually furnished drugs, and cited a report by a defense investigator he had received "that morning," after the prosecutor's cross-examination. The report stated that one of the girls (Cary Mesa) claimed to have told the prosecutor that defendant did not in fact furnish drugs. The prosecutor countered that he had relied on a police report in which Mesa and another girl (Denise Suorez) stated defendant had furnished drugs. He had not personally spoken to Mesa and had no knowledge of her supposed recantation at the time of his cross-examination. The trial court found that the prosecutor's question was in line with its ruling on impeachment and denied a motion for mistrial. The conclusion was not an abuse of discretion. The prosecutor appeared to act in good faith in asking defendant about his felony conduct, given the trial court's ruling and a police report supporting the line of inquiry. The prosecutor was not informed about Mesa's asserted recantation

and could have relied on the statement from Suorez in any event.

The prosecutor also asked defendant if he had lost his job because of drug use. Defendant replied, "No." Defense counsel moved for a mistrial on the grounds of prosecutorial misconduct. The prosecutor claimed to rely on defendant's own testimony that he had lost his job and that he was using drugs at the time. The prosecutor was given no discovery surrounding these issues. The most direct way to determine if defendant lost his job due to drug use was to ask him. The court ruled the question was permissible and denied the mistrial motion. A close review of the record, however, does not support the prosecutor's assertion. Defendant testified about his drug use *after* losing his job in Arizona and returning to California. Nonetheless, there was no prejudice from this question. Defendant denied that he lost his job because of drug use and the prosecutor did not explore the issue further. Moreover, it was defendant who raised the issue by testifying that he went on a two-week drug spree before the murder, during which time he was using large quantities of marijuana, methamphetamine, PCP, and alcohol. Defendant claimed to be drunk and high when he killed Chad. Given this expansive testimony, defendant could hardly have been prejudiced by the prosecutor's suggestion that drug use may have caused him to lose his job.

Finally, the prosecutor asked the unemployed defendant who had paid his bail on an unrelated charge of methamphetamine possession. Defendant replied, "My brother did." Defense counsel's objection to the question on relevance grounds was overruled, and he moved for a mistrial. Counsel did not further argue the point outside the jury's presence. On appeal, defendant argues that the prosecutor's question

impermissibly suggested defendant was "making bail with drug money." The trial court acted within its discretion in denying defendant's assertion of misconduct. Defendant made clear that he did not pay the bail himself. The prosecutor did not ask defendant if he knew where the money came from. It is not reasonably likely that the jury inferred from the prosecutor's single question that the bail somehow came from drug money.

### f.   *Request To Have Beatriz Garza Subject To Recall as a Witness*

At the guilt phase, the prosecutor called Efrain Garza's mother, Beatriz, to testify about events at her home on the day of the shooting. At the end of her testimony, the prosecutor asked that the witness be subject to recall. The court asked if the prosecutor had a specific date in mind, to which he responded, "It would be penalty. Just subject to recall. I have her information." Defense counsel reserved a motion for mistrial. Outside the presence of the jury, defense counsel argued that the prosecutor committed misconduct by referring to the penalty phase "as a certainty." The prosecutor responded that he had been addressing the court's inquiry about when Beatriz would be needed, and because he did not have a specific date, he referenced the penalty phase. The court denied the motion, observing, "I don't think the jury assumes that means now that there will be, in fact, a penalty phase that [the prosecutor] was somehow conveying that. It's just a matter of the contingency, and I don't find there's been prejudice." Defendant opines that the prosecutor never intended to recall Beatriz and that he was simply trying to "backhandly inform[] the jury of the inevitability of a penalty phase." The record provides no support for this bald assertion. The trial court was well within its discretion to reject it. The jury was aware from

the beginning of voir dire of the potential for a penalty phase. Nothing in the prosecutor's statement suggested a penalty phase was inevitable. No misconduct appears.

### 7. *Impeachment of Defendant with Misdemeanor Conduct*

Defendant contends that the prosecutor committed misconduct during cross-examination by asking him about the facts underlying an incident of vehicle theft and evading arrest in 1994. He argues that the question violated the trial court's ruling excluding such evidence as impeachment. Alternatively, he maintains, if the question was permitted, the trial court's ruling was erroneous. We reject both claims.

Before trial, the prosecutor moved to permit use of facts underlying defendant's 1994 misdemeanor conviction for automobile theft/joyriding (Veh. Code, § 10851) as impeachment if defendant chose to testify. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 292, 295–296.) Defendant opposed the motion on the ground that the crime was not one of moral turpitude because there was no evidence of intent to steal, and that its similarity to the carjacking charges made it unduly prejudicial. (Evid. Code, § 352.) The trial court tentatively excluded the evidence on the ground that there was insufficient evidence from which the jury could conclude that defendant intended to steal the car, but indicated that the prosecutor could revisit the issue. The prosecutor stated he would research whether evading the police constituted a crime of moral turpitude.

Two and a half months later, immediately before defendant testified, the parties revisited the issue. The prosecutor sought to clarify the court's previous ruling and stated a recollection that the court had allowed him to "impeach

[defendant] with the fact that he had the misdemeanor conduct, not a conviction but misdemeanor conduct of auto theft . . . ." After discussing a different incident involving a weapon, the prosecutor again represented that the court had tentatively admitted the conduct underlying the auto theft subject to an Evidence Code section 352 analysis. Defense counsel did not object to that representation, and the trial court stated, "That's consistent with my notes, because I did have a concern under 352. The issue came up if we let in the auto theft is it going to be prejudicial in light of the charges in this case and what weight would that have. And, again, I did indicate it was a tentative, and I would wait and hear what other moral turpitude conduct there was." Ultimately, the court ruled the "auto-related conduct, what we have described as auto theft or joyriding" was admissible for impeachment.

On direct examination, defendant admitted that he had a misdemeanor conviction for "joyriding." On cross-examination, the prosecutor asked, "The other incidents that you stated to counsel [that] you were involved in, I think he referred to it as a joyriding. That's when you were in a stolen car fleeing from the police that flipped and ejected people, right?" Defense counsel objected that the question was "improper impeachment." The objection was overruled, and defendant replied, "Yes."

Defense counsel later brought a motion for mistrial based on this questioning. At that time he argued, "It's my recollection, and I could be wrong, but my recollection on the prior motion was that this was a misdemeanor, no contest plea to joyriding. [¶] The prosecution did not have evidence that the defendant knew the car was stolen. [¶] There was discussion about the flight from the police, but it's my recollection that that would be excluded. [¶] We would object to that coming in at

all." The prosecutor countered that the underlying conduct was relevant for impeachment given that defendant only suffered a misdemeanor conviction. The trial court denied the motion and confirmed its ruling: "[I]n performing my balancing under [Evidence Code section] 352, I did decide it was appropriate to admit evidence of the conduct of the defendant, related to both the . . . allegations of furnishing drugs . . . and also conduct of the defendant being involved in conduct related to a stolen automobile." "So I'm not going to find that the People have inappropriately asked questions related to those subjects."

We reject defendant's claim of prosecutorial misconduct. Defendant has not shown that the prosecutor intentionally misled the court as to the scope of its prior tentative ruling. The court confirmed the ruling after reviewing its own notes. Ultimately, the court revisited the issue and ruled that the conduct admissible for impeachment. The prosecutor's question was therefore within the scope of the court's ultimate ruling. It is clear that, in the end, the court considered the question anew as it had indicated it would do.

We likewise reject defendant's claim that the evidence was erroneously admitted. The trial court's determination that the evidence was proper impeachment is reviewed for abuse of discretion. (*Ledesma, supra*, 39 Cal.4th at p. 705; see *People v. Wheeler, supra*, 4 Cal.4th at pp. 295−297 [as to the proper scope and the evidentiary basis for such evidence]; Simons, Cal. Evid. Manual (2022) § 3:58, pp. 310–312.) Even if, as the court initially concluded, there was no evidence of intent to steal, defendant's act of intentionally evading police with willful and wonton disregard for the safety of others was a crime of moral turpitude. (*People v. Dewey* (1996) 42 Cal.App.4th 216, 220–222 [violation of Veh. Code, § 2800.1]; accord, *People v. Gutierrez*

(2018) 28 Cal.App.5th 85, 91 [violation of Veh. Code, § 2800.2].) The police report showed that defendant was driving a stolen car and attempted to evade police at speeds of 80–100 miles per hour. He crashed the vehicle, knocked down a utility pole, and injured one of the passengers. That conduct posed a risk of danger to others and suggested a willingness to evade lawful process. (*Dewey*, at p. 222; cf. *People v. Lang* (1989) 49 Cal.3d 991, 1009–1010.) The court did not err in concluding that the conduct underlying defendant's misdemeanor conviction evinced moral turpitude.

Nor did the court abuse its discretion in admitting the incident after an Evidence Code section 352 objection. Defendant argues that the 1994 incident was unduly prejudicial because of its similarity to the charged crimes of carjacking. " 'Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 722.) As a general matter, there is quite a broad gap between misdemeanor joy riding and felonious carjacking. Here, there were significant differences between the 1994 misdemeanor incident and the charged crimes. In the 1994 incident, there was no evidence that defendant was involved in the initial theft of the car or that he used any force against the car's owner. The charged crimes involved carjackings at gunpoint, followed by assaults and murder. It was well within the court's discretion to conclude that the 1994 incident was not so similar or prejudicial as to warrant its exclusion.

## C. Penalty Phase Issues

### 1. Prosecutor's Inconsistent Theories Regarding the Shooter of Javier Ibarra

The prosecutor introduced evidence of defendant's involvement in the uncharged murder of Javier Ibarra as a circumstance in aggravation. The evidence showed that defendant, his brother Cipriano, and Gabriel Flores confronted Ibarra and that one of the three fatally shot him. The shooter's identity turned on witnesses' descriptions of the clothing the three men wore. The prosecutor argued, based on inferences from the evidence, that defendant was the shooter.

Before defendant's trial, Flores and Cipriano were each separately tried for Ibarra's murder. During those trials, the Kern County District Attorney's office took the position that Flores was the shooter. Flores and Cipriano were each convicted of murder. Flores's jury found not true an allegation that he had personally used a firearm.

Citing *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*), defendant argues that the prosecution's use of inconsistent theories about the shooter's identity violated due process under the United States Constitution. He further contends that the trial court's refusal to allow him to inform the jury of the prosecution's inconsistent theories violated his rights to present a defense and to a reliable penalty determination. On this record, we find no error. The evidence was ambiguous as to the shooter's identity. There is no evidence before us that the prosecutor deliberately manipulated the trial evidence to present a false picture of defendant's guilt. The fact that the prosecution had interpreted the evidence differently in separate

trials was not information that defendant was entitled to present in his case.

### a. *Proceedings Below*

Because defendant's claim of error turns on the good or bad faith actions of the prosecutor, we set forth the proceedings in some detail.

Before the penalty phase, the prosecutor filed a motion in limine to admit evidence of defendant's involvement in the 1995 murder of Javier Ibarra as a circumstance in aggravation.[40] The prosecutor had argued during defendant's pretrial recusal motion that he should be allowed to prove defendant's guilt of Ibarra's murder on any theory supported by the evidence, including direct perpetrator, aider and abettor, or coconspirator. Defendant argued that the uncharged crime should be excluded as lacking substantial evidence of his guilt under any theory. The trial court ruled the People could introduce evidence of defendant's involvement in the Ibarra murder as a circumstance in aggravation under theories of "aider and abettor or princip[al]." It denied defendant's request to introduce evidence that the prosecution had presented inconsistent theories in the Flores and Cipriano trials.

In conjunction with the earlier motion to disqualify, defendant proffered transcripts of closing arguments made by prosecutors in the Flores and Cipriano trials. The Flores prosecutor argued that Flores shot Ibarra: "Alma Mosqueda said the white hat was on Gabriel Flores. [Ysela] Nunez . . . says the white hat was the triggerman." "We have evidence that Flores is the triggerman based on the information that came on

---

[40]    Section 190.3, factor (b).

the stand." The prosecutor dismissed the defense theory that Juan Ramirez was the shooter because he was arrested two days after the murder wearing a white hat: "Two days later. So what? [¶] . . . I am sure some of you have white hats, a lot of people have white hats. So what does that mean? He was wearing it the night of the murder? No. . . . Got no bearing on the night of the murder." Alternatively, if Flores was not the shooter, the prosecutor argued that he was guilty as aider and abettor based on his participation in the assault on Ibarra that preceded the shooting.

The prosecutor in Cipriano's trial conceded Cipriano was not the shooter, arguing he was liable for murder as either a coconspirator or aider and abettor. According to that analysis, Cipriano and defendant attacked Ibarra together, then stepped aside, giving Flores an opportunity to shoot him. Cipriano testified on his own behalf and admitted being present, but claimed that he had gone there simply to escort Ibarra from the premises. A fight ensued, and he was surprised by the shooting. He claimed that defendant, not Flores, was the shooter. The prosecutor argued that this testimony was self-serving, as was his initial statement to police giving a false alibi and reporting his vehicle stolen. As for Cipriano's testimony that defendant was the shooter, the prosecutor argued this was just another fabrication "to blame it on an individual who has not been arrested or located yet in this case,[41] and I submit to you that, once again, . . . Cipriano Ramirez[] is trying to do that which he believes will get him out of trouble."

---

[41] Defendant was a fugitive in Mexico at the time of Cipriano's trial.

At the penalty phase in this case, the prosecutor called the following witnesses, in order, to testify about Ibarra's murder: Alma Mosqueda, Deputy Contreras, Sergeant Fuqua, Detective Allan Hall, Gerardo Soto, and Jesse Ibarra.

Mosqueda testified on direct examination that Ibarra was at her apartment when Cipriano called and asked if "they could come over and take care of business." Cipriano arrived shortly thereafter with defendant and Flores. Mosqueda and Ibarra were outside. Mosqueda recognized all three men. Cipriano told Mosqueda to go back into her apartment. As she did so, she saw Ibarra approach the three men with his arms outstretched as if inviting them to fight. Ibarra was unarmed. Shortly thereafter, Mosqueda heard shots and saw Ibarra lying on the ground. That evening, Mosqueda told investigating officers that Cipriano was wearing mechanics coveralls. She was subsequently asked by investigators what the other two men were wearing, but she could not remember. She did not recall if she described one of the suspects as wearing a cap.[42] Nor did she recall telling Jesse Ibarra that one of the suspects was wearing a white hat.

On cross-examination, defense counsel asked Mosqueda if she presently recalled that Flores was wearing a white hat on the night of the shooting. She replied, "In my memory . . . [h]e was wearing a white hat." She reported this fact to District Attorney Investigator Kevin Clerico about a year and a half after the shooting. She also reported to Clerico that the other two men (Cipriano and defendant) were not wearing hats. Asked if she was telling the truth at that time, she responded,

_____

[42] The evidence was that the shooter wore a white baseball cap. At times the witnesses and attorneys use the words "cap" and "hat" interchangeably.

"To my belief, yes." Counsel again asked, "Mr. Flores is the [one] that had the white cap, right?" to which Mosqueda replied, "To my memory, yes." Counsel then asked Mosqueda about her prior court testimony on four occasions between 1997 and 1998. She confirmed that, on each occasion, she identified Flores as wearing a white cap. Counsel further inquired, "And you have never testified in any of those hearings that anybody else was wearing a white cap, have you?" to which Mosqueda answered, "No."

Deputy Contreras testified on direct examination that he responded to the scene and found Ibarra dead. At that time, Mosqueda did not provide a description of the suspects' clothing. On cross-examination, defense counsel elicited the fact that Ysela Nunez was identified as a witness to the shooting.

Sergeant Daniel Fuqua testified on direct examination that, two days after the shooting, he arrested defendant and seized a white baseball cap with "Lamont" written on it. On the prosecutor's motion, the cap was admitted into evidence.

Detective Hall testified on direct examination that he interviewed Mosqueda on the night of Ibarra's murder. She identified two suspects, defendant and Cipriano. She said one man was wearing overalls, the other a cap. She did not identify Flores or say that he was wearing a cap. The detective interviewed defendant after his arrest. Defendant denied being at the apartment complex the day Ibarra was shot. He admitted that on the night of the shooting he was wearing a "mustard-colored Lamont cap." He also said that Cipriano and Flores do not wear caps.

Defendant's uncle, Gerardo Soto, testified on direct examination that he saw defendant on the night of the murder.

196

Defendant was wearing a dark Pendleton shirt and a dark baseball cap. The witness has never seen defendant wearing a white hat. On cross-examination, the witness verified that, shortly after the shooting, he told an officer that defendant was wearing a blue cap on the night of the shooting. He was telling the truth, and his memory of the event was better at that time. Soto confirmed that white caps with the word "Lamont" on them are very common and popular.

The victim's brother, Jesse Ibarra, testified on direct examination that he spoke to Mosqueda the day after the shooting. She told him defendant was involved and had been wearing a white "Lamont" cap.

Cipriano and Flores were both called by the prosecutor, and both invoked their right not to testify at defendant's trial. The prosecutor did not offer Cipriano's prior testimony identifying defendant as the shooter.

In various discussions between the court and counsel, the prosecutor observed that he had called Deputy Contreras, Detective Hall, and Jesse Ibarra to rebut Mosqueda's testimony elicited on cross-examination that Flores wore the white cap. He further observed, "nobody could predict how the evidence was going to come out" but that "the evidence is out." He argued, "I also recall the Court saying that if the evidence came in that it was just as likely it was the defendant [who shot Ibarra], then I could argue that." The court observed, "To the extent there's a conflict in the evidence, the jury is going to resolve that, if there's substantial evidence."

The following day, defense counsel moved for a mistrial on the basis of prosecutorial misconduct. He argued that the prosecutor had violated the trial court's ruling by introducing

evidence that defendant shot Ibarra, and that the prosecutor's pursuit of this theory had deprived defendant of a fair trial. The motion was denied, with the court making the following observation: "I am certain that I have never ruled that the People could not seek to prove that the defendant . . . was the shooter in the Ibarra incident. [¶] . . . That's been a theory Mr. Barton has asserted from the beginning. And Mr. Barton is not estopped or precluded from arguing that if there's evidence to support it."

Immediately thereafter, defendant called Ysela Nunez to testify. She saw the shooting from her second story window but could not identify any participants. She described the shooter as wearing black pants, a white hat, and a Pendleton shirt checkered in black, white, and grey.

Before penalty phase argument, defendant renewed his motion for mistrial. Defense counsel expressed in open court that he had transported Nunez from Texas to testify as a defense witness.[43] He had made a tactical decision to elicit testimony from Nunez that the shooter wore a white hat so that he could argue Flores was the shooter and defendant was only a minor participant. Counsel renewed his argument that the prosecutor had violated the trial court's ruling by introducing evidence that defendant shot Ibarra. Again the motion was denied, with an explicit ruling by the court that it had not precluded the prosecutor from presenting evidence that defendant shot Ibarra. The court observed, "the People are entitled to pursue the truth, just as the defense is entitled to pursue the truth, and I'm

---

[43]    Defense counsel sought and obtained fees for this purpose.

specifically going to find that the People did not violate my ruling."

During the penalty phase closing argument, the prosecutor argued that "the evidence points strongly to the fact that the defendant was the shooter" of Ibarra. He further contended that defendant "purposefully cho[se] to kill Chad just like he chose to kill Javier Ibarra, and not on accident."

### b. *No Due Process Violation Appears on This Record*

The prosecutor has broad discretion to prosecute a defendant for a particular crime so long as there is probable cause to believe that the defendant is guilty and the prosecution is not motivated by vindictiveness or invidious discrimination. (*People v. Lucas* (1995) 12 Cal.4th 415, 477.) Moreover, as a general matter, the law does not require consistency in results between different criminal defendants in different prosecutions. (*Standefer v. United States* (1980) 447 U.S. 10, 12–13, 22–26; *People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 8–22.)

In *Sakarias, supra,* 35 Cal.4th 140, a habeas proceeding, this court found a due process violation where the prosecutor adopted inconsistent and irreconcilable factual theories in separate trials and manipulated the available evidence to the detriment of each defendant. In that case, Sakarias and Waidla broke into the victim's house and attacked her with a knife and a hatchet. The victim was bludgeoned in the head five times. She was also stabbed in the chest four times and sustained three chopping wounds to the head. One of the chopping wounds occurred before death and penetrated the victim's skull. The other two were inflicted around the time of death or thereafter. (*Id.* at p. 146.) At some point during the assault, the victim was

dragged down the hall to a bedroom where she was later found dead. (*Ibid*.) Sakarias admitted the stabbings and that later, at Waidla's direction, he struck the victim's head twice with the hatchet after she was moved to the bedroom. Waidla admitted inflicting a single bludgeoning blow with the hatchet at the outset of the attack. (*Ibid*.) Thus, the evidence suggested that Waidla struck the first and fatal chopping blow, while Sakarias inflicted the other two chopping blows peri- or postmortem. (*Id*. at p. 147.)

In each of the separate trials, "the prosecutor attributed the three hatchet-edge blows to each defendant in turn in order to establish an aggravating circumstance of the crime [citation] on the basis of which the jury was urged to sentence each defendant to death." (*Sakarias*, *supra*, 35 Cal.4th at p. 160.) The prosecutor "manipulat[ed] the evidence" in each trial to support this result. (*Id*. at p. 162.) In Waidla's trial, the prosecutor introduced Waidla's admission that he had wielded the hatchet during the initial attack. The prosecutor did not introduce Sakarias's statement, as an admission against interest, that he had inflicted the two chopping wounds in the bedroom. The prosecutor also presented evidence from the medical examiner opining that an abrasion on the victim's lower back, caused by her being dragged to the bedroom, was sustained postmortem. This could indicate that the *initial* blow, preceding the dragging, was fatal. In Sakarias's trial, the prosecution introduced Sakarias's statement and omitted the medical examiner's opinion about the lower back abrasion. As a result, "no evidence was before Sakarias's jury that [the victim] was dead by the time Sakarias, as he admitted, struck her with the hatchet in the bedroom." (*Id*. at p. 148.) The

prosecutor then argued that Sakarias delivered all three hatchet blows, including the fatal one, in the bedroom. (*Ibid.*)

The referee presiding over the evidentiary hearing made several factual findings which were supported by substantial evidence. (*Sakarias, supra,* 35 Cal.4th at pp. 150–154.) Specifically, the referee found that the prosecutor's use of divergent factual theories " 'was an intentional strategic decision designed to fit the evidence [the prosecutor] presented at the successive trials, to meet the proffered defense theories, and to maximize the portrayal of each defendant's culpability.' " (*Id.* at p. 150.) The referee also concluded that the prosecutor in Sakarias's trial " 'deliberately refrained from asking [the medical examiner] about the postmortem abrasion on [the victim's] back. He did so to tailor his evidentiary presentation to his changed theory of the hatchet wounds. The most likely explanation of that abrasion would have been inconsistent with the factual theory of the killing he presented in Sakarias'[s] trial.' " (*Id.* at p. 151.)

We concluded that the prosecutor's deliberate and "bad faith" manipulation of the evidence to obtain a death judgement against each defendant violated due process. (*Sakarias, supra,* 35 Cal.4th at pp. 160, 162.) "[F]undamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act *only one* defendant could have committed. By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth. At least where, as in Sakarias's case, the change in theories between the two trials is achieved partly through deliberate manipulation of the evidence put before the jury, the use of such inconsistent and

irreconcilable theories impermissibly undermines the reliability of the convictions or sentences thereby obtained." (*Id.* at pp. 155–156, italics added.)

This case differs from *Sakarias* in several crucial respects. First, none of the defendants charged with Ibarra's murder was "necessarily convicted or sentenced . . . on a false factual basis." (*Sakarias, supra,* 35 Cal.4th at p. 164.) In Flores's trial, the jury rejected the prosecutor's theory that Flores was the shooter when it did not find true an allegation that Flores personally used a firearm. In Cipriano's trial, the prosecutor conceded Cipriano was *not* the shooter and argued that he was liable for murder as a coconspirator and an aider and abettor. The prosecutor briefly argued that Flores shot Ibarra based on Mosqueda's testimony and questioned the veracity of Cipriano's claim that his brother was the shooter. However, it was unnecessary for the prosecutor to take a firm position on the shooter's identity or for the jury to make a finding in that respect. The jury was simply asked to find Cipriano guilty for aiding and abetting the shooter, whomever that may have been. It follows that the state has not "necessarily convicted or sentenced a person on a false factual basis" (*id.* at p. 164), when the supposed factual inconsistency was either rejected by the earlier jury (as in Flores's trial) or was immaterial to its verdict (as in Cipriano's trial).

Second, in *Sakarias* the evidence pointed clearly to Waidla as having inflicted the fatal chopping blow. The referee specifically found that the prosecutor had strong reason to believe the victim was dead when she was dragged from the living room to the bedroom. (*Sakarias, supra,* 35 Cal.4th at p. 150.) We therefore found it unnecessary to consider "what result obtains when the likely truth of the prosecutor's

inconsistent theories *cannot* be determined" because the evidence is "ambiguous or inconclusive." (*Id.* at p. 164; see also *id.* at pp. 164–165, fn. 8.) Here, by contrast, the record before us does not point clearly to the truth of one theory and the falsity of the other. (*Id.* at p. 156.) Mosqueda did testify that Flores was wearing a white cap. But the jury in Flores's case refused to find he personally used a weapon based on that same testimony. And the victim's brother, Jesse Ibarra, testified that, on the day after the shooting, Mosqueda said defendant was involved and had been wearing a white cap. Two days after the shooting, Sergeant Daniel Fuqua arrested defendant and seized a white baseball cap. Defendant *admitted* to Detective Hall that on the night of the shooting he was wearing a "mustard-colored Lamont cap." He also said that Cipriano and Flores do not wear caps. Cipriano likewise testified at his separate trial that defendant was the shooter. Although Cipriano ultimately refused to testify at defendant's trial and his prior testimony was not admitted, the existence of this evidence suggests that the prosecutor did not act in bad faith by pursuing a theory that defendant shot Ibarra.

While not binding precedent, federal circuit courts have held that uncertainty in the evidence justifies the prosecutor's use of alternate theories in separate cases. (See, e.g., *U.S. v. Paul* (8th Cir. 2000) 217 F.3d 989, 998–999 ["When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent"]; *Parker v. Singletary* (11th Cir. 1992) 974 F.2d 1562, 1578.) The ambiguity in the evidence and the posture of the separate trials suggest that the prosecutor did not act in bad

faith here. As Justice Werdegar, the author of *Sakarias*, observed in a later case: "Although arguing inconsistent theories of culpability can be prosecutorial misconduct if pursued in bad faith [citation], such as when the change in theories is based on a 'deliberate manipulation of the evidence' [citation], no such bad faith is suggested here. Because the evidence suggests there was only one shooter, when Glover's jury in his trial failed to sustain the alleged firearm use enhancement the People could fairly conclude — and argue to defendant's jury — that defendant was the shooter." (*People v. Thomas* (2012) 54 Cal.4th 908, 951 (conc. opn. of Werdegar, J.), quoting *Sakarias*, *supra*, 35 Cal.4th at p. 156.)

Third, central to *Sakarias*'s holding was the fact that the prosecutor modified the evidence he presented in the separate trials to support his inconsistent theories of guilt. We found this "manipulation of the evidence for the purpose of pursuing inconsistent theories establishe[d] the prosecutor's *bad* faith." (*Sakarias*, *supra*, 35 Cal.4th at p. 162.) The record before us does not support a similar finding here. On the contrary, it was defense counsel, not the prosecutor, who elicited the critical evidence of who wore the white cap in an attempt to portray Flores as the shooter.

During direct examination of Mosqueda, the prosecutor asked whether, in the days after the shooting, she had identified anyone as wearing a white cap. Mosqueda could not recall making such a statement to police or to Jesse Ibarra. On cross-examination, defense counsel asked Mosqueda directly if Flores was wearing a white cap when he came to her house on the night of the shooting. Mosqueda testified that he was, and that she had told a district attorney investigator that fact about a year

and a half after the shooting. She also affirmed that she had testified consistently to that fact four times in court.

The prosecutor then sought to impeach Mosqueda's testimony elicited by the defense. He called Detective Hall and Jesse Ibarra to testify that, shortly after the shooting, Mosqueda had told them that defendant, not Flores, was wearing the white cap. It was also after Mosqueda's testimony on cross-examination that the prosecutor called Sergeant Fuqua and Detective Hall to testify that defendant was arrested two days after the shooting with a white baseball cap, and that defendant stated at the time that Cipriano and Flores do not wear caps.

Significantly, the prosecutor did not seek to introduce any evidence directly establishing that defendant was the shooter. It was defendant, not the prosecutor, who called Ysela Nunez to testify.[44] She was the only person who could identify the shooter as having worn a white cap. Defendant called Nunez as a defense witness after the close of the prosecution's penalty case, even in the face of the trial court's clarification that it would not preclude the prosecutor from arguing that defendant was the shooter if there was evidence to support it. Defense counsel stated in open court that he made a tactical decision to elicit this evidence so that he could argue Flores shot Ibarra and defendant was only a minor participant. In addition, the prosecutor did not move to admit Cipriano's prior testimony that

[44] In his opening statement, the prosecutor anticipated that Nunez would be called as a witness and summarized her expected testimony. Because the prosecutor did not call her as a witness, it appears he was summarizing anticipated defense testimony. Defense counsel summarized this expected testimony in his opening statement as well.

defendant was the shooter after Cipriano invoked his Fifth Amendment privilege at defendant's trial.

Defendant appears to concede these points in his briefing before us. He observes: "After much procedural jousting, it seemed that the prosecutor had withdrawn this aim [to prove that defendant was the shooter], as well as its desire to present Cipriano's testimony, and settled for the presentation of evidence showing at the most that [defendant] was guilty of being an aider and abettor to that crime or a conspirator with the target crime of murder." Defendant observes that the prosecutor "revert[ed] to his original goal" in questioning witnesses who testified *after* Mosqueda identified Flores as wearing the white cap.

In short, the record before us suggests the prosecutor introduced known impeachment evidence to counter a theory of third-party culpability first introduced by the defense that was contrary to the jury's finding in the Flores case. Once defendant elected to offer evidence as to the shooter's identity, the prosecutor was not obligated to sit idly by and eschew fair inferences from the evidence that defendant fired the shots.[45]

---

[45] Defendant perfunctorily asserts that the trial court "dece[ived]" defense counsel by initially limiting the prosecutor's theories of liability to aiding and abetting or principal in a battery. He urges the court inexplicably changed its ruling, demonstrating judicial bias. In fact, the trial court rejected defense counsel's view of the record and explained that it had not limited the prosecutor to an aiding and abetting theory of liability. Beyond its unsupported assertion, the defense points to nothing in the record indicating to the contrary. In any event, " ' " '[a] trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias,

This sequence of events, without more, does not suggest bad faith or "deliberate manipulation" of the evidence by the prosecutor. (*Sakarias, supra*, 35 Cal.4th at p. 156.)

Defendant cites *Bradshaw v. Stumpf* (2005) 545 U.S. 175 in support of his due process claim. As he acknowledges, the court there held that the prosecutor's inconsistent positions about the identity of a shooter in separate proceedings did not invalidate Stumpf's guilty plea because "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder." (*Id.* at p. 187.) Defendant observes, however, that the court remanded the case to the Sixth Circuit to evaluate whether the prosecutor's inconsistent arguments required reversal of the death sentence. In doing so, the court observed, "The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." (*Ibid.*) But it ultimately "express[ed] no opinion on whether the prosecutor's actions [in arguing inconsistent theories about who shot the victim] amounted to a due process violation." (*Ibid.*) Accordingly, he reaches too far in urging the case supports his due process argument here.

In rejecting defendant's due process claim, we have drawn certain inferences from the appellate record and, in particular, the timing of the presentation of evidence. We note, however, that the court and the parties did not have the benefit of our

_____

especially when they are subject to review.' " ' " (*Nieves, supra*, 11 Cal.5th at p. 485; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 731–732.)

decision in *Sakarias*, *supra*, 35 Cal.4th 140 when they litigated this issue below. *Sakarias* clarified that the prosecutor's good or bad faith, his manipulation of evidence, his discovery of significant new evidence, and the truth or falsity of the prosecutor's theory, all play a role in assessing whether a due process violation occurred. Nothing we say here precludes defendant from developing extra-record evidence bearing on these factors in support of a petition for writ of habeas corpus. (*People v. Sakarias* (2000) 22 Cal.4th 596, 635–636; see *People v. Jones* (2003) 30 Cal.4th 1084, 1130.)

Defendant further argues that the trial court deprived him of the right to present a defense and due process when it refused to allow him to present evidence of the prosecution's inconsistent theories. He fails to persuade. " 'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Juries are instructed that statements by the attorneys are not evidence. (CALCRIM Nos. 104, 222.) Here, the prosecutors in the Cipriano and Flores trials made assertions about what the evidence showed, argued credibility of certain witnesses, and invited each jury to draw its own inferences from the evidence. The trial court correctly ruled that the arguments made by advocates were not relevant *evidence* for this jury to consider. The court never prevented the defense from introducing competent evidence that Flores shot Ibarra or from arguing that theory to the jury. Indeed, the defense did both.

Finally, defendant claims that the prosecutor committed misconduct by arguing inferences unsupported by the evidence. But the evidence did support an inference that defendant wore the white cap and shot Javier Ibarra. Jesse Ibarra testified that

Mosqueda told him as much the day after the shooting. The day after that, an officer found defendant in possession of a white cap. During a subsequent interview with police, defendant admitted to wearing a "mustard-colored Lamont cap" on the night of the shooting. The trial court specifically found that the prosecutor did not run afoul of the court's ruling by urging that defendant was the shooter. No misconduct appears.

### 2. *Sufficiency of Evidence of Defendant's Participation in Crimes Against Javier Ibarra*

Defendant contends that evidence of the crimes against Ibarra should have been excluded because it was insufficient to support a finding that defendant personally shot Ibarra or engaged in a conspiracy to kill him. The claim lacks merit.

" ' "[A] trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1027.)

Discretion was not abused here. There was evidence that defendant was wearing a white cap when he shot Ibarra. Alternatively, there was evidence that Cipriano, defendant, and Flores together arrived to "take care of business" with Ibarra, that defendant and Cipriano assaulted Ibarra in a coordinated attack, and that the two brothers jumped back suddenly, allowing Flores to shoot him. Either scenario supported a finding of liability for murder as a direct perpetrator or an aider and abettor. And even if the jury did not believe defendant shot Ibarra or intended to aid and abet his murder, there was sufficient evidence that he and Cipriano committed a battery.

Evidence of such an attack would qualify as an unadjudicated crime under section 190.3, factor (b).

Defendant's argument that the evidence was inadmissible because it did not support a finding that defendant was the actual shooter or conspirator sets the bar too high. Section 190.3 provides that evidence of the use, attempt, or threat of force or violence "may be presented" and "shall be admitted." (§ 190.3.) "[W]e have consistently upheld admission of conduct amounting to a misdemeanor battery as a circumstance in aggravation . . . ." (*People v. Delgado* (2017) 2 Cal.5th 544, 583 (*Delgado*), and cases cited.) The jury was instructed to consider whether defendant committed "Murder or Battery." No theory of conspiracy was presented to the jury. It was for the jury to decide what crimes, if any, defendant committed. (*Id.* at p. 588.)

### 3. Admission of Cipriano Ramirez's Out-of-court Statements

During the penalty phase, the prosecutor elicited evidence of Cipriano's incriminating out-of-court statement made immediately before Ibarra's murder. Mosqueda testified that Cipriano had called her and asked if "we" could come over and "take care of business." Jesse Ibarra testified that Mosqueda gave a similar account to him immediately after the murder, stating that Cipriano had told her "we are coming over to take care of business." Defense counsel's objections that the questions called for hearsay and violated *Aranda/Bruton*[46] were overruled. His later motions to strike the statements and for a mistrial were denied.

---

[46] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

Defendant contends that the rulings violated his right to confrontation and compulsory process under the federal and state Constitutions and his federal constitutional right to due process.  He does not independently challenge the admission of evidence under state hearsay rules.  We find no error.

The Sixth Amendment bars the admission of testimonial hearsay from a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a previous opportunity for cross-examination.  (*Crawford*, *supra*, 541 U.S. at pp. 51, 53–54.)  The high court has made clear that the Sixth Amendment is concerned only with those hearsay statements that qualify as "testimonial."  (*Whorton v. Bockting* (2007) 549 U.S. 406, 419–420; *Davis v. Washington* (2006) 547 U.S. 813, 824 (*Davis*).)  "[T]he Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability." (*Whorton*, at p. 420.)

The high court has yet to state definitively just *what* facts conclusively demonstrate that particular hearsay qualifies as testimonial.  (*Sanchez*, *supra*, 63 Cal.4th at p. 687.)  However, it has never held a hearsay statement to be testimonial unless it was sufficiently formal and made by or to a government agent during the course of a criminal investigation, for the primary purpose of preserving evidence for trial.  (*Id.* at pp. 687–689; Simons, Cal. Evid. Manual, *supra*, §§ 2:115–2:123, pp. 230–250.)

Cipriano's "casual remark" to Mosqueda, "an acquaintance," (*Crawford*, *supra*, 541 U.S. at 51) during a phone call to her apartment, satisfies none, let alone all, of these criteria.  As a result they were "unquestionably nontestimonial." (*People v. Cortez* (2016) 63 Cal.4th 101, 129 (*Cortez*) [uncle's

statement to his nephew in his nephew's apartment]; accord, *Davis*, *supra*, 547 U.S. at p. 825 [statements made from one prisoner to another are nontestimonial].)

Citing *Bruton*, *supra*, 391 U.S. 123, and *Aranda*, *supra*, 63 Cal.2d 518,[47] defendant argues that a different result must obtain for extrajudicial statements of a codefendant that implicate the defendant in the commission of a crime. This is because such statements are "devastating to the defendant" and "their credibility is inevitably suspect." (*Bruton*, at p. 136.) "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested on cross-examination." (*Ibid.*)

Defendant's reliance on *Bruton* is misplaced. "The *Aranda/Bruton* rule addresses the situation in which 'an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged.*'" (*People v. Brown* (2003) 31 Cal.4th 518, 537 (*Brown*), quoting *People v. Fletcher*, *supra*, 13 Cal.4th at p. 455.) "'The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is "powerfully incriminating" as to a second defendant when determining the latter's guilt[, even when instructed to do so], admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant.'" (*Brown*, at p. 537, quoting *Fletcher*, at p. 455.) Further, *Bruton* "involved a nontestifying codefendant's hearsay statement that did *not* qualify for

---

[47] To the extent *Aranda* stated a broader rule of exclusion than required under the federal Constitution, its holding was abrogated by the "truth-in-evidence" provision of Proposition 8. (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

admission against the defendant under any hearsay exception and that was 'clearly inadmissible against [the defendant] under traditional rules of evidence.' " (*Cortez, supra*, 63 Cal.4th at p. 129, quoting *Bruton, supra*, 391 U.S. at p. 128, fn. 3.)

Flores and Cipriano were separately tried for Ibarra's murder. Defendant was not formally charged with Ibarra's murder, and he stood trial alone for the charged offenses here. The *Aranda/Bruton* rule has no application to a defendant who is separately tried and convicted. (*Brown, supra*, 31 Cal.4th at p. 537.) The question is simply the admissibility of the out-of-court statement. (*Cortez, supra*, 63 Cal.4th at p. 129.) As explained, the Sixth Amendment did not bar the use of Cipriano's nontestimonial statement to Mosqueda, and defendant fails to argue that the statement was inadmissible under statutory hearsay rules. Moreover, Cipriano's statement was not facially incriminating of defendant. (*Richardson v. Marsh* (1987) 481 U.S. 200, 208.) It did not name defendant or refer to him directly, and Cipriano's reference to "tak[ing] care of business" was not obviously incriminating, either directly or by inference. (*Montes, supra*, 58 Cal.4th at p. 867.) *Bruton* has no application in this context.

Defendant contends that *Bruton* states a rule of exclusion grounded in principles of due process that is broader than the reach of the Sixth Amendment's confrontation clause. He cites no authority, other than *Bruton* itself, to support this claim. But the holding in *Bruton* sounds in the Sixth Amendment. (*Bruton, supra*, 391 U.S. at pp. 126, 128, 136–137.) Accordingly, numerous courts have considered and rejected the argument. (*People v. Almeda* (2018) 19 Cal.App.5th 346, 361–363; *People v. Washington* (2017) 15 Cal.App.5th 19, 26–31; *People v. Arceo* (2011) 195 Cal.App.4th 556, 570–575; see also *U.S. v. Figueroa-*

*Cartagena* (1st Cir. 2010) 612 F.3d 69, 85; *U.S. v. Berrios* (3d Cir. 2012) 676 F.3d 118, 128; *U.S. v. Dargan* (4th Cir. 2013) 738 F.3d 643, 651; *U.S. v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378–379; *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 325–326; *U.S. v. Dale* (8th Cir. 2010) 614 F.3d 942, 958–959; *U.S. v. Clark* (10th Cir. 2013) 717 F.3d 790, 813–817.)

Ultimately, we need not weigh in on the matter. *Bruton*, whatever its constitutional basis, is inapplicable here. There was no joint trial and Cipriano's statements were not facially incriminating of defendant.

### 4. *Admission of Unadjudicated Criminal Activity Involving a Firearm*

Defendant challenges the admission of penalty phase evidence concerning an unadjudicated incident where he was found in possession of methamphetamine and a loaded firearm.[48] We find no error.

Bakersfield Police Officer Michael Coronado testified that he arrested defendant on August 22, 1997, in a Bakersfield apartment. Coronado was admitted by one of the tenants. She and the other woman inside told the officer that they were the only people there. However, when the officer went upstairs to a bedroom, he found defendant kneeling down, with his hands under the bed. About six inches from defendant was an open purse, and inside the purse was a pistol with a round in the chamber. There was methamphetamine on a nearby dresser.

---

[48] Defendant was separately charged with violations of Health and Safety Code sections 11370.1, subdivision (a) and 11550, subdivision (e) based on this incident. The charges were bifurcated and tried separately after the penalty phase verdict was returned.

Coronado arrested defendant. In a later statement, defendant admitted that the methamphetamine and the gun were his. He said he had the gun for protection because he was traveling frequently between Arizona and California. When he heard police at the door to the apartment, he hid the gun so it would not be found on his person. Defendant was cooperative during his arrest. Defendant's urine sample reflected use of methamphetamine.

Section 190.3, factor (b) authorizes the admission of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." We review the trial court's decision to admit factor (b) evidence for abuse of discretion. (*Delgado*, *supra*, 2 Cal.5th at p. 582.) Based on the prosecutor's offer of proof, the court reasoned that the loaded firearm was in close proximity to both defendant and the drugs, and that defendant was aware of its presence, thus supporting an inference that the firearm was "available for the defendant to put to immediate use, to aid in the drug possession."

No abuse of discretion appears. "[I]llegal possession of potentially dangerous weapons may 'show[] an implied intention to put the weapons to unlawful use,' rendering the evidence admissible pursuant to section 190.3, factor (b)." (*People v. Dykes* (2009) 46 Cal.4th 731, 777 (*Dykes*) [possession of a loaded handgun while under arrest], quoting *People v. Michaels* (2002) 28 Cal.4th 486, 535–536 [possession of double-edged dagger, various knives, and a concealed handgun]; accord, *People v. Quartermain* (1997) 16 Cal.4th 600, 631 [possession of several sawed-off rifles and silencers]; *People v. Garceau* (1993) 6 Cal.4th 140, 203 [possession of weapons including a machine gun, a silencer, and handguns].)

Defendant argues these cases are distinguishable because they involved illegal weapons possession, while here defendant's gun possession was legal and posed no threat to the officer. To the contrary, it is unlawful to be armed with a loaded, operable firearm while in possession of methamphetamine. (Health & Saf. Code, § 11370.1, subd. (a).) Defendant was convicted of that offense in a bifurcated trial involving this same incident. Moreover, the trial court did not abuse its discretion in concluding that defendant's possession of a loaded gun, which was available for immediate use, posed a threat to the officer. The two women in the apartment tried to conceal defendant's whereabouts. When the officer entered the bedroom, he found drugs in view and defendant crouching behind a bed, with his hands out of sight. The officer drew his gun and ordered defendant to raise his hands. Although defendant complied without incident, he was certainly in a position to wield his gun against the officer had the officer not acted quickly. To the extent there was an innocent explanation for defendant's possession of the firearm, the jury was free to consider it, "but such inferences do not render the evidence inadmissible per se." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589.)

*Dykes*, *supra*, 46 Cal.4th 731 is similar. There the defendant was lawfully detained by a police officer. Without being prompted to do so, the defendant removed a hat and gloves and placed them on the roof of the officer's patrol car. The officer examined the gloves and found a loaded and cocked handgun. We upheld admission of this incident under section 190.3, factor (b) even though the defendant made no attempt to use or display the weapon. We reasoned that "the jury legitimately could infer an implied threat of violence from all the circumstances, including the 'criminal character of defendant's possession'

[citations], the concealment of the loaded and cocked weapon in a manner that rendered it available for instant, surprise use, and defendant's use of a similar firearm in committing the present offense." (*Id*. at p. 777.) Those factors are likewise present here: defendant's possession of the gun and drugs was unlawful; he concealed the weapon in a purse within reach; and he used a handgun to kill Chad. Admission of the evidence was proper.

### 5. *Prosecution's Rebuttal Evidence*

Defendant indicated a desire to introduce mitigation evidence. He argues the court erroneously indicated it would permit the prosecution to offer rebuttal evidence that was speculative, inconclusive, and inflammatory. He urges that the court's indication caused him to forgo that mitigating evidence, rather than risk opening the door to rebuttal. He argues that, as a result, he was denied due process and the right to a reliable penalty determination. There was no error.

Defendant's claim involves two incidents: (1) the proffered testimony of correctional officer Toody Clites about an incident involving defendant and other inmates at the Lerdo County jail, and (2) proffered evidence that defendant had been stopped in a vehicle after a drive-by shooting in rival gang territory and that shell casings matching those found at the shooting scene were recovered from the vehicle.

During an in limine hearing, Clites recounted an inmate conversation she heard through an intercom system. Inmates Sterns, Ruiz, and Castro were saying that guards searched their cells and seized shanks. They discussed the need to fashion more weapons. Sterns commented, "I'm going down, man, for a long fucking time. So I ain't hesitating on getting the fuck out

of here or taking officers out." Ruiz commented, "[T]he next time those fuckers toss my place, it's fucking on. I'm going to take those fuckers out, too." Castro commented, "No worry, Loco. It's on, and I'm with you." Defendant was not present during these conversations. Shortly thereafter, defendant was allowed to leave his cell and went upstairs to speak with Sterns. Sterns told defendant about the discussions described. The two discussed informants, shanks, and officers and made a plan to produce additional shanks. Sterns commented that the next time they were harassed or searched by the officers, "[I]t was going to be on," to which defendant responded, "[C]ount me in." Defendant then spoke to Ruiz, who commented that he was "sick and tired" of the shanks being seized. Ruiz said, "[I]t's fucking on, Loco," and defendant again replied, "[C]ount me in."

The trial court initially ruled this incident inadmissible as section 190.3, factor (b) evidence in aggravation, but deferred ruling on whether it might be admissible to rebut defendant's evidence in mitigation. Defendant proffered, as evidence of mitigation, his good behavior while incarcerated at Camp Owens as a juvenile, including that he was a peacemaker, got along with all races and ethnic groups, and followed direction. The court tentatively ruled that "if the defense present[s] evidence as to the defendant's conduct while housed at Camp Owens, if it is offered as a predictor of his future behavior, then the People would be entitled to admit evidence of the Lerdo shank incident . . . as rebuttal to that." The court gave, as an example, testimony that defendant was "well behaved, and complied with all the rules." By contrast, the court observed that general testimony from people who had contact with defendant at Camp Owen and opined that he had no animosity towards people of other races or ethnic backgrounds would not

open the door to rebuttal with the Lerdo incident. Ultimately, defendant did not introduce evidence of his behavior at Camp Owens, and the prosecutor did not introduce evidence of the Lerdo jail incident.

As to the second instance, defendant proffered evidence that he had been shot at on one occasion and "jumped" by a group on another occasion. The assailants were unknown. The prosecutor proffered rebuttal evidence that defendant had been stopped in a vehicle shortly after a drive-by shooting in rival gang territory. A search of the vehicle recovered .22-caliber casings on the rear passenger floorboard that matched the casings found at the shooting scene. The court ruled that the drive-by shooting incident was relevant to rebut defendant's proffered evidence showing that he was the innocent victim of violent activity by "showing that the defendant may engage in violent activity, himself, which would invite retaliation." Ultimately, defendant did not introduce evidence that he was the victim of violent attacks and the prosecutor did not introduce evidence of defendant's involvement in a drive-by shooting.

"The scope of rebuttal lies within the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 409.) "[A] defendant who introduces good character evidence widens the scope of the bad character evidence that may be introduced in rebuttal." (*People v. Fierro* (1991) 1 Cal.4th 173, 237.) " '[T]he scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf,' but once a defendant 'place[s] his general character in issue, the prosecutor [is] entitled to rebut with evidence or argument suggesting a more balanced picture of his personality.' " (*Carpenter*, at pp. 408−409.) "The theory for permitting such rebuttal evidence

and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy. Accordingly, the prosecutor, when making such a rebuttal effort, is not bound by the listed aggravating factors or by his statutory pretrial notice of aggravating evidence." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 791.)

The court did not err in finding the rebuttal evidence admissible to counter defendant's proposed mitigation. These incidents related directly to particular character traits defendant proposed to prove. Defendant's participation in conversations with other inmates about producing shanks and resisting cell searches by the officers tended to rebut defendant's proffered evidence of his good behavior while incarcerated at Camp Owens as a juvenile. With respect to this incident, the court made clear that defendant could introduce more general character evidence that defendant had not exhibited racial or ethnic animosity while incarcerated at Camp Owens without opening the door to the Lerdo incident. Defendant elected not to do so. Defendant's presence in a car along with the weapon used in a recent drive-by shooting tended to rebut defendant's proffered evidence that he had been an unfortunate victim of gang attacks. In the words of the trial court, this evidence tended to show that defendant had "engage[d] in violent activity, himself, which would invite retaliation."

Defendant protests that evidence in the Lerdo incident was speculative and inconclusive because he did not actually engage in attacks on custodial officers and no shanks were discovered in his possession. But the fact that officers were successful in monitoring the inmates and interrupting their plans before they could be carried out does not minimize the

potential threat. Defendant's discussion of these topics and affirmance, "count me in," was relevant rebuttal. Defendant argues that the drive-by shooting incident was similarly speculative and inconclusive because it involved "an unnamed house [and] an unnamed victim." But defendant offers no cause to believe that the prosecution witness, Kern County Deputy Sheriff Chavez, would be unable to substantiate these details based on his investigation of the crime. The reason he never did so was because defendant elected not to present his mitigating evidence, thus obviating the need for rebuttal. The prosecutor's offer of proof was sufficient to support the trial court's indicated ruling to admit the evidence in rebuttal.

### 6. Exclusion of Mitigating Evidence Regarding Events Before Defendant's Birth

Defendant claims that the trial court acted in an arbitrary, capricious, and prejudicial manner by excluding evidence in mitigation regarding events that transpired before his own birth. The assertion fails.

"At the penalty phase a defendant must be permitted to offer any relevant potentially mitigating evidence, i.e., evidence relevant to the circumstances of the offense or the defendant's character and record." (*In re Gay* (1998) 19 Cal.4th 771, 814 (*Gay*); see § 190.3; *Penry v. Lynaugh* (1989) 492 U.S. 302, 317.) "The 'background of the defendant's family is material if, and to the extent that, it relates to the background of *defendant himself*.' [Citation.] The 'background of the defendant's family is of no consequence in and of itself.' " (*People v. McDowell* (2012) 54 Cal.4th 395, 434, italics added.) The court has broad discretion to determine the relevance of evidence proffered to demonstrate defendant's character. (*People v. Souza* (2012) 54 Cal.4th 90, 137.)

Defendant's claim of error involves the testimony of four penalty phase witnesses: defendant's material grandmother, Esperanza Villa;[49] his mother, Angelita; his maternal aunt, Maria; and his maternal aunt, Olivia Soto.

Esperanza testified that defendant was born in small adobe home in Mexico. The family was poor and resources were scarce. Defendant's father "drank a lot." Angelita eventually left the marriage and moved to the United States when defendant was a sickly one year old. Defense counsel asked Esperanza if she had observed how defendant's father treated his wife when they were living together in Mexico. The prosecutor's relevance objection was sustained as to "the period prior to the birth of the defendant." At a sidebar, defense counsel explained that defendant's older brother, Lorenzo, was present during that period and observed his father abusing his mother. According to counsel, Lorenzo "became the man of the house and was very abusive towards the younger boys, particularly the Defendant . . . ." He argued that this evidence was relevant to show "why Lorenzo was the way he was." The court ruled: "The question is why is Juan the way he is. And if Lorenzo was abusive, then you can put in evidence of Lorenzo's abuse." Before the jury, Esperanza testified that she had moved to the United States before defendant was born and did not have first-hand knowledge of the relationship between defendant's parents thereafter. Esperanza did recount that Angelita wrote to her once and described an incident where her husband pushed

---

[49]     Because several witnesses have overlapping family names we refer to those witnesses by their given names to avoid confusion.

her into a piece of furniture while she was pregnant, injuring her abdomen.

Angelita testified that defendant's father was a violent alcoholic. He spent the family's money on liquor at times leaving the family without food. When defense counsel asked Angelita if defendant's father was "violent with you when he was drinking," the trial court sustained the prosecutor's objection to questions about conduct before defendant's birth. When counsel reframed the question for the period after defendant's birth, Angelita testified, "He was always violent when he drank." He was violent toward both her and the children. Angelita said that defendant was sick and malnourished as a baby. From the time defendant's brother, Lorenzo, was seven years old, he had to watch the younger children while Angelita worked in the fields for $2.25 an hour. Lorenzo told Angelita that he regularly "beat" the children when they were under his care. The other children also reported to her that Lorenzo would "hit" defendant to "tr[y] to straighten [him] out." Angelita described the conduct as corrective and confirmed that defendant never had visible injuries or had to go to the hospital. She opined that "the reason for all of this is that [defendant] never had his father with him."

Maria testified that she knew defendant's parents. When asked if she "remember[ed] anything" about defendant's father, the court sustained an objection to limit testimony to the relevant time period after defendant's birth. Maria testified that it was "common knowledge" in the family that defendant's father was a violent drinker. Angelita left Mexico with her five children to escape his abuse. When she arrived in the United States, she had nothing, "not even clothes for the children." Defendant was ill and malnourished. At 18 months he could not crawl. She opined that "Lorenzo has always had his father's

character, very violent." He would hit defendant, and defendant preferred to stay at Maria's house to avoid the violence.

Olivia testified that Lorenzo "used to hit [defendant] a lot." Olivia would interfere so that defendant would not be badly hurt. She considered defendant to have been "abused" by Lorenzo. When the prosecutor attempted to impeach Olivia with a prior statement given to his investigator, she explained that, if she previously said that Lorenzo had not abused defendant, she misunderstood the investigator's question.

The trial court's limitation to evidence occurring after defendant's birth was not an abuse of discretion. As the trial court observed, defendant's father's earlier behavior was not relevant to show its effect on defendant's development. However, the witnesses were allowed to testify that the father was violent toward defendant, his mother and siblings, and that his abuse caused financial instability, ultimately forcing the family to flee to the United States. Testimony established that defendant was ill and malnourished as a child, and that his oldest brother, Lorenzo, was left in charge of the children while his mother worked in the fields. During that time, Lorenzo beat defendant for discipline. This testimony painted a very clear picture of the father's behavior, and the consequences inflicted on the entire family. Defendant was not denied the opportunity to offer relevant potentially mitigating evidence of his character.

Defendant argues that his "inability to present evidence about what happened to Lorenzo before [defendant was born] in 1976 deprived him of the opportunity to corroborate evidence that the prosecutor contested regarding [his] abuse as a child at the hands of Lorenzo and thus make more credible the testimony of the family about what happened to him as a child."

He fails to persuade. It was undisputed that Lorenzo was violent towards defendant. Angelita, Maria, and Olivia all testified consistently on that point. The prosecutor attempted through cross-examination to question the *severity* of the violence. The trial court did not abuse its discretion in concluding that Lorenzo's own exposure to violence before defendant's birth was at most tangential and speculative on that point.

Defendant relies on *Gay, supra,* 19 Cal.4th 771 for the proposition that "a family history remarkable for extensive drug abuse in multiple generations and various branches of the family" is relevant mitigation evidence. (*Id.* at p. 805.) His reliance is misplaced. *Gay* involved evidence that defendant suffered from a major affective disorder and psychoactive substance abuse, both of which had a genetic component that also manifested in Gay's family members. (*Id.* at pp. 804–805.) No similar evidence of genetic disposition was proffered here.

### 7. *Evidence and Instruction Regarding the Impact of Execution on Defendant's Family*

Over defendant's objection, the trial court told the jury: "Sympathy for the family of the defendant is not a matter that you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character." (CALJIC No. 8.85.) The court did not otherwise limit defendant's introduction of mitigating evidence on this topic.

Citing *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*), defendant argues that the court's instruction prevented the jury from understanding defendant's uniqueness as a human being

and upset the balance between the penalty evidence available to the defendant and the state. Just as the prosecutor was allowed to present evidence of the impact of the victim's death on his family and friends, defendant argues he should have been allowed to present evidence of the pain and loss his execution would cause his family. The court's instruction, he claims, violated his constitutional rights to due process, equal protection, and a reliable penalty determination.

*People v. Williams* (2013) 56 Cal.4th 165 rejected these same arguments based on the identical instruction given here: "Established precedent is to the contrary. 'The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation. (*People v. Smith* (2005) 35 Cal.4th 334, 366–367; *People v. Smithey* (1999) 20 Cal.4th 936, 1000; *People v. Ochoa* (1998) 19 Cal.4th 353, 454–456 . . . .)' (*People v. Bennett* (2009) 45 Cal.4th 577, 601.) '[N]othing in the federal Constitution requires a different result (*Ochoa*, at p. 456) and defendant identifies no reason to reconsider our conclusion.' (*Bennett*, at p. 602.)" (*Williams*, at p. 197.)

Defendant asserts that our precedent, particularly *People v. Ochoa, supra*, 19 Cal.4th 353 (*Ochoa*), conflicts with the later decision in *Payne, supra*, 501 U.S. 808. We rejected that claim in *People v. Bennett, supra*, 45 Cal.4th at page 602 (*Bennett*): "Defendant argues the high court's decision contains an implicit recognition capital defendants have the right to introduce *execution-impact* evidence. To the contrary, the high court made clear, consistent with *Ochoa*, that a defendant must be allowed to introduce mitigating evidence 'concerning *his own circumstances*.' (*Payne, supra*, 501 U.S. at p. 822, italics added.) As we have explained, execution-impact evidence is irrelevant under section 190.3 because it does not concern a defendant's

*own circumstances* but rather asks the jury to spare defendant's life based on the effect his or her execution would have on his or her family. (*Ochoa*, . . . at p. 456.) We further concluded that nothing in the federal Constitution requires a different result (*Ochoa*, at p. 456) and defendant identifies no reason to reconsider our conclusion."

Finally, defendant argues that execution-impact evidence is admissible under section 190.3, which permits introduction of "any matter relevant to . . . mitigation . . . ." (§ 190.3.) Not so. As we observed in *Bennett*, *supra*, 45 Cal.4th at page 602: "We rejected this construction in *Ochoa*, *supra*, 19 Cal.4th at page 456, and we see no reason to revisit the issue. Defendant's argument rests on the use of the word 'mitigation' in statutes governing determinate sentencing (§ 1170) and probation (§ 1203). Neither statute is analogous to section 190.3. Unlike those statutes, section 190.3 identifies examples of matters relevant to aggravation, mitigation, and sentence including, but not limited to, the 'circumstances of the present offense, any prior felony conviction . . . , and the defendant's character, background, history, mental condition and physical condition.' We concluded that, '[*i*]*n this context*, what is ultimately relevant is a defendant's background and character — not the distress of his or her family.' (*Ochoa*, . . . at p. 456, italics added.)"

The court did not limit mitigation evidence related to defendant's background or character. And, notably, the court's instruction allowed the jury to consider the impact defendant's execution would have on his relationships with family to the extent it "illuminates some positive quality of the defendant's background or character." Defendant presented evidence that he had a loving relationship with his two young daughters who visited him regularly while he was in custody. Defendant's

mother, Angelita, testified that defendant was "very endearing with" her and always remembered her birthdays and holidays. The court's instruction did not preclude the jury from considering these positive aspects of defendant's character.

### 8. *Refusal To Give a Lingering Doubt Instruction*

Defendant argues that the trial court's rejection of his requested lingering doubt instructions[50] denied him his constitutional right to present a defense under the Sixth and Fourteenth Amendments. Defendant acknowledges we have repeatedly held otherwise. (*People v. Rivera* (2019) 7 Cal.5th 306, 346; *People v. Boyce* (2014) 59 Cal.4th 672, 708 (*Boyce*), and cases cited.)

The concept of lingering doubt is adequately covered by CALJIC No. 8.85, factor (k). (*Boyce*, *supra*, 59 Cal.4th at pp. 708–709.) As given here, that instruction informed the jury that

---

[50]    The requested instructions read:

"Each of you may consider as a mitigating factor any lingering or residual doubt that you may have as to whether the defendant intentionally killed the victim. Lingering or residual doubt is defined as doubt concerning proof that remains after you have been convinced beyond a reasonable doubt."

"The adjudication of guilt is not infallible and any lingering doubts you entertain on the question of guilt may be considered by you in determining the appropriate penalty, including the possibility that some time in the future, facts may come to light that have not yet been discovered. [¶] A lingering doubt is defined as any doubt, however slight, which is not sufficient to create in the minds of the jurors a reasonable doubt."

Other requested instructions specifically described the concept of lingering doubt as a factor in mitigation and related the concept of lingering doubt to the carjacking and kidnapping special circumstance findings.

it may consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The trial court also gave defendant's special instruction that "[y]our consideration of mitigating factors is not limited to those that have been given you" and "[y]ou may also consider any other facts relating to the circumstance of the case or to the character and background of the defendant as a reason for not imposing the sentence of death." Counsel was permitted to argue that lingering doubt is a mitigating circumstance, and he did so. "In light of the . . . instructions and counsel's argument, the concept was well covered." (*Boyce*, *supra*, 59 Cal.4th at p. 709.)

Defendant relies on *People v. Gay* (2008) 42 Cal.4th 1195, but that case is distinguishable. There, in a penalty retrial, the trial court instructed that a prior jury had found defendant guilty of murdering the victim by personal use of a firearm, and that it had been " 'conclusively proved by the jury in the first case that this defendant did, in fact, shoot and kill Officer Verna' and that the jury was to 'disregard any statements . . . and . . . any evidence to the contrary during the trial.' " (*Id.* at p. 1198.) We concluded that the trial court's explicit directive negated its later instruction on lingering doubt, as evidenced by the jury's confusion on that subject expressed during deliberations. (*Id.* at pp. 1225–1226.) There was " 'no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.' " (*Id.* at p. 1226, quoting *Francis v. Franklin* (1985) 471 U.S. 307, 322.) By contrast, no irreconcilable lingering doubt instructions were given here. Defendant points

to nothing in the record demonstrating that the jury was left with the incorrect impression that it could not consider lingering doubt as a circumstance in mitigation.

### 9. *Intracase Proportionality Review*

The imposition of a death sentence is subject to "intracase" review to determine whether the penalty is disproportionate to a defendant's personal culpability. (*People v. Mincey* (1992) 2 Cal.4th 408, 476 (*Mincey*).) " 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities.' " (*Virgil, supra,* 51 Cal.4th at p. 1287.)

Defendant does not highlight anything related to his background or circumstances to support his claim that a death sentence is disproportionate here. Instead he compares his sentence to the one imposed on Garza, who was allowed to plead guilty to murder in exchange for a life sentence. The outcome of Garza's case is not a relevant consideration. "Evidence of the disposition of a codefendant's case, as opposed to evidence of the codefendant's complicity and involvement in the offense, is not relevant to the decision at the penalty phase, which is based on the character and record of the *individual* defendant and the circumstances of the offense." (*Mincey, supra,* 2 Cal.4th at p. 476; accord, *Ledesma, supra,* 39 Cal.4th at p. 744.) This is particularly true where the disposition of the codefendant's case was based on plea negotiations. " 'The exercise of prosecutorial

discretion in obtaining evidence and making charging decisions is not pertinent to a review of a capital sentence.' " (*People v. Ochoa* (2001) 26 Cal.4th 398, 458.)

The uncontradicted evidence was that defendant, not Garza, shot and killed Chad. The murder was the culmination of a series of violent crimes defendant committed over the span of several days that included the kidnapping and robbery of Juan Carlos and Paredes. (See *Virgil*, *supra*, 51 Cal.4th at p. 1287.) The jury was within its authority to conclude that the circumstances of the crime and defendant's personal history justify a death sentence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 158 (*Crittenden*).)

### 10. Cumulative Error

Defendant urges prejudice by the cumulative effect of error in the guilt and penalty phases, particularly the impact of errors on the penalty determination. We have found five errors during the trial: Juror No. 11's inadvertent exposure to her father's opinion that defendant was guilty; the gang expert's recitation of hearsay evidence to support his opinion that various persons were gang members; the prosecutor's question posed to Daniel Quintana, which the court ruled argumentative; the prosecutor's question to defendant about whether he had lost his job because of drug use; and the prosecutor's brief display of a photograph of Chinese-manufactured ammunition. As explained above, none of these errors, considered individually, was prejudicial. The errors considered together do not support a different conclusion.

### 11. Challenges to California's Death Penalty Law

Defendant raises a number of familiar legal challenges to California's death penalty statute. He acknowledges that we

have previously rejected all of these claims, but presents them again to urge reconsideration and preserve the issues for federal review. We adhere to our settled precedents, which hold:

"Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. [Citations.] The various special circumstances are not unduly numerous or expansive." (*People v. Winbush* (2017) 2 Cal.5th 402, 488 (*Winbush*).)

Capital sentencing is "an inherently moral and normative function, and not a factual one amenable to burden of proof calculations." (*Winbush*, *supra*, 2 Cal.5th at p. 489.) For this reason, California's death penalty scheme does not violate the Fifth, Sixth, Eighth and Fourteenth Amendments for failing to require written findings (*Molano*, *supra*, 7 Cal.5th at p. 678); unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity (*People v. Capers* (2019) 7 Cal.5th 989, 1013–1014 (*Capers*)); or findings beyond a reasonable doubt that aggravating factors exist,[51] that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Fayed* (2020) 9 Cal.5th 147, 213–214 (*Fayed*); *Krebs*, *supra*, 8 Cal.5th at p. 350). These conclusions are not altered by *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, or *Hurst v.*

---

[51] California does require that section 190.3, factors (b) and (c) evidence be proved beyond a reasonable doubt. This is, however, an evidentiary rule. It is not constitutionally mandated. (*People v. Anderson* (2001) 25 Cal.4th 543, 589; *People v. Miranda* (1987) 44 Cal.3d 57, 97–98.)

*Florida* (2016) 577 U.S. 92. (*Rhoades*, *supra*, 8 Cal.5th at p. 455; *Capers*, at pp. 1013–1014.)

Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth or Fourteenth Amendments. (*Rhoades*, *supra*, 8 Cal.5th at p. 455; *Capers*, *supra*, 7 Cal.5th at p. 1013.)

The federal Constitution does not require intercase proportionality review (*People v. Hoyt* (2020) 8 Cal.5th 892, 955; *Rhoades*, *supra*, 8 Cal.5th at pp. 455–456), or " 'disparate sentence review' " (*Crittenden*, *supra*, 9 Cal.4th at p. 157).

The laws providing different procedures for capital and noncapital defendants do not violate equal protection. (*Fayed*, *supra*, 9 Cal.5th at p. 214; *Rhoades*, *supra*, 8 Cal.5th at p. 456.)

California's capital sentencing scheme does not violate the Eighth Amendment. (*People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 670; *Molano*, *supra*, 7 Cal.5th at p. 679.)

" 'The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties,' " including the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights (ICCPR), the American Declaration of the Rights and Duties of Man, and the International Convention Against All Forms of Racial Discrimination. (*People v. Jackson* (2016) 1 Cal.5th 269, 373; accord, *Suarez*, *supra*, 10 Cal.5th at pp. 189–190; *People v. Thompson* (2016) 1 Cal.5th 1043, 1130.) As we have explained, "Although the United States is a signatory [to the ICCPR], it signed the treaty on the express condition '[t]hat the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on

any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment . . . .' " (*People v. Brown* (2004) 33 Cal.4th 382, 403–404.) We have repeatedly rejected reliance on statistical studies purporting to show racial disparities in various aspects of the capital system to demonstrate that capital punishment itself violates international law and norms. (*Suarez*, at pp. 189–190, and cases cited.)

### D. *Refusal To Dismiss Counts 10 and 11 in the Interest of Justice*

Defendant was charged with possession of methamphetamine while armed with a firearm (Health & Saf. Code, § 11370.1, subd (a); count 10) and possession of a loaded, operable firearm while under the influence of methamphetamine (*id.*, § 11550, subd. (e)(1); count 11). At defendant's request, counts 10 and 11 were bifurcated. After the penalty phase concluded, another jury was convened to try these counts. It found the defendant guilty of count 10 and not guilty of count 11.

Defendant argues that the court erred in denying his motion to dismiss these counts in the interest of justice after the jury returned a death verdict. (§ 1385). The court's ruling is subject to review for abuse of discretion. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 530 (*Romero*).)

Defendant's motion was based on "judicial economy." He argued that "[t]here is simply no justification for another trial where there is no benefit to the court, public interest or prosecution. The cost of another Ramirez trial is prohibitive and would constitute undue consumption of scarce judicial resources and an unjustifiable and unacceptable expenditures of taxpayer

monies." The People countered that a trial would take at most two days, and that the People had an interest in obtaining verdicts on these counts as potential aggravating factors under section 190.3, factor (c) (prior felony convictions) in the event of a retrial of the penalty phase. The trial court found that the trial of counts 10 and 11 would not be unduly time consuming and denied the motion.

No abuse of discretion appears. As we explained in *Romero, supra*, 13 Cal.4th 497: " 'the language of [section 1385], 'in furtherance of justice,' requires consideration both of the constitutional rights of the defendant, and *the interests of society represented by the People*, in determining whether there should be a dismissal. [Citations.]" [Citations.] At the very least, the reason for dismissal must be "that which would motivate a reasonable judge." [Citations.]' [Citation.] 'Courts have recognized that society, represented by the People, has a legitimate interest in "the fair prosecution of crimes properly alleged." [Citation.] " '[A] dismissal which arbitrarily cuts [off] those rights without a showing of detriment to the defendant is an abuse of discretion.' " ' " (*Id.* at pp. 530–531.)

"From these general principles it follows that a court abuses its discretion if it dismisses a case, or strikes a sentencing allegation, *solely 'to accommodate judicial convenience or because of court congestion.'* " (*Romero, supra*, 13 Cal.4th at p. 531, italics added; accord, *People v. Clancey* (2013) 56 Cal.4th 562, 581; *People v. Hernandez* (2000) 22 Cal.4th 512, 525; *People v. Williams* (1998) 17 Cal.4th 148, 159.) Here, the only reason defendant proffered to dismiss the charges was to avoid burdening judicial resources. That consideration was inappropriate and the trial court properly rejected it.

## III.  DISPOSITION

We affirm the judgment.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. RAMIREZ

S099844


Concurring Opinion by Justice Groban


After arguing in two separate trials over a span of three years that defendant Juan Villa Ramirez did not shoot Javier Ibarra and that his co-perpetrator, Gabriel Flores, did, the prosecution changed its theory. During the penalty phase of Ramirez's death trial in this case, the prosecution contended the evidence showed that Ramirez personally shot Ibarra and pointed to this previous killing as evidence of Ramirez's dangerousness and lack of capacity for rehabilitation. I agree with the majority that the evidence before us in this direct appeal does not demonstrate the prosecution changed its theory in bad faith. I also agree that Ramirez's contentions are better addressed on habeas corpus, where he can seek the opportunity to discover and present additional evidence of the prosecution's intent. I write to emphasize that the prosecution's turnabout warrants additional scrutiny.

I.

At the penalty phase of Ramirez's trial, the prosecutor introduced evidence that Ramirez was involved in the murder of Ibarra, with which he had not been charged. As the majority notes, Ramirez's brother Cipriano and another co-perpetrator, Flores, had been charged with and convicted of the Ibarra murder in two separate trials, each of which concluded before Ramirez's trial began. (Maj. opn., *ante*, at p. 191.) At the close of Flores's trial, the prosecution argued that Flores shot Ibarra

and that the defense's theory that Ramirez was the shooter was unsupported. (*Id.* at p. 193.) At the close of Cipriano's trial, the prosecution argued that Flores shot Ibarra and characterized Cipriano's testimony that Ramirez was the shooter as fabricated and self-serving, accusing him of falsely pinning Ibarra's killing on Ramirez, who at the time had "not been arrested or located." (*Id.* at p. 194; see *id.* at p. 193.)

Approximately three years later, during the closing arguments in the penalty phase of this case, the prosecution offered a different theory of who shot Ibarra. In urging the jury to sentence Ramirez to death, the prosecutor argued: "[T]he evidence points strongly to the fact that [Ramirez] was the shooter" of Ibarra. The prosecutor urged the jury to "give extreme weight" to this fact. He argued the evidence showed the Ibarra murder was prearranged and Ramirez was not intoxicated when he committed it, as he claimed to have been at the time of the murder of Chad Yarborough, the victim in this case. He also argued that the Ibarra killing was intentional, and on this basis urged the jury to infer that Ramirez's killing of Yarborough likewise "wasn't some random chance thing. It was [Ramirez] purposefully choosing to kill Chad just like he chose to kill Javier Ibarra, and not on accident." The prosecutor further pointed to Ramirez's killing of Ibarra as evidence of Ramirez's dangerousness and lack of capacity for rehabilitation, despite his young age at the time of the Yarborough murder. The prosecution observed that Ramirez had "done so much evil in such a short time," and asked the jury: "[D]o we really want to see how much he can do given more time?" The record does not disclose why the prosecution changed its theory.

II.

Our leading case on inconsistent prosecutorial theories is *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias II*). As the majority explains, in *Sakarias II* we held, on habeas corpus, that the prosecutor violated the due process rights of a capital defendant by "intentionally and without good faith justification arguing inconsistent and irreconcilable factual theories" in his trial and that of his co-perpetrator and attributing to each defendant "culpable acts that could have been committed by only one person." (*Id.* at p. 145.) We reasoned that "the People's use of irreconcilable theories of guilt or culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for — and, where prejudicial, actually achieves — a false conviction or increased punishment on a false factual basis for one of the accuseds." (*Id.* at pp. 159–160.) We further observed that in the death penalty context, "[t]he prejudice question is . . . a complex one, involving two questions as to each petitioner and each culpability-increasing act inconsistently attributed to petitioners: for each petitioner we must ask, first, whether the People's attribution of the act to the petitioner is, according to all the available evidence, probably false or probably true, and, second, whether any probably false attribution of a culpability-increasing act to the petitioner could reasonably have affected the penalty verdict." (*Id.* at p. 164.) Because we could not "conclude *beyond a reasonable doubt* that the prosecutorial argument . . . played no role in the penalty decision," we reversed Sakarias's penalty. (*Id.* at p. 166.)

Our decision in *Sakarias II* was issued in response to Sakarias's habeas corpus petition. Previously, on direct appeal, Sakarias had claimed that the prosecution's inconsistent

arguments about which co-perpetrator struck the fatal blow violated due process protections. (*People v. Sakarias* (2000) 22 Cal.4th 596, 632–637 (*Sakarias I*).) We had observed at that time that "under any view of the proper constitutional limits, the [due process] issue is better decided on a petition for writ of habeas corpus than on direct appeal." (*Id.* at p. 635.) In the record on direct appeal, there was no evidence of "any factual explanations the trial prosecutor may have for any material inconsistencies we might find by comparing the transcripts of the two trials" or "of other extra-record evidence of the prosecutor's state of mind." (*Ibid.*) The record did not disclose whether the prosecutor "made a knowingly false argument," (*ibid.*) or whether "significant new evidence surfaced . . . or other events occurred such that the prosecutor, at the time of defendant's trial, neither knew nor had reason to know his argument was false" (*id.* at p. 636). We determined that "the questions of which of two conflicting factual theories is true, or which the prosecutor believed or should have believed was true" were better litigated "in a habeas corpus proceeding." (*Ibid.*)

As the majority notes, when the Sakarias case returned to us on habeas corpus, we appointed a referee to hear evidence and make factual findings concerning the prosecutor's knowledge, beliefs, and intent in choosing to advance inconsistent theories of who struck the fatal blow in the separate trials of Sakarias and his co-perpetrator and in choosing the evidence to present in each case. (*Sakarias II*, *supra*, 35 Cal.4th at p. 150.) The referee heard testimony from the prosecutor and from the former head of the branch of the district attorney's office in which the prosecutor had worked and admitted and reviewed evidence and transcripts from the two trials. (*Ibid.*)

Our decision to reverse Sakarias's death sentence was based on the referee's findings.  (*Id*. at pp. 149–150, 160–165.)

## III.

This case is in a similar posture to *Sakarias I*.  Like *Sakarias I*, this is a direct appeal and we do not have before us factual findings about the prosecutor's knowledge, belief, and intent in deciding to argue for the first time at the penalty phase in this case that Ramirez, not Flores, shot Ibarra.  In short, we really do not know why the prosecution changed its theory.  As the majority observes, Ramirez is free to pursue a writ of habeas corpus to try to demonstrate the prosecutor acted in bad faith to Ramirez's prejudice.  (Maj. opn., *ante*, at p. 207.)

The majority also correctly reasons that, at least in its current posture, this case is distinguishable from *Sakarias II*.  (Maj. opn., *ante*, at pp. 201–206.)  Despite the prosecution's arguments in the Flores and Cipriano cases that Flores was the shooter, neither verdict rested on a finding that Flores was the shooter.  Indeed, the jury's "not true" finding on the prosecution's allegation that Flores personally used a firearm suggests the jury did not consider it true beyond a reasonable doubt that Flores shot Ibarra.  Moreover, because the record before us does not clearly show whether Flores or Ramirez was the shooter, we cannot determine whether Ramirez was "necessarily . . . sentenced  . . . on a false factual basis." (*Sakarias II, supra*, 35 Cal.4th at p. 164.)[1]  Finally, as the

---

[1] In *Sakarias II*, we observed that the level of certainty as to whether the defendant was convicted on a false factual basis might be relevant to the prejudice inquiry on habeas corpus, but we expressly reserved for another day the question "what result

majority observes, there is no indication on the record before us that the prosecutor manipulated the evidence in Ramirez's trial for the purpose of securing a judgment of death. (See *id.* at p. 162 [citing to deliberate manipulation of evidence to pursue inconsistent theories as evidence of bad faith].) As the majority points out, the record supports an inference that the prosecutor introduced evidence that Ramirez shot Ibarra to *counter* defense evidence that the shooter was Flores. (Maj. opn., *ante,* at p. 206.)

For purposes of this direct appeal, this is sufficient to deny relief. But it does not fully answer the question why, in the space of less than three years, this same District Attorney's office went from arguing that Ramirez's co-perpetrators' contentions that Ramirez shot Ibarra were unsupported and self-serving to arguing that the evidence showed Ramirez was the shooter. As we observed in *Sakarias II*, "A criminal prosecutor's function 'is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial.'" (*Sakarias II, supra,* 35 Cal.4th at p. 159.) When the government, through its prosecutors, takes "a formal position inconsistent with the guilt or culpability of at least one convicted defendant" it "cast[s] doubt on the factual basis for the conviction." (*Id.* at p. 158.) Unless the prosecution has a good faith basis for its change in theories, we risk " 'reduc[ing] criminal trials to mere gamesmanship and rob[bing] them of

---

obtains when the likely truth of the prosecutor's inconsistent theories *cannot* be determined." (*Sakarias II, supra,* 35 Cal.4th at p. 164.)

their supposed purpose of a search for truth.' " (*Id.* at p. 159; cf. Rules Prof. Conduct, rule 3.3(a) [attorneys have duty of candor toward tribunal]; *id.* rule 3.8, com. [1] ["A prosecutor has the responsibility of a minister of justice and not simply that of an advocate"].)

The prosecution's use of inconsistent theories in the separate trials of alleged co-perpetrators raises particular concerns in the capital context. At the penalty phase of a capital trial, the jury has the "power and discretion . . . to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779; see Pen. Code, § 190.3.) The jury's decision whether to sentence a person to death or to life in prison without the possibility of parole "is inherently moral and normative, not factual." (*Rodriguez*, at p. 779.) "It is not simply a finding of facts which resolves the penalty decision, ' "but . . . the jury's moral assessment of those facts as they reflect on whether defendant should be put to death . . . ." ' " (*People v. Brown* (1985) 40 Cal.3d 512, 540.) In *Bradshaw v. Stumpf* (2005) 545 U.S. 175 the high court acknowledged that a prosecutor's use of inconsistent theories "may have a more direct effect" on a death sentence than it does on a guilty verdict. (*Id.* at p. 187.) Having reversed the grant of relief as to the defendant's guilt due to lack of prejudice, the high court remanded to the Court of Appeals to consider whether the prosecutor's use of inconsistent theories was prejudicial with respect to sentencing. (*Id.* at pp. 186–187.) As Justice Souter pointed out in his concurring opinion, the court's decision to remand on penalty reflected an acknowledgement of " '[t]he heightened need for reliability in capital cases,' " which " 'only underscores the gravity' " of the " 'serious questions . . . raised

when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.' " (*Id.* at p. 189 (conc. opn. of Souter, J.).) We similarly have acknowledged that "[a]t least where the punishment involved is death, due process is . . . offended by the People's inconsistent and irreconcilable attribution of culpability-increasing acts" to different defendants. (*Sakarias II*, *supra*, 35 Cal.4th at p. 160.)

Relying on these principles, Ramirez argues that the reduced culpability of a person who is not the actual shooter could have been material to the jury's choice of sentence in his case. I agree. A capital jury may well conclude that someone who personally killed before deserves greater punishment than someone who had aided and abetted a killing. In this case the prosecutor pointed to Ramirez's personal shooting of Ibarra to dispel any lingering doubt about whether Ramirez intentionally shot Yarborough and as evidence of his dangerousness and lack of capacity for rehabilitation, despite his drug problems and his young age. (See Pen. Code, § 190.3, subds. (a), (k), (i).) The prosecutor urged the jury to "give extreme weight" to the fact that Ramirez had killed before. He emphasized Ramirez "personally chose to kill Chad, just like he chose to kill Javier Ibarra" and pointed to Ramirez's killing of Ibarra as evidence of his propensity to "evil."

In sum, I agree with the majority that the record in this case does not show the prosecution acted in bad faith when it changed its theory and argued for the first time at the penalty phase of Ramirez's trial that Ramirez personally shot Ibarra. On this record, we simply do not know why the prosecution changed its theory. The fact that the Flores jury did not find true beyond a reasonable doubt that Flores personally used a firearm helps explain why the prosecution would want to try a

different theory at Ramirez's trial. Similarly, the fact that the defense in the penalty trial first argued to the jury that Ramirez was not the shooter helps explain why the prosecution may have wanted to rebut that theory. Though these facts help explain *why* the prosecution may have switched theories, they do not fully resolve "the questions of which of two conflicting factual theories is true, or which the prosecutor believed or should have believed was true." (*Sakarias I*, *supra*, 22 Cal.4th at p. 636.) We simply need more information to determine whether the prosecutor acted "without good faith justification" in changing its theory to argue that Ramirez shot Ibarra. (*Sakarias II*, *supra*, 35 Cal.4th at p. 145.)

There is nothing in this record that demonstrates the prosecution acted in bad faith. But when the same district attorney's office has argued in two trials that one co-perpetrator personally killed a murder victim and then argues three years later that a different co-perpetrator personally killed the victim, scrutiny is warranted. In *Sakarias II*, the referee made factual findings after a comprehensive hearing that included sworn testimony from the prosecutor and from the former head of the district branch. We have no such record here. But the question whether the prosecution had a good faith basis for arguing irreconcilable theories of who shot Ibarra deserves an answer. Our decision on direct appeal in *Sakarias I* makes clear that a habeas corpus petition is the appropriate way to seek that answer. (*Sakarias I*, at p. 635.)

**GROBAN, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Ramirez

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S099844
**Date Filed:** August 25, 2022

_____

**Court:**  Superior
**County:**  Kern
**Judge:**  Kenneth C. Twisselman II

_____

**Counsel:**

Snedeker, Smith & Short, Lisa R. Short and Michael R. Snedeker for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Sean M. McCoy and Leanne Le Mon, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael R. Snedeker
Snedeker, Smith & Short
2800 North Lombard Street, PMB 710
Portland, OR 97217-6234
(503) 234-3584

Sean M. McCoy
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7752